# Exhibit 6

*Before the*
FEDERAL TRADE COMMISSION
Washington, DC 20580

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Facebook, Inc. | ) |
| | ) |
| _____ | ) |

**Complaint, Request for Investigation, Injunction, and Other Relief**

**Submitted by**

**The Electronic Privacy Information Center**

## I. Introduction

1. This complaint concerns Facebook's secretive and non-consensual use of personal information to conduct an ongoing psychological experiment on 700,000 Facebook users, *i.e.* the company purposefully messed with people's minds. As set forth in detail below, Facebook altered the News Feeds of Facebook users to elicit positive and negative emotional responses. Facebook conducted the psychological experiment with researchers at Cornell University and the University of California, San Francisco, who failed to follow standard ethical protocols for human subject research.

2. At the time of the experiment, Facebook did not state in the Data Use Policy that user data would be used for research purposes. Facebook also failed to inform users that their personal information would be shared with researchers. Moreover, at the time of the experiment, Facebook was subject to a consent order with the Federal Trade Commission which required the company to obtain users' affirmative express consent prior to sharing user information with third parties.

3. Facebook's conduct is both a deceptive trade practice under Section 5 of the FTC Act and a violation of the Commission's 2012 Consent Order.

4. The Commission should impose sanctions, including a requirement that Facebook make public the algorithm by which it generates the News Feed for all users.

## II. Parties

5. The Electronic Privacy Information Center ("EPIC") is a public interest research center located in Washington, D.C. EPIC focuses on emerging privacy and civil

liberties issues and is a leading consumer advocate before the FTC. EPIC has a particular interest in protecting consumer privacy, and has played a leading role in developing the authority of the FTC to address emerging privacy issues and to safeguard the privacy rights of consumers.[1] The Commission's 2012 settlement with Facebook followed from a Complaint filed by EPIC and a coalition of privacy and civil liberties organization in December 2009 and a Supplemental Complaint filed by EPIC in February 2010.[2] In that matter, the Commission settled charges that Facebook "deceived consumers by telling them they could keep their information on Facebook private, and then repeatedly allowing it to be shared and made public." The Commission subsequently required Facebook "to take several steps to make sure it lives up to its promises in the future, including giving consumers clear and prominent notice and obtaining consumers' express consent before their information is shared beyond the privacy settings they have established."[3]

6. Facebook Inc. was founded in 2004 and is based in Palo Alto, California. Facebook's headquarters are located at 156 University Avenue, Suite 300, Palo Alto, CA 94301. At all times material to this complaint, Facebook's course of business, including the acts and practices alleged herein, has been and is in or affecting commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act, 15 U.S.C. § 45.

---

[1] *See, e.g.*, Letter from EPIC Exec. Dir. Marc Rotenberg to FTC Comm'r Christine Varney (Dec. 14, 1995) (urging the FTC to investigate the misuse of personal information by the direct marketing industry), http://epic.org/privacy/internet/ftc/ftc_letter.html; DoubleClick, Inc., *FTC* File No. 071-0170 (2000) (Complaint and Request for Injunction, Request for Investigation and for Other Relief), http://epic.org/privacy/internet/ftc/DCLK_complaint.pdf; Microsoft Corporation, FTC File No. 012 3240 (2002) (Complaint and Request for Injunction, Request for Investigation and for Other Relief), http://epic.org/privacy/consumer/MS_complaint.pdf; Choicepoint, Inc., FTC File No. 052-3069 (2004) (Request for
Investigation and for Other Relief) , http://epic.org/privacy/choicepoint/fcraltr12.16.04.html.
[2] In the Matter of Facebook, Inc., (2009) (EPIC Complaint, Request for Investigation, Injunction, and Other Relief), https://epic.org/privacy/inrefacebook/EPIC-FacebookComplaint.pdf [hereinafter EPIC 2009 Facebook Complaint]; In the Matter of Facebook, Inc., (2010) (EPIC Supplemental Materials in Support of Pending Complaint and Request for Injunction, Request for Investigation and for Other Relief), https://*epic.org/privacy/inrefacebook/EPIC_Facebook_Supp.pdf* [hereinafter EPIC 2009 Facebook Supplement]; In the Matter of Facebook, Inc., (2010) (EPIC Complaint, Request for Investigation, Injunction, and Other Relief) , https://epic.org/privacy/facebook/EPIC_FTC_FB_Complaint.pdf [hereinafter EPIC 2010 Facebook Complaint].
[3] *In the Matter of Facebook, Inc.*, FTC Docket No. C-4365 (2011) (Press Release), http://www.ftc.gov/news-events/press-releases/2011/11/facebook-settles-ftc-charges-it-deceived-consumers-failing-keep.

### III. <u>Factual Background</u>

**A. Facebook Represents That Its News Feed Rankings Are Based on Content-Neutral Factors**

7. As set forth above, Facebook represents to users that its "News Feed is an ongoing list of updates on [a user's] homepage that shows [him] what's new with the friends and Pages [the user] follow[s]."[4]

8. News Feed was created in 2006. According to a post on the official Facebook blog, the News Feed was created to allow users to "get the latest headlines generated by the activity of [their] friends and social groups."[5]

9. According to Facebook's "Help" section, the items shown on the News Feed are determined by an "algorithm [which] uses several factors to determine top stories, including the number of comments, who posted the story, and what kind of story it is (ex: photo, video, status update)."[6]

10. Some content, called "promoted posts" are placed higher in the News Feed, and labeled as "promoted."[7]

11. Other posts called "suggested posts," are interspersed into the News Feed and marked as "Suggested Post[s]." Posts that contain advertisements are marked as "sponsored."[8]

12. Facebook asserts that users are able to control which posts their News Feed will show by adjusting their settings.[9]

**B. Facebook Represents That It Only Shares User Data With Advertisers, App Developers, and Other Facebook Users**

13. Facebook's Data Use Policy states that Facebook uses information it receives about its users "in connection with the services and features [Facebook] provide[s]."[10]

---

[4] *What is News Feed?*, FACEBOOK (June 2014), https://www.facebook.com/help/210346402339221.
[5] Ruchi Sanghvi, *Facebook Gets a Facelift*, Facebook (Sep. 5, 2006), https://www.facebook.com/notes/facebook/facebook-gets-a-facelift/2207967130.
[6] *How does News Feed decide which stories are top stories?*, Facebook (June 2014), http://www.facebook.com/help/166738576721085.
[7] *How do promoted posts work in News Feed?*, Facebook (June 2014), http://www.facebook.com/help/352814104840288.
[8] *Id*.
[9] *How does News Feed decide which stories are top stories?*, Facebook (June 2014), https://www.facebook.com/help/166738576721085 ("If you feel you're missing stories you'd like to see, or seeing stories in your News Feed that you don't want to see, you can adjust your settings.").
[10] Facebook Data Use Policy, *Information we receive and how it is used*, https://www.facebook.com/about/privacy/your-info

14. At the time the research at issue was conducted, Facebook's September 2011 Data Use Policy was in effect.[11]

15. Facebook's September 2011 Data Use Policy stated that Facebook "may use" information it received about its users (1) as part of its efforts to keep Facebook safe and secure; (2) to provide users with location features and services; (3) to measure or understand the effectiveness of ads; and (4) to make suggestions to users, such as suggested that a user add another user as a friend.[12]

16. In a subsection called "How we use the information we receive," Facebook's Data Use Policy stated, "We use the information we receive about you in connection with the services and features we provide to you and other users like your friends, the advertisers that purchase ads on the site, and the developers that build the games, applications, and websites you use."[13]

17. The subsection "How we use the information we receive" also stated, "Your trust is important to us, which is why we don't share information we receive about you with others unless we have:

    - received your permission;
    - given you notice, such as by telling you about it in this policy; or
    - removed your name or any other personally identifying information from it. [14]

18. Facebook's September 2011 Data Use Policy did not mention the use of users' data for research, testing, or analysis.[15]

19. In May 2012, four months after the research at issue was conducted, Facebook made changes to its Data Use Policy.[16]

20. These changes included adding "internal operations, including troubleshooting, data analysis, testing, research and service improvement" to the list of things for which Facebook may use information it receives from users.[17]

---

[11] *See Enhancing Transparency in Our Data Use Policy*, Facebook (May 11, 2012) http://newsroom.fb.com/news/2012/05/enhancing-transparency-in-our-data-use-policy/ (announcing changes to Facebook's Data Use Policy); Kashmir Hill, *Facebook Added 'Research' to User Agreement 4 Months After Emotion Manipulation Study,* Forbes (June 30, 2014), http://www.forbes.com/sites/kashmirhill/2014/06/30/facebook-only-got-permission-to-do-research-on-users-after-emotion-manipulation-study/
[12] Facebook Data Use Policy (September 23, 2011), *available at* http://thecoudrain.com/files/documents/Facebook-Data-Use-Policy.pdf. *See also* Redline of Proposed Data Use Policy (May 2012), https://fbcdn-dragon-a.akamaihd.net/hphotos-ak-xpa1/t39.2178-6/851577_359286377517112_2039494561_n.pdf
[13] *Id*.
[14] *Id*.
[15] *Id.*
[16] *See Redline of Proposed Data Use Policy, https://fbcdn-dragon-a.akamaihd.net/hphotos-ak-xpa1/t39.2178-6/851577_359286377517112_2039494561_n.pdf*

**C. The Facebook Core Data Study Used Data From Users' News Feeds to Manipulate Users' Emotions**

21. The Study was designed and written by Adam D. I. Kramer, from the Core Data Science Team at Facebook, Inc.; Jamie E. Guillory, from the Center for Tobacco Control Research and Education at the University of California, San Francisco; and Jeffrey T. Hancock, from the Departments of Communication and Information Science at Cornell University in Ithaca, New York.[18]

22. For one week (January 11-18, 2012), Facebook "manipulated the extent to which people (N = 689,003) were exposed to emotional expressions in their News Feed" to test "whether exposure to emotions led people to change their own posting behaviors."[19]

23. Facebook conducted two parallel experiments: "One in which exposure to friends' positive emotional content in their News Feed was reduced, and one in which exposure to negative emotional content in their News Feed was reduced."[20]

24. Prior to the experimental period, Facebook reviewed subjects' Facebook posts to determine that the "experimental groups did not differ in emotional expression during the week before the experiment."[21]

25. During the experimental period, when subjects of the experiment loaded their News Feeds, emotional posts written by family and friends "had between a 10% and 90% chance (based on their User ID) of being omitted from their News Feed for that specific viewing."[22] "Both experiments had a control condition, in which a similar proportion of posts in their News Feed were omitted entirely at random (i.e., without respect to emotional content)."[23]

26. After manipulating the subjects' News Feeds, Facebook analyzed "the percentage of all words produced by a given person that was either positive or negative during the experimental period."[24]

---

[17] Facebook Data Use Policy, *Information we receive and how it is used*, https://www.facebook.com/about/privacy/your-info; Redline of Proposed Data Use Policy, https://fbcdn-dragon-a.akamaihd.net/hphotos-ak-xpa1/t39.2178-6/851577_359286377517112_2039494561_n.pdf
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id*
[22] *Id.*
[23] *Id.*
[24] *Id.*

27. In total, over 3 million posts were analyzed, containing over 122 million words, 4 million of which were positive (3.6%) and 1.8 million negative (1.6%).[25]

28. Facebook used Linguistic Inquiry and Word Count software to determine whether posts were positive or negative.[26] Because computers, not human researchers, viewed the content of Facebook users' posts, the researchers found the study to be "consistent with Facebook's Data Use Policy."

29. Facebook asserted that it obtained "informed consent for this research" because all users agree to Facebook's Data Use Policy "prior to creating an account on Facebook."[27]

**D. Many Facebook Users Object to the Facebook Core Data Study**

30. Mashable user "ageekylink .blogspot.fr" commented, "Facebook should not be manipulating people's data without their consent. What they did was really wrong."[28]

31. @realretroguy tweeted "May be time to start looking for an alternative to Facebook......what else can they manipulate?"[29]

32. DoNotGoGently@( tweeted "Shame on @facebook for cynically misinterpreting informed consent. Shame on PNAS for publishing the study."[30]

33. wildfyre99 posted "I've already cancelled and removed my account. I urge everyone else who is tired of Facebook's abuse to do the same."[31]

34. Zee Chen posted "It is just so wrong. They violated and went beyond what we would expect when we sign that TOS. I think everyone knows they use us for ads

---

[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] Colin Daileda, *Anger Builds Over Facebook's Emotion-Manipulation Study*, MASHABLE, June 30, 2014, http://mashable.com/2014/06/29/anger-facebook-emotion-manipulation-study/ (comment of user ageekylink .blogspot.fr).
[29] Rob Cerroni (@realretroguy), TWITTER, June 29, 2014, https://twitter.com/realretroguy/statuses/483285332130283520
[30] Chris Patil (@DoNotGoGently), TWITTER, June 29, 2014, https://twitter.com/DoNotGoGently/statuses/48328099398641664
[31] Gail Sullivan, *Cornell Ethics Board Did Not Pre-Approve Facebook Mood Manipulation Study*, WASH. POST. (July 1, 2014), http://www.washingtonpost.com/news/morning-mix/wp/2014/07/01/facebooks-emotional-manipulation-study-was-even-worse-than-you-thought/ (comment of wildfyre99).

and how to make money, but to not tell your users you are experimenting on them for a psychology experiment? That is so wrong."[32]

35. Tex1967 said "You do not expect a company, providing you with a product or service, to try to manipulate your emotions and actions . . . to do something to someone unknowingly is still inherently wrong."[33]

36. cmckeonjr said,"The natural reaction of subscribers to Facebook is, What other secret plans do you have to manipulate us without our consent? The precedent of manipulating people's emotions secretively is unsettling, and their response, that they will decide what's right and what's wrong, reassures no one."[34]

37. Nate Skate R said, "Most of the users of fb . . . have no idea they could become 'lab rats' using the information they shared privately. If they are going to do any type of psychological evaluation, it needs to be fully reviewed prior. . . . The [terms of service] should read something like ' . . . we may conduct psychological studies based on your information shared.'"[35]

38. Nancy wrote: "This was false science, false science that was unethical and manipulative in a way that no legitimate data or conclusions could be gained. That academics from prominent universities were part of this false science is shocking and shameful."[36]

39. User "sussexred" said, "Facebook . . . [has] crossed a line here; they have used their service in a way which people did not sign up for and it had a negative effect on them."[37]

40. @kissane_sxsw tweeted "Get off Facebook. Get your family off Facebook. If you work there, quit. They're f*cking awful."[38]

---

[32] Gail Sullivan, *Facebook Responds To Criticism Of Its Experiment On Users*, WASH. POST. (June 30, 2014), http://www.washingtonpost.com/news/morning-mix/wp/2014/06/30/facebook-responds-to-criticism-of-study-that-manipulated-users-news-feeds/ (comment of Zee Chen).

[33] Mary Schlangenstein, *Facebook Researchers Manipulated News Feeds in 2012 Study*, BLOOMBERG (June 30, 2014), http://www.bloomberg.com/news/2014-06-29/facebook-allowed-researchers-to-influence-users-in-2012-study.html (comment of user Tex1967).

[34] Gail Sullivan, *Facebook Responds To Criticism Of Its Experiment On Users*, WASH. POST. (June 30, 2014), http://www.washingtonpost.com/news/morning-mix/wp/2014/06/30/facebook-responds-to-criticism-of-study-that-manipulated-users-news-feeds/ (comment of cmckeonjr).

[35] *Id.* (comment of user Nate Skate R).

[36] Vindu Goel, *After Uproar, European Regulators Question Facebook on Psychological Testing*, NEW YORK TIMES, July 2, 2014, *available at* http://bits.blogs.nytimes.com/2014/07/02/facebooks-secret-manipulation-of-user-emotions-under-british-inquiry (comment of user Nancy).

[37] Charles Arthur, *Facebook emotion study breached ethical guidelines, researchers say*, THE GUARDIAN (June 30, 2014), http://www.theguardian.com/technology/2014/jun/30/facebook-emotion-study-breached-ethical-guidelines-researchers-say (comment of user sussexred).

[38] Erin Kissane (@kissane), TWITTER (June 27, 2014), https://twitter.com/kissane/statuses/482728344656809984.

41. Said Facebook user Andrew Baron: "This is the nail in the coffin for my concern that Facebook is the kind of company that Google talks about when they say don't be evil. Y'all act like it's no big deal and can't understand why this was destructive. There is no turning back from this."[39]

42. Wall Street Journal commenter William Mullaney, "As if there aren't already plenty of reasons to never use Facebook they went and gave us another one."[40]

43. Mike Lamson commented, "I was shocked and upset to think that me and my friends could have our feeds and information manipluated [sic] like this. That is so wrong. Talk about breaking trust with your users."[41]

44. NinjaofSin commented, "Every time I start thinking maybe I should spend a little more time on Facebook, something like this comes out and I run the other way."[42]

45. JSintheStates shrieked, "This is f'n outrageous! Facebook using people like rats, and having the unmitigated gaul to publish in the Proceedings of the NAS? I question their ethical basis for running their little "experiment"! Are they funded by Big Brother NSA? In addition to losing the US Constitution and the Bill of Rights, do we now get "manipulated mind-control" as well? This is really sick, and perverse! Anyone still on Facebook after hearing about this outrage deserves whatever they get!"[43]

46. @RalphPici tweeted, "It's sad in a pathetic way that @facebook doesn't get that its about trust and that they betrayed user trust #FacebookExperiment."[44]

47. Scientella wrote: "Someone needs to prosecute. Those 'surveyed' need to sue. The US constitution was established to protect the freedom of individuals. We now have a police state and greedy companies acting in cohoots manipulating people for their profit. If we dont fight this now George Orwells totalitarian society awaits us. It already exists in China…and they are soon to be our leaders."[45]

---

[39] Adam D. I. Kramer, Facebook (June 29, 2014), https://www.facebook.com/akramer/posts/10152987150867796 (comment of Andrew Baron).
[40] Reed Albergotti, *Furor Erupts Over Facebook's Experiment on Users*, Wall St. J. (June 30, 2014), http://online.wsj.com/articles/furor-erupts-over-facebook-experiment-on-users-1404085840 (comment of William Mullaney).
[41] *Id.* (comment by user "Mike Lamson").
[42] *Supra* note **Error! Bookmark not defined.** (comment of user NinjaofSin).
[43] *Supra* note **Error! Bookmark not defined.** (comment of user "JSintheStates").
[44] RalphPici (@RalphPici), TWITTER (July 3, 2014), https://twitter.com/RalphPici
[45] *Id*. (comment of user Scientella).

## IV. Legal Analysis

A. The FTC's Section 5 Authority

48. The FTC Act prohibits unfair and deceptive acts and practices, and empowers the Commission to enforce the Act's prohibitions.[46] These powers are described in FTC Policy Statements on Deception[47] and Unfairness.[48]

49. A trade practice is unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."[49]

50. The injury must be "substantial."[50] Typically, this involves monetary harm, but may also include "unwarranted health and safety risks."[51] Emotional harm and other "more subjective types of harm" generally do not make a practice unfair.[52] Secondly, the injury "must not be outweighed by an offsetting consumer or competitive benefit that the sales practice also produces."[53] Thus the FTC will not find a practice unfair "unless it is injurious in its net effects."[54] Finally, "the injury must be one which consumers could not reasonably have avoided."[55] This factor is an effort to ensure that consumer decision making still governs the market by limiting the FTC to act in situations where seller behavior "unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decisionmaking."[56] Sellers may not withhold from consumers important price or performance information, engage in coercion, or unduly influence highly susceptible classes of consumers.[57]

---

[46] *See* 15 U.S.C. § 45 (2010).
[47] Fed. Trade Comm'n, FTC Policy Statement on Deception (1983), available at http://www.ftc.gov/bcp/policystmt/ad-decept.htm [hereinafter FTC Deception Policy].
[48] Fed. Trade Comm'n, FTC Policy Statement on Unfairness (1980), available at http://www.ftc.gov/bcp/policystmt/ad-unfair.htm [hereinafter FTC Unfairness Policy].
[49] 15 U.S.C. § 45(n); *see, e.g.*, *Fed. Trade Comm'n v. Seismic Entertainment Productions, Inc.*, Civ. No. 1:04-CV- 00377 (Nov. 21, 2006) (finding that unauthorized changes to users' computers that affected the functionality of the computers as a result of Seismic's anti-spyware software constituted a "substantial injury without countervailing benefits.").
[50] FTC Unfairness Policy, *supra*.
[51] *Id.*; *see, e.g.*, *Fed. Trade Comm'n v. Information Search, Inc.*, Civ. No. 1:06-cv-01099 (Mar. 9, 2007) ("The invasion of privacy and security resulting from obtaining and selling confidential customer phone records without the consumers' authorization causes substantial harm to consumers and the public, including, but not limited to, endangering the health and safety of consumers.").
[52] FTC Unfairness Policy, *supra*.
[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*

51. An act or practice is deceptive if it involves a representation, omission, or practice that is likely to mislead the consumer acting reasonably under the circumstances, to the consumer's detriment."[58]

52. There are three elements to a deception claim. First, there must be a representation, omission, or practice that is likely to mislead the consumer.[59] The relevant inquiry for this factor is not whether the act or practice actually misled the consumer, but rather whether it is likely to mislead.[60]

53. Second, the act or practice must be considered from the perspective of a reasonable consumer.[61] "The test is whether the consumer's interpretation or reaction is reasonable."[62] The FTC will look at the totality of the act or practice and ask questions such as "how clear is the representation? How conspicuous is any qualifying information? How important is the omitted information? Do other sources for the omitted information exist? How familiar is the public with the product or service?"[63]

54. Finally, the representation, omission, or practice must be material.[64] Essentially, the information must be important to consumers. The relevant question is whether consumers would have chosen another product if the deception had not occurred.[65] Express claims will be presumed material.[66] Materiality is presumed for claims and omissions involving "health, safety, or other areas with which the reasonable consumer would be concerned."[67]

55. The FTC presumes that an omission is material where "the seller knew, or should have known, that an ordinary consumer would need omitted information to evaluate the product or service, or that the claim was false . . . because the manufacturer intended the information or omission to have an effect."[68]

56. The Commission has previously found that Facebook may not alter the privacy settings of its users.[69]

---

[58] FTC Deception Policy, *supra*.
[59] FTC Deception Policy, *supra* ; *see, e.g.*, *Fed Trade Comm'n v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) (holding that Pantron's representation to consumers that a product was effective at reducing hair loss was materially misleading, because according to studies, the success of the product could only be attributed to a placebo effect, rather than on scientific grounds).
[60] FTC Deception Policy, *supra*.
[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] *Id.*
[68] *Cliffdale Associates, Inc.*, 103 F.T.C. 110, 110 (1984).
[69] *In the Matter of Facebook, Inc., a corporation; FTC File No. 092 3184*, FTC.gov (Dec. 30, 2011), http://www.ftc.gov/enforcement/cases-proceedings/092-3184/facebook-inc.

57. The Commission has previously found that a company may not repurpose user data for a use other than the one for which the user's data was collected without first obtaining the user's "express affirmative consent."[70]

**B. The 2012 Federal Trade Commission Consent Order**

58. On July 27, 2012, the Commission entered into a consent order with Facebook regarding violations of Section 5 of the FTC Act.[71]

59. The settlement followed a complaint by EPIC, and established new privacy safeguards for Facebook users.[72]

60. The settlement prohibits Facebook from misrepresenting the extent to which it maintains the privacy or security of covered information.[73]

61. Specifically, Count I of the Consent Order includes language that prohibits Facebook from misrepresenting "its collection or disclosure of any covered information," and "the extent to which Respondent makes or has made covered information accessible to third parties."[74]

**C. Count I: Deceptive Failure to Inform Users that their Data Would Be Shared With Third-Party Researchers**

62. As described above, Facebook represented to consumers that the company shared user data with users' "friends" on the website, advertisers, and developers.

63. In fact, as described above, Facebook shared user data with third-party researchers at multiple universities.

64. Users could not reasonably have known that their data might be shared with third-party behavioral science researchers.

65. As described above, Facebook users were materially concerned with this data sharing practice.

---

[70] *In the Matter of Google, Inc.;* FTC File No. 102 3136 (Oct. 13, 2011) (Decision and Order), http://www.ftc.gov/sites/default/files/documents/cases/2011/10/111024googlebuzzdo.pdf.
[71] *In the Matter of Facebook, Inc.*, FTC Docket No. C-4365 (2012) (Decision and Order), http://www.ftc.gov/os/caselist/0923184/120810facebookdo.pdf [hereinafter FTC Facebook Consent Order].
[72] *Id.*
[73] *Id.* "Covered information" is defined as "information from or about an individual consumer including, but not limited to: (a) a first or last name; (b) a home or other physical address, including street name and name of city or town; (c) an email address or other online contact information, such as an instant messaging user identifier or a screen name; (d) a mobile or other telephone number; (e) photos and videos; (f) Internet Protocol ("IP") address, User ID or other persistent identifier; (g) physical location; or (h) any information combined with any of (a) through (g) above."
[74] *Id*.

66. Therefore, Facebook's failure to adequately disclose that it shared consumer data with third-party researchers constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**D. Count II: Unfair Failure to Inform Users That They Were Subject to Behavioral Testing**

67. As described above, Facebook represented to users that the company only shared user data for advertising purposes or in conjunction with web app developers.

68. In fact, as described above, Facebook subjected certain users to ongoing behavioral testing by collecting user data and feeding it into a separate algorithm.

69. Users could not reasonably have guessed that use of their Facebook account might subject them to behavioral testing.

70. As described above, users were materially concerned with this change in Facebook's data use.

71. Therefore, Facebook's failure to adequately disclose that it used consumer data to manipulate users' News Feeds and record users' reactions constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**E. Count III: Violation of the 2012 Consent Order**

72. As described above, Facebook misrepresented its data collection practices, in contravention of Count I of the Consent Order.

73. As described above, Facebook misrepresented the extent to which it made covered information accessible to third parties, also in contravention of Count I of the Consent Order.

74. Therefore, Facebook has violated Count I of its 2012 Consent Order with the FTC and is subject to FTC enforcement in Federal district court.

## V. <u>Prayer for Investigation and Relief</u>

75. EPIC urges the Commission to investigate Facebook, Inc., and enjoin its deceptive data collection and data sharing practices.

76. Specifically, EPIC requests the Commission to:

    a. Initiate an investigation of Facebook's unlawful manipulation of the NewsFeed and the transfer of user data to third parties in violation of the 2012 Consent Order;

    b. Demand that Facebook make public the algorithm that produces the NewsFeed

    c. Enforce the 2012 Consent Order; and

    d. Provide such other relief as the Commission finds necessary and appropriate.

 

Respectfully Submitted,

Marc Rotenberg, Executive Director
Julia Horwitz, Consumer Protection Counsel
Electronic Privacy Information Center
1718 Connecticut Ave. NW Suite 200
Washington, DC 20009
202-483-1140 (tel)
202-483-1248 (fax)