**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-cv-02184-TJK |
| | ) | |
| FACEBOOK, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**BRIEF OF AMICI CURIAE PUBLIC CITIZEN,**
**CAMPAIGN FOR A COMMERCIAL-FREE CHILDHOOD, COMMON SENSE MEDIA,**
**AND UNITED STATES PUBLIC INTEREST RESEARCH GROUP, INC.,**
**IN SUPPORT OF NEITHER PARTY AND IN OPPOSITION TO PLAINTIFF'S**
**CONSENT MOTION FOR ENTRY OF STIPULATED ORDER**

Rebecca Smullin (D.C. Bar No. 1017451)
Scott L. Nelson (D.C. Bar No. 413548)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
202-588-1000

Attorneys for Amici Curiae

October 15, 2019

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Civil Rule 7(o)(5), amici curiae Public Citizen, Common Sense Media, and United States Public Interest Research Group, Inc., state that they have no parent corporations, they have no stock, and no publicly traded corporations have an ownership interest in them.

Amicus curiae Campaign for a Commercial-Free Childhood states that it is a fiscally-sponsored project of TSNE MissionWorks. TSNE MissionWorks has no parent corporation and no stock, and no publicly traded corporation has an ownership interest in it.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................. i

TABLE OF AUTHORITIES ......................................................................... iii

INTEREST OF AMICI ............................................................................ 1

ARGUMENT ................................................................................... 1

I.   The proposed decree would give Facebook broad immunity from potential FTC claims. ..... 3

    A.   The release extends to innumerable practices and far beyond the complaint's allegations. ......................................................................... 4

        1. Complaints about Facebook practices that target children ............................... 8

        2. Complaints about Facebook's solicitation and exposure of health data .......... 11

    B.   The proposed consent decree's injunctive provisions fail to redress complaints that the FTC has received about alleged Facebook violations............................. 16

II.  Because of its broad release clause, the proposed decree is unfair, unreasonable, inadequate, and inconsistent with the public interest. ........................................... 19

CONCLUSION ............................................................................... 24

# TABLE OF AUTHORITIES

**CASES**                                                                      **PAGES**

*American Financial Services Association v. FTC*,
    767 F.2d 957 (D.C. Cir. 1985) ..........................................................................................4

*Appalachian Voices v. McCarthy*,
    38 F. Supp. 3d 52 (D.D.C. 2014) ...................................................................................21

*Citizens for a Better Environment v. Gorsuch*,
    718 F.2d 1117 (D.C. Cir. 1983) ..........................................................................1, 19, 23

*FTC v. Amazon.com, Inc.*, No. C14-1038-JCC,
    2016 WL 10654030 (W.D. Wash. July 22, 2016) ..........................................................11

*FTC v. Match Group, Inc.*, No. 3:19-cv-02281-K
    (N.D. Tex. filed Sept. 25, 2019) ...................................................................................15

*FTC v. MoneyGram International, Inc.*, No. 1:09-cv-06576
    (N.D. Ill. Nov. 13, 2018).........................................................................................16, 17

*FTC v. Ruby Corp.*, No. 1:16-cv-02438
    (D.D.C. filed Dec. 14, 2016)..........................................................................................15

*FTC v. Wyndham Worldwide Corp.*,
    799 F.3d 236 (3d Cir. 2015)...........................................................................................15

*Home Builders Associations of Northern California v. Norton*,
    293 F. Supp. 2d 1 (D.D.C. 2002) ...................................................................................21

*LabMD, Inc. v. FTC*,
    776 F.3d 1275 (11th Cir. 2015) .....................................................................................15

*United States Department of Justice v. Daniel Chapter One*,
    89 F. Supp. 3d 132 (D.D.C. 2015)..................................................................................22

*United States v. Hyundai Motor Co.*,
    77 F. Supp. 3d 197 (D.D.C. 2015) ...........................................................................20, 21

**STATUTES**

American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 .................6

12 U.S.C. § 5581(b)(5)(C)(ii) ...................................................................................6

15 U.S.C. § 45(a) .....................................................................................................4

15 U.S.C. § 45(b) ...................................................................................................22

15 U.S.C. § 45(m) ..................................................................................................22

15 U.S.C. § 45(n) .....................................................................................................4

15 U.S.C. § 46(a) ...................................................................................................22

15 U.S.C. § 46(b) ...................................................................................................22

15 U.S.C. § 53(b) ...................................................................................................22

15 U.S.C. § 57b(a) .................................................................................................22

15 U.S.C. § 57b-1 ..................................................................................................22

15 U.S.C. §§ 6501-6506 ........................................................................................10

15 U.S.C. § 6502(c) .................................................................................................6

## REGULATIONS

16 C.F.R. part 312..................................................................................................10

16 C.F.R. § 312.10 ...................................................................................................9

16 C.F.R. § 312.4(d)(1) .......................................................................................9, 17

16 C.F.R. part 318..................................................................................................13

16 C.F.R. § 318.7 .....................................................................................................6

## FEDERAL TRADE COMMISSION MATERIALS

*Apple Inc.*, No. C-4444,
    2014 WL 1330287 (F.T.C. Mar. 25, 2014)................................................10, 17

*CardSystems Solutions, Inc.*, No. C-4168,
   2006 WL 2709787 (F.T.C. Sept. 5, 2006) ......................................................................15

*Dissenting Statement of Commissioner Rebecca Kelly Slaughter, In the Matter of FTC vs.
   Facebook* (July 24, 2019), *available at* https://www.ftc.gov/enforcement/cases-
   proceedings/092-3184/facebook-inc..........................................................................2, 4, 7

*Dissenting Statement of Commissioner Rohit Chopra, In re FTC v. Facebook, Inc.,
   Commission File No. 1823109* (July 24, 2019), *available at*
   https://www.ftc.gov/enforcement/cases-proceedings/092-3184/facebook-inc ..........2, 4, 20

*Google Inc.*, No. C-4499,
   2014 WL 6984156 (F.T.C. Dec. 2, 2014)..................................................................11, 17

*Statement of Chairman Joe Simons and Commissioners Noah Joshua Phillips and
   Christine S. Wilson, In re Facebook, Inc.* (July 24, 2019), *available at*
   https://www.ftc.gov/enforcement/cases-proceedings/092-3184/facebook-inc ...................4

## MISCELLANEOUS

Marshall Allen, *Health Insurers Are Vacuuming Up Details About You—And It Could Raise
   Your Rates*, ProPublica (July 17, 2018), https://www.propublica.org/article/health-
   insurers-are-vacuuming-up-details-about-you-and-it-could-raise-your-rates.................. 15

Associated Press, *Facebook Launches Messenger Kids App*, Wash. Post. (Dec. 4, 2017),
   https://www.washingtonpost.com/lifestyle/kidspost/facebook-launches-messenger-
   kids-app/2017/12/04/05d233d6-d924-11e7-b1a8-62589434a581_story.html ...................8

Jacqueline L. Bender, Maria-Carolina Jimenez-Marroquin, and Alejandro R. Jadad, *Seeking
   Support on Facebook: A Content Analysis of Breast Cancer Groups*, J. Med. Internet
   Res. (Jan.- Mar. 2011), https://www.jmir.org/2011/1/e16/...............................................11

Emily Birnbaum, *Patients, Health Data Experts Accuse Facebook of Exposing Personal Info*,
   Hill (Feb. 19, 2019), https://thehill.com/policy/technology/430634-patients-health-
   data-experts-accuse-facebook-of-exposing-personal-health.............................................13

Brakkton Booker, *Housing Department Slaps Facebook with Discrimination Charge*, NPR
   (Mar. 28, 2019), https://www.npr.org/ 2019/03/28/707614254/hud-slaps-facebook-
   with-housing-discrimination-charge ................................................................................7

Russell Brandom, *Facebook Design Flaw Let Thousands of Kids Join Chats with Unauthorized
   Users*, Verge (July 22, 2019), https://www.theverge.com/2019/7/22/
   20706250/facebook-messenger-kids-bug-chat-app-unauthorized-adults ...........................7

Josh Constine, *Facebook Pays Teens to Install VPN That Spies on Them*, TechCrunch (Jan. 29, 2019), https://techcrunch.com/2019/01/29/facebook-project-atlas/ ............................7, 11

Facebook, *Annual Report 2018* (2019), https://s21.q4cdn.com/399680738/files/ doc_financials/ annual_reports/2018-Annual-Report.pdf...........................................................................5

Facebook, *Community Standards*, https://www.facebook.com/communitystandards/introduction .........................................19

Facebook, *The Facebook Companies*, https://www.facebook.com/help/111814505650678..........5

Facebook, *Messenger Kids Privacy Policy*, https://www.facebook.com/legal/messengerkids/ privacypolicy (last updated Dec. 4, 2017) ......................................................................8

Facebook for Developers, *Tools to Scale Your Business*, https://developers.facebook.com/ products#business-tools ....................................................................................................6

Christina Farr, *Facebook Is Making a Big Push This Summer to Sell Ads to Drugmakers*, CNBC (May 26, 2017), https://www.cnbc.com/2017/05/26/facebook-health-summit-june-6-will-focus-on-pharma-cannes-to-follow.html ....................................................................12

Christina Farr, *Facebook Will Allow Patients in Support Groups to Post Questions Anonymously*, CNBC (Apr. 30, 2019), https://www.cnbc.com/2019/04/30/facebook-adds-health-support-groups-with-anonymous-posting.html ............................................12

Christina Farr and Alexei Oreskovic, *Exclusive: Facebook Plots First Steps into Healthcare*, Reuters (Oct. 3, 2014), https://www.reuters.com/article/us-facebook-health/exclusive-facebook-plots-first-steps-into-healthcare-idUSKCN0HS09720141003 .........................12

Zeke Faux, *How Facebook Helps Shady Advertisers Pollute the Internet*, Bloomberg Businessweek (Mar. 27, 2018), https://www.bloomberg.com/news/features/2018-03-27/ad-scammers-need-suckers-and-facebook-helps-find-them ...........................................5

Müge Fazlioglu, *What FTC Enforcement Actions Teach Us About the Makings of Reasonable Privacy and Data Security Practices: A Follow-Up Study* (June 11, 2018), https://iapp.org/news/a/what-ftc-enforcement-actions-teach-us-about-the-makings-of-reasonable-privacy-and-data-security-practices-a-follow-up-study .................................23

Cat Ferguson, *Predatory Behavior Runs Rampant in Facebook's Addiction Support Groups*, Verge (May 21, 2018), https://www.theverge.com/2018/5/21/17370066/facebook-addiction-support-groups-rehab-patient-brokering...........................................................14

Nathan Halverson, *Facebook Knowingly Duped Game-Playing Kids and Their Parents Out of Money*, Reveal (Jan. 24, 2019), http://www.revealnews.org/article/facebook-knowingly-duped-game-playing-kids-and-their-parents-out-of-money .....................10, 17

Karen Hao, *Facebook's Ad-Serving Algorithm Discriminates by Gender and Race*, MIT Tech. Rev. (Apr. 5, 2019), https://www.technologyreview.com/s/613274/facebook-algorithm-discriminates-ai-bias/ .......................................................................................7

David Ingram, *Facebook Fuels Broad Privacy Debate by Tracking Non-Users*, Reuters (Apr. 15, 2018), https://www.reuters.com/article/us-facebook-privacy-tracking/facebook-fuels-broad-privacy-debate-by-tracking-non-users-idUSKBN1HM0DR...........................6

Mike Isaac, *New York Attorney General to Investigate Facebook Email Collection* (Apr. 25, 2019), https://www.nytimes.com/2019/04/25/technology/facebook-new-york-attorney-general-investigation.html .......................................................................................7

Nat Ives, *Facebook Axes Age, Gender and Other Targeting for Some Sensitive Ads*, Wall St. J. (Mar. 19, 2019), https://www.wsj.com/articles/facebook-axes-age-gender-and-other-targeting-for-some-sensitive-ads-11553018450 ...............................................................7

Letter from Campaign for a Commercial-Free Childhood, *et al*. to Mark Zuckerberg, CEO, Facebook, Inc. (Jan. 30, 2018), http://www.commercialfreechildhood.org/ sites/default/files/devel-generate/gaw/FBMessengerKids.pdf...............................................8

Letter from Common Sense Media, *et al*. to Donald S. Clark, Secretary of the Commission, and Andrew Smith, Director, Bureau of Consumer Protection, FTC (Feb. 21, 2019), http://d2e111jq13me73.cloudfront.net/sites/default/files/uploads/2.21.19_fbftcletter. pdf .......................................................................................................................10, 11

Letter from Fred Trotter, *et al*. to Division of Privacy and Identify Protection, FTC (Dec. 14, 2018), https://missingconsent.org/downloads/SicGRL _FTC_Compliant.pdf ................................................................................ 12, 13, 14, 15

Letter from James T. Graves and Angela J. Campbell, Institute for Public Representation, *et al.*, to Donald S. Clark, Secretary of the Commission, and Andrew Smith, Director, Bureau of Consumer Protection, FTC (Oct. 3, 2018), https://www.commercialfreechildhood. org/sites/default/files/devel-generate/wab/FTC%20FB%20Messenger% 20Kids%20Letter.pdf.............................................................................................................9

Letter from Rebecca Stimson, Head of Public Policy, Facebook UK, to Damian Collins, Chair, Digital, Culture, Media, and Sport Committee, House of Commons (May 14, 2018), https://www.parliament.uk/documents/commons-committees/culture-media-and-sport/180514-Rebecca-Stimson-Facebook-to-Ctte-Chair-re-oral-ev-follow-up.pdf. ...................................................................................................................................5

Louise Matsakis, *How a Facebook Group for Sexual Assault Survivors Became a Tool for Harassment*, Wired (July 19, 2018), https://www.wired.com/story/how-a-metoo-facebook-group-became-harassment-tool........................................................................14

Mayo Clinic, *Support Groups: Make Connections, Get Help* (June 2, 2018), https://www.mayoclinic.org/healthy-lifestyle/stress-management/in-depth/support-groups/art-20044655 ......................................................................................................12

National Cancer Institute, *Cancer Support Groups* (Jan. 24, 2019), https://www.cancer.gov/about-cancer/coping/adjusting-to-cancer/support-groups....................................................12

Andrew Perrin & Monica Anderson, *Share of U.S. Adults Using Social Media, Including Facebook, Is Mostly Unchanged Since 2018* (Apr. 10, 2019), https://www.pewresearch.org/fact-tank/2019/04/10/share-of-u-s-adults-using-social-media-including-facebook-is-mostly-unchanged-since-2018.........................................................5

Kristine Phillips, *Grindr Says It Will Stop Sharing Users' HIV Data with Third-Party Firms Amid Backlash* (Apr. 3, 2018), https://www.washingtonpost.com/news/to-your-health/wp/2018/04/03/grindr-says-it-will-stop-sharing-users-hiv-data-with-third-party-firms-amid-backlash/ ........................................................................................................15

Mohana Ravindranath, *How Your Health Information Is Sold and Turned Into 'Risk* Scores*'*, Politico (Feb. 3, 2019), https://www.politico.com/story/2019/02/03/health-risk-scores-opioid-abuse-1139978...........................................................................................................15

4 William B. Rubenstein, Newberg on Class Actions § 13:61 (5th ed. 2019) ............................21

Sam Schechner and Mark Secada, *You Give Apps Sensitive Personal Information. Then They Tell Facebook*, Wall St. J. (Feb. 22, 2019), https://www.wsj.com/articles/you-give-apps-sensitive-personal-information-then-they-tell-facebook-11550851636.................6, 7

Megan Thielking, *Facebook Announces New Steps in Effort to Allow Users to Ask Health Questions Anonymously*, Stat (Apr. 30, 2019), https://www.statnews.com/2019/04/30/facebook-new-steps-privacy-health-data/.......................................................18

Nick Whigham, *Leaked Document Reveals Facebook Conducted Research to Target Emotionally Vulnerable and Insecure Youth*, News Corp Australia (May 1, 2017), www.news.com.au/technology/online/social/leaked-document-reveals-facebook-conducted-research-to-target-emotionally-vulnerable-and-insecure-youth/news-story/d256f850be6b1c8a21aec6e32dae16fd............................................................................11

**INTEREST OF AMICI**

Amici are four nonprofit organizations that work to protect and defend the privacy and other rights of children, patients, and other consumers through research, education, and advocacy. The organizations are deeply concerned about both Facebook's repeated violations of consumer rights and the ability of the Federal Trade Commission (FTC) to address past violations and prevent future ones. All four organizations have sent or supported recent complaints to the FTC alleging that Facebook violated consumer-protection law. A description of each organization is included in the motion for leave to file this brief.[1]

**ARGUMENT**

This Court should reject the parties' attempt to resolve this action with the proposed consent decree because the decree, as currently formulated, would not provide "overall fairness to beneficiaries" or reflect "consistency with the public interest." *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (internal quotation marks and citations omitted). This lawsuit involves Facebook's repeated and flagrant violations of the FTC Act, of the company's own representations to consumers about its protections of their data, and of a 2012 FTC order that settled eight claims that the company had used unfair practices and deceived consumers about its privacy protections, including by widely sharing data that the company represented would be kept private. *See* Compl., Ex. A, ECF No. 1-1 (*Facebook, Inc*., No. C-4365, 2012 FTC LEXIS 135 (F.T.C. July 27, 2012) (decision and order)) ("2012 Order"); Compl., Ex. B, ECF No. 1-2

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than the amici curiae, their members, or their counsel contributed money that was intended to fund the preparation or submission of this brief.

1

(Complaint, *Facebook, Inc.*, No. C-4365 (F.T.C. July 27, 2012), 2012 FTC LEXIS 136). Though the 2012 order prohibited Facebook from misrepresenting aspects of its privacy and data practices, *see* 2012 Order, pt. I, the company relapsed just four months after the order's entry and began deceiving consumers all over again, "engaging in the very same conduct that the Commission alleged was deceptive" in 2012, Compl. ¶¶ 9, 36, ECF No. 1. The proposed decree is insufficient to address Facebook's repeated abuses of consumers' privacy. Among other things, the requirements it imposes are largely procedural and the fine is too small to vindicate the agency's authority or to deter a company of Facebook's extraordinary size.[2]

This brief focuses on the most glaring problem in the proposed decree: its broad release clause, which could bar the FTC from pursing any claim concerning an unfair or deceptive consumer practice by Facebook based on information or complaints received by the agency before June of this year. Such a release, extending far beyond the allegations raised by the government in this case, is neither fair nor reasonable. Complaints that amici and others have sent to the FTC about two topics in particular—Facebook's interactions with children and its handling of sensitive health data—show the gravity of the potential claims at stake. By signing away these and other potential claims, the FTC would sacrifice the possibility of government-ordered redress for Facebook's wrongdoing and give up an opportunity to improve consumer protections in the social-media market more broadly.

---

[2] *See generally Dissenting Statement of Commissioner Rebecca Kelly Slaughter, In the Matter of FTC vs. Facebook* (July 24, 2019) ("Slaughter Dissent"); *Dissenting Statement of Commissioner Rohit Chopra, In re FTC v. Facebook, Inc., Commission File No. 1823109* (July 24, 2019) ("Chopra Dissent"). Both are available at https://www.ftc.gov/enforcement/cases-proceedings/092-3184/facebook-inc.

Notably, plaintiff's motion for entry of a stipulated order offers nothing to justify the proposed decree's release clause. Of course, even without the proposed release, the FTC could decide not to pursue unidentified Facebook violations or continue investigating such violations after this lawsuit concludes. But unlike an exercise of prosecutorial discretion, what the government and Facebook seek here—a court order forbidding FTC action—would reward Facebook's recidivist conduct by giving the company a *binding* pass for unidentified illegal conduct and limiting the protections of tens of millions of United States consumers against unscrupulous company practices.

## I.     The proposed decree would give Facebook broad immunity from potential FTC claims.

The proposed decree purports to "resolve" two sets of potential claims: (1) any claim that Facebook violated the 2012 FTC order before June 12, 2019, and (2) all "consumer-protection claims known by the FTC prior to June 12, 2019, that [Facebook] violated Section 5 of the FTC Act." Stip. Order for Civil Penalty, Monetary Judgment, and Injunctive Relief 1-2, ECF No. 2-1 ("Proposed Decree"). Because this release clause would cover claims outside the scope of the complaint and beyond the reach of the proposed decree's injunctive relief, it is neither fair nor in the public interest.

### A.  The release extends to innumerable practices and far beyond the complaint's allegations.

As the FTC commissioners' statements in connection with the agency's approval of the settlement acknowledge, the breadth of the proposed release is unusual.[3] It covers a universe of potential claims that extends far beyond this lawsuit's allegations about specific misrepresentations by Facebook about its privacy practices.

Section 5 prohibits *all* "unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45(a), not just misconduct regarding consumer-data privacy, and not only acts or practices involving misrepresentations, *see id.* § 45(n) (defining unfair practices as those involving substantial injury that consumers cannot reasonably avoid and that is "not outweighed by countervailing benefits to consumers or competition"); *see generally Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 982 (D.C. Cir. 1985) (holding that "unfairness" is not limited to "conduct involving deception, coercion or the withholding of material information").

Moreover, because of the extraordinary variety of ways in which Facebook interacts with consumers, its activities could implicate either the 2012 FTC order or section 5 in innumerable

---

[3] *See* Chopra Dissent 17 ("I have not been able to find a single Commission order – certainly not one against a repeat offender – that contains a release as broad as this one."); Slaughter Dissent 14 (concluding that "in every recent major settlement, if there was a liability release, it was cabined to the offenses described in the complaint"). A statement by the three commissioners approving the proposed decree cites two other consent decrees with releases, but both are limited to conduct alleged in the complaint or closely related conduct. Neither extends to the entirety of the defendant's consumer business. *See Statement of Chairman Joe Simons and Commissioners Noah Joshua Phillips and Christine S. Wilson, In re Facebook, Inc.* 7 & n.10 (July 24, 2019), *available at* https://www.ftc.gov/enforcement/cases-proceedings/092-3184/facebook-inc.

4

ways.[4] Facebook operates not only through its eponymous website and mobile application, but also through its other social-media products (*e.g.*, Instagram); the payments, virtual reality, virtual private network, and messaging companies it owns;[5] *millions* of third-party websites or apps that are integrated with Facebook in some way;[6] and the vast number of entities that advertise to Facebook users, promoting both legitimate products and scams.[7] The company collects data on *billions* of consumers, including most adults in the United States—both Facebook users and non-users.[8] And through the many features of its own products and the business tools it offers to third

---

[4] The release would cover claims against "Facebook, Inc., its successors and assigns, acting directly, or through any corporation, company, subsidiary, division, affiliate, website, or other device that it directly or indirectly controls," as well Facebook's officers and directors. Proposed Decree at 2.

[5] *See* Facebook, *The Facebook Companies*, https://www.facebook.com/help/1118145056 50678 (last visited Oct. 14, 2019) (including links to policies that describe each Facebook company); Facebook, *Annual Report 2018*, at 5 (2019), https://s21.q4cdn.com/399680738/files/ doc_financials/annual_reports/2018-Annual-Report.pdf (describing consumer-facing products).

[6] In one week in 2018, 8.4 million websites included a Facebook "like" button and 2.2 million websites used Facebook's Pixel product to monitor how people used their website; in 2017, the number of apps *just against which the company took "action"* numbered nearly 400,000. *See* Letter from Rebecca Stimson, Head of Public Policy, Facebook UK, to Damian Collins, Chair, Digital, Culture, Media, and Sport Committee, House of Commons 2, 3 (May 14, 2018), https:// www.parliament.uk/documents/commons-committees/culture-media-and-sport/180514-Rebecca-Stimson-Facebook-to-Ctte-Chair-re-oral-ev-follow-up.pdf.

[7] Regarding scammers' use of Facebook advertisements, *see generally* Zeke Faux, *How Facebook Helps Shady Advertisers Pollute the Internet*, Bloomberg Businessweek (Mar. 27, 2018), https://www.bloomberg.com/news/features/2018-03-27/ad-scammers-need-suckers-and-facebook-helps-find-them.

[8] *See* Compl. ¶ 2. Sixty-nine percent of U.S. adults use Facebook. *See* Andrew Perrin & Monica Anderson, *Share of U.S. Adults Using Social Media, Including Facebook, Is Mostly Unchanged Since 2018* (Apr. 10, 2019), https://www.pewresearch.org/fact-tank/2019/04/10/share-of-u-s-adults-using-social-media-including-facebook-is-mostly-unchanged-since-2018/. Facebook also receives data on individuals who are not users or logged

parties, it interacts with these consumers electronically in countless ways, some overt and some not.[9]

Additionally, complaints sent to the FTC about Facebook practices implicate the Children's Online Privacy Protection Act (COPPA) and the FTC's health breach notification rule—both of which state that violations of those provisions shall be considered violations of an FTC rule prohibiting unfair or deceptive acts or practices. *See* 15 U.S.C. § 6502(c) (COPPA); 16 C.F.R. § 318.7 (health breach notification rule, implementing section 13407(e) of the American Recovery and Reinvestment Act of 2009, Public Law No. 111-5, 123 Stat. 115). The release clause does not specify whether it covers claims under COPPA, the health breach notification rule, or other statutes or rules with similar references to the FTC's authority, *see, e.g.*, 12 U.S.C. § 5581(b)(5)(C)(ii) (example of another statute stating that violations of other consumer-protection rules shall be treated as violations of an FTC unfair or deceptive acts or practices rule). Both that ambiguity and the possibility that the release extends to such claims further highlight the potential breadth of the proposed decree.

---

into its system. *See* David Ingram, *Facebook Fuels Broad Privacy Debate by Tracking Non-Users*, Reuters (Apr. 15, 2018), https://www.reuters.com/article/us-facebook-privacy-tracking/facebook-fuels-broad-privacy-debate-by-tracking-non-users-idUSKBN1HM0DR; Sam Schechner and Mark Secada, *You Give Apps Sensitive Personal Information. Then They Tell Facebook*, Wall St. J. (Feb. 22, 2019), https://www.wsj.com/articles/you-give-apps-sensitive-personal-information-then-they-tell-facebook-11550851636.

[9] *See, e.g.*, Schechner & Secada, *You Give Apps*, *supra* n.8 (regarding data-sharing through apps that are not overtly tied to Facebook); *see generally* Facebook for Developers, *Tools to Scale Your Business*, https://developers.facebook.com/products#business-tools (last visited Oct. 14, 2019) (describing Facebook offerings to application developers).

The problems with the breadth of the release are not hypothetical. Facebook's business practices have persistently generated questions about misconduct. For example, in a public statement opposing the settlement, one FTC commissioner stated that "[h]ardly a week passes without a news story revealing some potentially illegal conduct by Facebook." Slaughter Dissent 15. Indeed, in the first half of 2019 alone, journalists reported on a number of troubling concerns about Facebook's consumer practices: a function in a Facebook product that allowed children to "chat" with unauthorized adults; Facebook's practice of paying teens for access to their online data; Facebook's ad algorithms discriminating by race and gender; and Facebook's collection of sensitive health data that consumers input into mobile apps without knowing that they are linked to Facebook on the back end.[10] Also this year, Facebook has been investigated or sued for unauthorized collection of users' email address books and for discrimination related to the advertising it hosts.[11]

---

[10] *See* Russell Brandom, *Facebook Design Flaw Let Thousands of Kids Join Chats with Unauthorized Users*, Verge (July 22, 2019), https://www.theverge.com/2019/7/22/20706250/facebook-messenger-kids-bug-chat-app-unauthorized-adults; Josh Constine, *Facebook Pays Teens to Install VPN That Spies on Them*, TechCrunch (Jan. 29, 2019), https://techcrunch.com/2019/01/29/facebook-project-atlas/; Karen Hao, *Facebook's Ad-Serving Algorithm Discriminates by Gender and Race*, MIT Tech. Rev. (Apr. 5, 2019), https://www.technologyreview.com/s/613274/facebook-algorithm-discriminates-ai-bias/; Schechner & Secada, *You Give Apps*, *supra* n.8.

[11] *See* Brakkton Booker, *Housing Department Slaps Facebook with Discrimination Charge*, NPR (Mar. 28, 2019), https://www.npr.org/2019/03/28/707614254/hud-slaps-facebook-with-housing-discrimination-charge; Mike Isaac, *New York Attorney General to Investigate Facebook Email Collection* (Apr. 25, 2019), https://www.nytimes.com/2019/04/25/technology/facebook-new-york-attorney-general-investigation.html; *see also* Nat Ives, *Facebook Axes Age, Gender and Other Targeting for Some Sensitive Ads*, Wall St. J. (Mar. 19, 2019), https://www.wsj.com/articles/facebook-axes-age-gender-and-other-targeting-for-some-sensitive-

The proposed decree would not remedy many of these and other potential problems with Facebook's practices, but would release section 5 claims concerning them if they were known to the FTC or claims that these practices violated the 2012 FTC order. In particular, complaints about Facebook's treatment of children and its handling of health data, including complaints submitted by amici, raise concerns that could fall under the proposed decree's release clause and that illustrate the problems with awarding Facebook such a broad release.

### 1. Complaints about Facebook practices that target children

In 2017, Facebook launched Messenger Kids, a social-media product targeting children.[12] This product raised multiple concerns about harm to children. In 2018, dozens of individual experts and organizations called on the company to discontinue the product, warning that "a growing body of research demonstrates that excessive use of digital devices and social media is harmful to children and teens, making it very likely this new app will undermine children's healthy development."[13] Then, citing this warning, amici Campaign for a Commercial-Free Childhood, Public Citizen, and U.S. Public Interest Research Group (U.S. PIRG), along with other groups, urged the FTC to investigate Facebook for several alleged abuses. Noting that it was easy to create

---

ads-11553018450 (regarding settlement of some ad-related discrimination lawsuits against Facebook).

[12] *See* Associated Press, *Facebook Launches Messenger Kids App*, Wash. Post. (Dec. 4, 2017), https://www.washingtonpost.com/lifestyle/kidspost/facebook-launches-messenger-kids-app/2017/12/04/05d233d6-d924-11e7-b1a8-62589434a581_story.html.

[13] Letter from Campaign for a Commercial-Free Childhood, *et al.* to Mark Zuckerberg, CEO, Facebook, Inc., at 1 (Jan. 30, 2018), http://www.commercialfreechildhood.org/sites/default/files/devel-generate/gaw/FBMessengerKids.pdf (with signatories including Campaign for a Commercial-Free Childhood, Common Sense Media, and Public Citizen).

a fake account to "approve" a child's access, they asserted that Messenger Kids was violating COPPA by collecting personal information from children without verifiable parental consent. They also expressed concern that Facebook was not adequately disclosing its Messenger Kids privacy policies or ensuring their compliance with COPPA.[14] For example, though COPPA limits the period that websites can retain children's information to the time needed to fulfill its original purpose, *see* 16 C.F.R. § 312.10, the Messenger Kids privacy notice does not state such a limitation.[15] Further, the notice does not name "all operators collecting or maintaining personal information from children through the Web site or online service," 16 C.F.R. § 312.4(d)(1), instead making only vague reference to disclosures within Facebook's "family of companies" or to "service providers"—a universe that could mean Facebook is sharing young children's personal information, including their photos and videos, with numerous unidentified entities and their employees.[16]

In 2019, amicus Common Sense Media, joined by amici Campaign for a Commercial-Free Childhood and Public Citizen and other groups, pressed the FTC to investigate the company's

---

[14] *See* Letter from James T. Graves and Angela J. Campbell, Institute for Public Representation, to Donald S. Clark, Secretary of the Commission, and Andrew Smith, Director, Bureau of Consumer Protection, FTC (Oct. 3, 2018), https://www.commercialfreechildhood.org/sites/default/files/devel-generate/wab/FTC%20FB%20Messenger%20Kids%20Letter.pdf.

[15] *See* Letter from James T. Graves and Angela J. Campbell, *supra* n.14. In pertinent part, the Facebook Messenger Kids privacy notice remains the same as it was at the time of the complaint. *See* Facebook, *Messenger Kids Privacy Policy*, https://www.facebook.com/legal/messengerkids/privacypolicy (with date of last revision remaining December 4, 2017).

[16] *See* Letter from James T. Graves and Angela J. Campbell, *supra* n.14, at 4-5.

9

other interactions with children after documents revealed "that for years … Facebook maintained a system that encouraged children to make unknowing and unauthorized credit card purchases for virtual items in games on Facebook's platform."[17] Pointing out that a class-action settlement involving these practices had provided incomplete relief and was expiring earlier this year, the organizations urged the FTC to investigate whether the company's billing conduct was an unlawful unfair practice. Further, they asked the agency to investigate whether Facebook had violated COPPA or improperly handled minors' data by making third-party apps available to children younger than age 13.[18]

These concerns are serious. Through COPPA, Congress has recognized that children under age 13 warrant special protection when using the internet. The statute and its implementing regulations require websites and online services directed at such young children to obtain verifiable parental consent before collecting or using children's personal information and mandate other safeguards related to such data. *See generally* 15 U.S.C. §§ 6501-6506; 16 C.F.R. pt. 312. Moreover, billing parents for children's in-app activities, without proper controls, can cause direct financial harm, and the FTC has repeatedly taken the position that the practice is unfair, filing and settling related claims. *See Apple Inc.*, No. C-4444, 2014 WL 1330287, at *5 (F.T.C. Mar. 25,

---

[17] Letter from Common Sense Media, *et al*. to Donald S. Clark, Secretary of the Commission, and Andrew Smith, Director, Bureau of Consumer Protection, FTC, at 1 (Feb. 21, 2019), http://d2e111jq13me73.cloudfront.net/sites/default/files/uploads/2.21.19_fbftcletter.pdf; *see generally* Nathan Halverson, *Facebook Knowingly Duped Game-Playing Kids and Their Parents Out of Money*, Reveal (Jan. 24, 2019), http://www.revealnews.org/article/facebook-knowingly-duped-game-playing-kids-and-their-parents-out-of-money.

[18] *See* Letter from Common Sense Media, *supra* n.17, at 2-6.

2014); *Google Inc.*, No. C-4499, 2014 WL 6984156, at *5-6 (F.T.C. Dec. 2, 2014); *see also FTC v. Amazon.com, Inc.*, No. C14-1038-JCC, 2016 WL 10654030, at *8-11 (W.D. Wash. July 22, 2016) (granting summary judgment to the FTC on Amazon's liability under section 5 for in-app billing practices). Additionally, Facebook's Messenger Kids and in-app billing-practices are not the only instances in which "Facebook has demonstrated a lack of care toward young people."[19] In urging the FTC to investigate Facebook's in-app billing, groups enumerated reports of other troubling Facebook practices, such as its efforts to pay teenagers for access to data on their phones and its research concerning the possibility of targeting ads to teenagers feeling down.[20]

### 2.   Complaints about Facebook's solicitation and exposure of health data

The FTC has also received complaints about Facebook's efforts to attract and use health data. The data often comes through the circles of Facebook members—or "groups"—that individual users can form on the company's website. More than a decade ago, users started creating such groups to discuss issues related to particular health conditions.[21] Some medical experts advise

---

[19] Letter from Common Sense Media, *supra* n.17, at 6.

[20] *See id.* (citing Josh Constine, *Facebook Pays Teens to Install VPN That Spies on Them*, TechCrunch (Jan. 29, 2019), https://techcrunch.com/2019/01/29/facebook-project-atlas/, and Nick Whigham, *Leaked Document Reveals Facebook Conducted Research to Target Emotionally Vulnerable and Insecure Youth*, News Corp Australia (May 1, 2017), www.news.com.au/technology/online/social/leaked-document-reveals-facebook-conducted-research-to-target-emotionally-vulnerable-and-insecure-youth/news-story/d256f850be6b1c8a21aec6e32dae16fd).

[21] *See* Jacqueline L. Bender, Maria-Carolina Jimenez-Marroquin, and Alejandro R. Jadad, *Seeking Support on Facebook: A Content Analysis of Breast Cancer Groups*, J. Med. Internet Res. (Jan.- Mar. 2011), https://www.jmir.org/2011/1/e16/.

that patients and caregivers may benefit from the support and community they find online.[22] News reports suggest, however, that Facebook has looked to the groups—and users' participation in them—to serve its advertising-centric business model. In 2014, the company explored the creation of online support communities and health-related applications after "Facebook executives … [came] to realize that healthcare might work as a tool to increase engagement with the site."[23] Now, reportedly, many health-related Facebook groups are "sponsored or supported by drug companies."[24] "Ensuring that these groups are active and vibrant could help Facebook as it increasingly looks to health care and pharmaceutical companies for advertising."[25]

    In December 2018, patients and data experts sent a lengthy complaint to the FTC regarding Facebook's health support-group practices.[26] The complaint explained that even membership in a

---

[22] *See, e.g.*, Nat'l Cancer Inst., *Cancer Support Groups* (Jan. 24, 2019), https://www.cancer.gov/about-cancer/coping/adjusting-to-cancer/support-groups; Mayo Clinic, *Support Groups: Make Connections, Get Help* (June 2, 2018), https://www.mayoclinic.org/healthy-lifestyle/stress-management/in-depth/support-groups/art-20044655.

[23] Christina Farr and Alexei Oreskovic, *Exclusive: Facebook Plots First Steps into Healthcare*, Reuters (Oct. 3, 2014), https://www.reuters.com/article/us-facebook-health/exclusive-facebook-plots-first-steps-into-healthcare-idUSKCN0HS09720141003.

[24] Christina Farr, *Facebook Will Allow Patients in Support Groups to Post Questions Anonymously*, CNBC (Apr. 30, 2019), https://www.cnbc.com/2019/04/30/facebook-adds-health-support-groups-with-anonymous-posting.html.

[25] *Id.*; *see also* Christina Farr, *Facebook Is Making a Big Push This Summer to Sell Ads to Drugmakers*, CNBC (May 26, 2017), https://www.cnbc.com/2017/05/26/facebook-health-summit-june-6-will-focus-on-pharma-cannes-to-follow.html.

[26] *See* Letter from Fred Trotter, *et al*. to FTC (Dec. 14, 2018), https://missingconsent.org/downloads/SicGRL_FTC_Compliant.pdf; *see also* Emily Birnbaum, *Patients, Health Data Experts Accuse Facebook of Exposing Personal Info*, Hill (Feb. 19, 2019), https://thehill.com/

group, such as a cancer support-group or an HIV-positive group, can communicate sensitive health information, and that within a Facebook group, users may share many more details about their conditions as they seek information and support.[27] It expressed concern that Facebook markets health support-groups to users without making clear the extent to which such sensitive data can be exposed or taking steps to limit such exposure. For example, the complaint explained that mismatches between the company's privacy statements and those of group administrators can mislead consumers about the privacy of their data.[28] It also provided information indicating that Facebook practices unduly expose users to the sharing and misuse of their health data. It described how a patient advocate and a security researcher discovered that Facebook allowed group data to be downloaded in bulk by individuals who were *not* members of a group, and alleged that Facebook violated the FTC's health breach notification rule, 16 C.F.R. pt. 318, by not treating such a bulk download of health-group data as a reportable breach.[29] Further, the complaint pointed out that even after Facebook eliminated that vulnerability in its software, Facebook-hosted health data remains susceptible to exploitation by those who took advantage of the earlier software flaw,

---

policy/technology/430634-patients-health-data-experts-accuse-facebook-of-exposing-personal-health.

[27] *See* Letter from Fred Trotter, *et al.*, *supra* n.26, at 16-18, 28.

[28] *See id.* at 12-15, 36.

[29] *See* Letter from Fred Trotter, *et al.*, *supra* n.26, at 6, 16-18, 25-29, 38-39.

by scammers posing as users seeking to join a group and download group information, or by apps given access to groups by their administrators.[30]

Exploitation of health or similarly sensitive data can put consumers at risk of privacy invasions and other harms. Marketers and scammers can take advantage of patients and caregivers, preying on their vulnerabilities for profit or harassment. For example, members of one addiction support-group found themselves targeted for addiction-treatment sales pitches; it turned out that the group, which Facebook had praised in its own materials, was the marketing arm of a treatment center that used the group to fish for leads.[31] In another case, a Facebook group for sexual harassment survivors was taken over by internet trolls who advertised it for sharing erotica and threatened survivors with contacting their abusers, calling child protective services about their children, or releasing their stories.[32] Additionally, as insurers scour social media and other sources for data, they might use Facebook users' information against them, in pricing or in other ways

---

[30] *See id.* at 14 & n.1, 22-24, 30-33.

[31] *See id.* at 33; Cat Ferguson, *Predatory Behavior Runs Rampant in Facebook's Addiction Support Groups*, Verge (May 21, 2018), https://www.theverge.com/2018/5/21/17370066/facebook-addiction-support-groups-rehab-patient-brokering.

[32] *See* Louise Matsakis, *How a Facebook Group for Sexual Assault Survivors Became a Tool for Harassment*, Wired (July 19, 2018), https://www.wired.com/story/how-a-metoo-facebook-group-became-harassment-tool/.

those consumers may never anticipate.[33] Patient advocates also worry that health information leaked from Facebook groups could put some individuals at risk of physical attack.[34]

The complaint regarding Facebook's unscrupulous treatment of individuals with health issues asserts a range of violations: violation of the 2012 FTC order, violation of the health breach notification rule, and unfair or deceptive practices. Importantly, some of the alleged practices are similar to others the FTC has pursued as unfair. For example, the FTC has used section 5's prohibition on unfairness to pursue companies for failing to protect user data against hackers or other unauthorized users. *See FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 240-41 (3d Cir. 2015); *LabMD, Inc. v. FTC*, 776 F.3d 1275, 1277 (11th Cir. 2015); Compl. ¶¶ 54-56, *FTC v. Ruby Corp.*, No. 1:16-cv-02438 (D.D.C. filed Dec. 14, 2016); *CardSystems Sols., Inc.*, No. C-4168, 2006 WL 2709787, at *1-2 (F.T.C. Sept. 5, 2006). Similarly, it has pursued companies for unfairly exposing their customers to scammers. *See, e.g.*, Compl. ¶¶ 71-73, *FTC v. Match Group, Inc.*, No. 3:19-cv-02281-K (N.D. Tex. filed Sept. 25, 2019) (alleging that online dating service unfairly

--------

[33] *See generally* Marshall Allen, *Health Insurers Are Vacuuming Up Details About You—And It Could Raise Your Rates*, ProPublica (July 17, 2018), https://www.propublica.org/article/health-insurers-are-vacuuming-up-details-about-you-and-it-could-raise-your-rates (describing how insurance companies "vacuum up personal details about hundreds of millions of Americans," including by collecting social media posts, which they feed into pricing algorithms); *cf.* Mohana Ravindranath, *How Your Health Information Is Sold and Turned Into 'Risk* Scores*'*, Politico (Feb. 3, 2019), https://www.politico.com/story/2019/02/03/health-risk-scores-opioid-abuse-1139978 (describing how companies like LexisNexis have started creating opioid-related risk scores, based on their "hoovering up" of data from multiple sources).

[34] *See* Letter from Fred Trotter, *et al.*, *supra* n.26, at 1, 28-29, 33; *cf.* Kristine Phillips, *Grindr Says It Will Stop Sharing Users' HIV Data with Third-Party Firms Amid Backlash* (Apr. 3, 2018), https://www.washingtonpost.com/news/to-your-health/wp/2018/04/03/grindr-says-it-will-stop-sharing-users-hiv-data-with-third-party-firms-amid-backlash/ (mentioning concern that another internet company's sharing of HIV status could put users at risk).

exposed consumers to risk of fraud through communications that the company knew were likely sent by scammers); *FTC v. MoneyGram Int'l, Inc.*, No. 1:09-cv-06576 (N.D. Ill. Nov. 13, 2018), ECF No. 20 ("MoneyGram Order") (stipulated order settling claims that money transfer company violated prior order addressing actions exposing customers to fraud); *see also* Compl. ¶¶ 83-84, *FTC v. MoneyGram Int'l, Inc.*, No. 1:09-cv-06576 (N.D. Ill. Oct. 19, 2009), ECF No. 1 (unfairness claim).

### B. The proposed consent decree's injunctive provisions fail to redress complaints that the FTC has received about alleged Facebook violations.

The proposed decree's release clause purports to "resolve" amici's and others' complaints of 2012 order violations or unfair or deceptive practices that were known to the FTC, and would thus prevent further FTC action addressing them. The decree, however, would do nothing to remedy many of the alleged violations described in the complaints or to prevent them from recurring. The proposed decree, for example, includes no limitations on Facebook's billing for children's in-app purchases. The decree also does not direct Facebook to implement specific measures to protect vulnerable patients from scammers or limit its handling of health data.

If the parties sought to remedy amici's and others' concerns about health data and Facebook's engagement with children, there are many injunctive measures they could consider. For example, to redress and prevent future unfair in-app billing practices, a consent decree might require Facebook to (1) refund injured consumers; (2) seek re-entry of credit card numbers at pertinent junctures, making it harder for children to incur charges; or (3) use analysis of credit-card chargeback rates to identify and address when children are likely being led unwittingly into charges. Indeed, settlement agreements in other FTC in-app billing cases have included some such measures, and Facebook earlier identified others of these potential safeguards, but declined to

adopt them out of fear of lost revenue. *See Apple Inc.*, No. C-4444, 2014 WL 1330287, at *7-8 (F.T.C. Mar. 25, 2014) (ordering Apple to refund certain in-app charges incurred by minors and to obtain express consent for billing of in-app charges); *Google Inc.*, No. C-4499, 2014 WL 6984156, at *8-9 (F.T.C. Dec. 2, 2014) (similar); Halverson, *Facebook Knowingly Duped Game-Playing Kids and Their Parents Out of Money*, *supra* n.17 (discussing Facebook consideration of measures). In this case, however, the proposed decree would do none of these things.

To address Facebook's targeting of young children through games or Messenger Kids, the proposed decree might also include provisions such as: (1) a requirement that Facebook verify parental consent before permitting account-holders to add apps attracting children; (2) restrictions on the period of time Facebook can hold children's data or the types of entities with which Facebook can share such data; (3) a mandate to comply with COPPA, including the requirement to name entities receiving children's information, *see* 16 C.F.R. § 312.4(d)(1). The decree could also enumerate extra security or privacy protections for accounts that Facebook concludes are likely being used by children. But the proposed decree would do none of these things.

The decree could also put in place a strong remedy for the problems alleged by the health advocates' complaint. It might include such requirements as: (1) restrictions on group administrators' ability to allow others to access users' health data; (2) restrictions on administrators' representations about privacy in their groups; or (3) limits on the amount of sensitive health information that Facebook can receive, store, or share. A consent decree could also limit Facebook's relationships with health-related companies, to remediate or prevent exploitation of consumers by scammers buying health-related ads or participating in health support-groups. *Cf.* MoneyGram Order 7-22 (prescribing detailed requirements for money transfer

17

company to prevent and address fraudsters' use of the company's platform).[35] The proposed decree

would not impose any of these safeguards, though.

Finally, given the particular sensitivity of health-related data as well as data involving

children, the FTC could push the company to delete existing children's data and health data, absent

express consent to the contrary, and to start afresh, under a cleaned-up privacy and security

program. Indeed, the proposed decree takes just such an approach to another sensitive category of

data: the facial-recognition templates that the government alleges Facebook deceptively collected.

*See* Proposed Decree, Att. A, pt. VI. With regard to Facebook practices targeted at children or

health data, however, the proposed decree would not require such measures.

Notably, the decree makes brief references to children and to health-related issues, but

these acknowledgments would not address all of amici's and others' concerns. The decree

mentions children and health only as examples of topics implicating privacy concerns. *See*

Proposed Decree, Att. A, at Definitions § B.8 (defining the term "ordinary consumers" to include

children or terminally ill individuals, in the context of a representation or practice targeted at such

an audience); *id.* pt. VII, § E.2.b (listing practices involving health data or products directed at

minors as examples of those that present a material risk to the privacy, confidentiality, or integrity

of consumer information). Though the proposed decree includes general privacy-evaluation

---

[35] Facebook recently announced that it will permit individuals to pose questions in health support-groups anonymously, by sending such questions to administrators. But without a court order, this practice is voluntary and subject to change. Further, as reported in the press, this practice does not appear to limit the sensitive data that is available to group "administrators" or that can be used by advertisers or others. *See* Megan Thielking, *Facebook Announces New Steps in Effort to Allow Users to Ask Health Questions Anonymously*, Stat (Apr. 30, 2019), https://www.statnews.com/2019/04/30/facebook-new-steps-privacy-health-data/.

requirements, *see* Proposed Decree, Att. A, pts. VII-X, and a mandate to establish "appropriate" information-security "safeguards," *id.* pt. V, these general requirements do not encompass the range of potentially unlawful conduct that amici and others have identified or establish express limits, such as the ones described above, on the company's interactions with children or its treatment of health data. Moreover, some of the proposed decree's general provisions, related to "covered third parties," leave a potential gap in Facebook's treatment of group administrators or other system users who may gain access to sensitive health data through other users themselves. The proposed decree defines "Covered Third Party" based on the use or receipt of certain information "*outside of a User-initiated transfer.*" Proposed Decree, Att. A, at Definitions § E (emphasis added). This exception, although unclear, could be read to apply to communication through a health support-group. Thus, for example, while the proposed decree would require certification from any Covered Third Party regarding its compliance with Facebook policies, *see id.* pt. VII, § E.1, and notifications about material changes in the company's sharing with such parties, *see id.* pt. II, it would not necessarily require such certifications regarding handling of group content, *cf.* Facebook, *Community Standards*, https://www.facebook.com/communitystandards/introduction (last visited Oct. 14, 2019) (Facebook's general standards about what it allows on its site), or notices of material changes in the types of data made available to other users.

## II.  Because of its broad release clause, the proposed decree is unfair, unreasonable, inadequate, and inconsistent with the public interest.

Because of the breadth of the release, the proposed decree is far from "fair, adequate, reasonable and appropriate under the particular facts." *Citizens*, 718 F.2d at 1126 (citation omitted). As an initial matter, it does not "incorporate[] concepts of corrective justice and

accountability." *United States v. Hyundai Motor Co.*, 77 F. Supp. 3d 197, 199 (D.D.C. 2015) (citation omitted) (holding that incorporation of such concepts is necessary for a consent decree to be substantively fair). Here, rather than holding Facebook accountable for its violations, the government has proposed excusing the company for violations without even identifying them, let alone addressing or penalizing each one.

The lack of transparency built into the release makes it particularly unjust, because of the nature of the claims in this case. At bottom, the government's complaint suggests that Facebook has built a business on duping consumers into giving it extensive personal data, based on false promises about how it protects privacy. *See generally* Compl. ¶¶ 3-4; Chopra Dissent 2 ("In many ways, Cambridge Analytica's scheme was a small-scale reflection of Facebook's own tactics of tricking users into sharing excessive amounts of personal data and then getting paid by third parties to target individual users."). Even after being ordered in 2012 to stop its deceptive practices, Facebook allegedly continued to violate the rights of tens of millions of U.S. consumers by sharing data it represented would be kept private, failing to share information with the independent privacy assessor required by the FTC's 2012 order, and misrepresenting its handling of phone-number and facial-recognition data. *See* Compl. ¶¶ 7-14. Such unlawful opaqueness should not be rewarded with a court order that sweeps under the rug even more information about other acts and practices that the FTC knows may have violated the law.

In light of the broad release, the consent decree also fails to measure up to the standard of adequacy, reasonableness, and appropriateness. "When assessing whether [a] consent decree" satisfies this standard, "courts focus on the extent to which the decree is confined to the dispute between the parties and whether the decree adequately accomplishes its purported goal." *Hyundai Motor Co.*, 77 F. Supp. 3d at 200 (internal quotation marks and citation omitted). Here, far from

being "confined to the dispute between the parties," *id.*, the proposed decree would give Facebook a pass on an untold number of past violations, of unknown breadth and consequence. For this reason, the decree is very different from typical consent decrees. *See, e.g.*, *Appalachian Voices v. McCarthy*, 38 F. Supp. 3d 52, 56 (D.D.C. 2014) (approving consent decree when its "scope … is limited to the sole remaining issue in [the] litigation"); *Home Builders Ass'ns of N. Cal. v. Norton*, 293 F. Supp. 2d 1, 4 (D.D.C. 2002) (in approving consent decree settling claims about a habitat designation for a particular species, noting that the decree would "in no way disturb" other protections for that species); *cf.* 4 William B. Rubenstein, Newberg on Class Actions § 13:61 (5th ed. 2019) (explaining that because of limits on claim preclusion, in class actions, "courts often police a proposed settlement agreement to ensure that the release is not overly broad, that is, that it does not release claims outside the factual predicate of the class's claims").

The breadth of the release also raises questions about the adequacy of other parts of the proposed decree. Without more information from the parties, the Court cannot know the number or substance of any known potential claims that are being released or the severity and breadth of the conduct at issue. Such information could be important to evaluating other aspects of the proposed decree. For example, in support of the proposed $5 billion fine, the government treats each of the "approximately 900 million views of Facebook webpages containing allegedly deceptive statements about data privacy" as a violation of the 2012 order and compares the per-violation amount of the fine to the per-violation amounts of the fines imposed in other cases. *See* Pl.'s Consent Motion 4, ECF No. 2. But if the proposed decree aims to settle other, known—but unidentified—violations of the 2012 order, the government's estimate of the per-violation fine necessarily is too low. To the extent a per-violation comparison matters, what the government and this Court should evaluate is the size of the fine across *all* the 2012 order violations identified by

the FTC, not some subset that the parties agreed could be listed publicly in a complaint. *See generally U.S. Dep't of Justice v. Daniel Chapter One*, 89 F. Supp. 3d 132, 148-49 (D.D.C. 2015) (listing five factors that courts consider in determining appropriate civil penalties for violations of FTC orders, but not mentioning per-violation amount), *aff'd*, 650 F. App'x 20 (D.C. Cir. 2016) (per curiam). Similarly incomplete is the government's argument that the settlement "addresses the *issues that gave rise to the* FTC investigation in a fair and efficient manner." Pl.'s Consent Motion at 6 (emphasis added). Again, information about the scope of the "resolved" claims that are known to the FTC is necessary for the Court to evaluate whether the proposed decree addresses issues fairly and efficiently.

In addition, the proposed release is inconsistent with the public interest because of the ways in which it increases, rather than decreases, consumers' risk of being harmed online by Facebook and other companies. As an initial matter, by giving up the FTC's enforcement rights, the proposed release limits consumers' ability to receive redress for Facebook's wrongdoing. Individuals have no private right of action under the FTC Act, and thus depend on the FTC for enforcement of the 2012 order and section 5. Moreover, even when individuals have causes of action to pursue, they may face hurdles that the government would not. Deception claims, by definition, involve actions that consumers do not accurately understand and thus may not be able to identify for legal action. And even when consumers learn of harmful Facebook practices, they may not be able to investigate and address violations as efficiently as the government, which can proceed through FTC administrative proceedings or in court, can use mandatory processes to investigate violations even before the start of litigation, and can seek relief for consumers nationally, without the hurdles of class certification. *See* 15 U.S.C. §§ 45(b), (m), 46(a), (b), 53(b), 57b(a), 57b-1.

Further, the release limits consumers' abilities to pursue self-help remedies. If the parties revealed the additional Facebook violations (or potential violations) that the release "resolves," that information could empower individuals to take steps to protect themselves. They might change, for example, how they share information within health support-groups or whether they permit their children to use Messenger Kids. Absent that information through this lawsuit, consumers might not even learn of the need to take protective action.

The release could also increase the risk that consumers will suffer harm from other companies. When they identify and address violations, the FTC's enforcement actions can be an important signal to other market participants about what the FTC considers necessary to protect consumers and avoid unfair or deceptive practices.[36] By releasing claims without identifying them, the FTC is forgoing an opportunity to send such signals to Facebook's competitors and to persuade companies across the market to adopt more consumer-protective practices.

In sum, the proposed release clause gives away too much. American consumers—the "beneficiaries" of any settlement here, *Citizens*, 718 F.2d at 1126—deserve action that will address the harm caused by Facebook's past violations and prevent future ones. The broad release that the parties propose runs too far in the opposite direction, allowing past violations to escape without remedy.

---

[36] For an example of guidance to industry based on FTC enforcement actions and settlements, *see* Müge Fazlioglu, *What FTC Enforcement Actions Teach Us About the Makings of Reasonable Privacy and Data Security Practices: A Follow-Up Study* (June 11, 2018), https://iapp.org/news/a/what-ftc-enforcement-actions-teach-us-about-the-makings-of-reasonable-privacy-and-data-security-practices-a-follow-up-study.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiff's consent motion for entry of stipulated order for civil penalty, monetary judgment, and injunctive relief.

Dated: October 15, 2019                            Respectfully submitted,

<div style="margin-left: 50%">

/s/ Rebecca Smullin
Rebecca Smullin (D.C. Bar No. 1017451)
Scott L. Nelson (D.C. Bar No. 413548)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
202-588-1000
rsmullin@citizen.org

Attorneys for Amici Curiae
Public Citizen, *et al.*

</div>