UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff<br><br>      v.<br><br>FACEBOOK, Inc.,<br>a corporation,<br><br>            Defendant. | Case No. 19-cv-2184-TJK<br><br>**PLAINTIFF'S RESPONSE TO *AMICI*** |

Pursuant to this Court's December 10, 2019 order, Plaintiff, the United States of America, respectfully files this response to the three *amicus* briefs in this matter: (1) the brief filed by the Electronic Privacy Information Center ("EPIC") (ECF No. 26); (2) the brief filed jointly by Public Citizen, the Campaign for a Commercial-Free Childhood, Common Sense Media, and United States Public Interest Research Group (hereinafter "Public Citizen") (ECF No. 25); and (3) the brief filed by the Center for the Legalization of Privacy (the "Center") (ECF No. 21).

## ARGUMENT

The *amici* raise some broad and conceptually interesting policy questions about data-privacy law in the United States generally. However, none of that impacts the only issue actually before this Court—the narrow and straightforward question of whether to enter a proposed consent settlement of a government enforcement action. That determination is governed by a "limited" and highly deferential standard of review, under which the Stipulated Order comfortably passes muster, without regard to the hypothetical

case *amici* want the court to now consider. *See In re Idaho Conservation League*, 811 F.3d 502, 515 (D.C. Cir. 2016) (the court's "duty is only to satisfy itself of the settlement's overall fairness to beneficiaries and consistency with the public interest" without "inquir[ing] into the precise legal rights of the parties nor reach[ing] and resolv[ing] the merits of the claims or controversy").

The proposed settlement brings definite and substantial relief to consumers as soon as possible and avoids years of litigation that would postpone the possibility of any relief for years. That consideration alone confirms that the proposed settlement "is well within the reaches of the public interest." *See United States v. W. Elec. Co.*, 900 F.2d 283, 309 (D.C. Cir. 1990) (the court's function here "is not to determine whether the resulting array of rights and liabilities is the one that will *best* serve society, but only to confirm that the resulting settlement is within the *reaches* of the public interest" (emphasis in original)). The Court should accordingly decline *amici*'s improper invitations to second-guess decisions the Federal Trade Commission and Department of Justice made regarding which claims to bring, which claims not to bring, when to settle litigation, and on what terms to settle—all of which are discretionary decisions reserved to the judgment of the executive branch.

### 1. The Proposed Resolution Is in the Public Interest and Should Be Entered Without Delay

"The balancing of competing social and political interests affected by a proposed . . . consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree." *United*

*States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981).  The terms of the settlement at issue advance the public interest by protecting consumers from Facebook's conduct while not unduly stifling innovation and commerce.  The proposed settlement has two main components: a civil-penalty award and injunctive relief imposing new compliance terms on Facebook.  The $5 billion civil penalty is the largest civil penalty ever obtained by the United States on behalf of the FTC—dwarfing the previous record of $168 million.[1]  *United States v. Dish Network, LLC*, 256 F. Supp. 3d 810, 991 (C.D. Ill. 2017).

The proposed settlement imposes injunctive and fencing-in relief specifically designed to prevent future misuse of data and requires fundamental changes to Facebook's data-privacy practices.  Among other things, the proposed Amended FTC Administrative Order ("Amended FTC Order") requires Facebook to consider and document privacy risks before implementing any new or modified practices that implicate consumer data, implement safeguards to control for those risks, and justify why it did not implement other known safeguards, such as collecting less consumer data.  Facebook must share these privacy reviews with the CEO, a third-party assessor, and, upon request, the FTC and Department of Justice.  Facebook also must implement new protections for consumer data before sharing it with third-party app developers.  Additionally, Facebook must extend the Amended FTC Order's privacy protections to any Facebook-affiliated entity that shares consumers' personal information, including WhatsApp.

---

[1] Indeed, the penalty here for Facebook's privacy violations are on par with penalties assessed for the *Deepwater Horizon* disaster ($5.5 billion civil penalty) and the *Countrywide* mortgage fraud scandal ($5 billion civil penalty).

The Amended FTC Order also establishes strong new mechanisms, from the corporate board down, to ensure that Facebook executives are held accountable for the decisions they make about privacy, and that those decisions are subject to meaningful oversight.  For instance, the order requires Facebook to restructure its board of directors to create a new independent board committee with specific authority and responsibility for overseeing Facebook's privacy practices.  Additionally, the new order requires Facebook, among other things, to:

- Hold Facebook management more directly accountable for Facebook's privacy program by requiring Facebook's CEO (and his successors) to certify compliance every quarter and subjecting the CEO personally to potential civil and criminal penalties for false certifications;
- Cooperate with a stronger and more independent assessor, who must independently judge the effectiveness of Facebook's privacy program and privacy controls—and not rely solely on management assertions—and who can only be removed with the consent of the FTC;
- Create a comprehensive data-security program, which must include encrypting user passwords and not asking for passwords to other third-party accounts when people sign up for Facebook accounts;
- Implement strict employee-access controls to user information;
- Not use phone numbers it received specifically for security purposes for advertising;

- Implement privacy protections related to facial recognition technology, including obtaining users' affirmative consent before using facial recognition technology in a manner that materially exceeds prior disclosures to users; and

- Not misrepresent the purposes for which it uses personal information (in addition to existing prohibitions about the collection or disclosure of such information).

Given the extraordinary monetary relief and foundational privacy reforms contained in the proposed resolution of this case, this settlement more than satisfies the relevant standard of being within "the reaches of the public interest," *W. Elec. Co.*, 900 F.2d at 309.  Indeed, the measures in the Amended FTC Order provide consumers with substantial privacy protections they do not currently enjoy.  These measures not only address Facebook's past misconduct, but also introduce a sea change in how Facebook approaches privacy decisions by requiring it to consider privacy at every stage of its operations, and providing unprecedented transparency and accountability for those decisions.  *Cf. United States v. Archer- Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case.").

The *amici* pay lip service to the standard this Court should use to evaluate the consent settlement, but they apply that standard in a fundamentally incorrect, unworkable way.  One of the most significant problems is that the *amici* essentially invite this Court to make *de novo* factual findings about the conduct in the United States' filings, about other administrative complaints the *amici* have filed with the FTC, about other claims the *amici* suggest should be brought, and about other purported Facebook misconduct.  EPIC

Brief at 10-11; Public Citizen Brief at 8-16.  The only way for the Court to do this would be to engage in exactly the type of inquiry that the D.C. Circuit has repeatedly eschewed when approving consent settlements.  *In re Idaho Conservation League*, 811 F.3d at 515 (the Court "need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy"); *W. Elec. Co.*, 900 F.2d at 309 (D.C. Cir. 1990) (the district court's function in deciding whether to approve a consent decree "is not to determine whether the resulting array of rights and liabilities is the one that will best serve society").

*Amici* criticize the government's citations to the significant deference owed to the government in the entry of consent decrees—a proposition drawn from cases such as *Idaho Conservation League*, *supra*, and *Citizens for a Better Environment v. Gorsuch*, 718 F.2d 1117 (D.C. Cir. 1983).  The government does not suggest that it is entitled to a rubber stamp from this Court.  Rather, the point is that both the size of the monetary relief and scope of injunctive relief plainly meet the standard—and, just as importantly, that *amici*'s insistences that the Court explore all aspects of Facebook's behavior and demand more pounds of flesh are exactly the types of arguments rejected in *Citizens for a Better Environment*, 718 F.2d at 1126 ("The court's duty when passing upon a settlement agreement is fundamentally different from its duty in trying a case on the merits . . . .  [I]t is precisely the desire to avoid a protracted examination of the parties' legal rights which underlies consent decrees."), and harshly criticized in *SEC v. Citigroup Global Markets, Inc.*, 752 F.3d 285, 297 (2d Cir. 2014) ("What the district court may not do is find the public interest disserved based on its disagreement with the [agency's] decisions on discretionary matters of policy, such as deciding to settle without requiring an admission

of liability."). Indeed, "[t]he job of determining whether the proposed [agency] consent decree best serves the public interest . . . rests squarely with the [agency], and its decision merits significant deference." *Id*. The wisdom of this deference is particularly evident in this case, where the *amici*'s own views on what a proper resolution looks like have shifted. EPIC and other *amici* originally told the FTC that a $2 billion civil penalty would be appropriate,[2] but they now tell this Court that a $5 billion civil penalty is "not sufficient."

In any event, the penalty amount here is far from a slap on the wrist. In *United States v. Dish Network*, for example, the largest civil penalty obtained in an FTC matter, the court found more than 95 million Telemarketing Sales Rule ("TSR") and state law do-not-call violations that carried maximum penalties and statutory damages of $783 billion. After noting that Dish was culpable, had not taken responsibility for its actions, and had a history of not complying with do-not-call laws, the court assessed a $280 million total fine—approximately 20 percent of Dish's after-tax profits. The court reasoned that the amount represented "a significant penalty" for the defendant's violations "over years and years of careless and reckless conduct," but that it also was constitutionally appropriate and consistent with due process. *See Dish Network*, 256 F. Supp. 3d at 991; *see also United States v. Reader's Digest Ass'n, Inc.*, 662 F.2d 955, 959-60 (3d Cir. 1981) (affirming $1,750,000 civil penalty for 17,940,521 violations of FTC

---

[2] https://epic.org/privacy/facebook/2011-consent-order/US-NGOs-to-FTC-re-FB-Jan-2019.pdf.  The letter to the FTC was signed by EPIC, Color of Change, Common Sense Media, Constitutional Alliance, Government Accountability Project, Open Market Institute, Privacy Times, Patient Privacy Rights, and Stop Online Violence Against Women.

consent order, or approximately $0.10 per violation).  Here, the $5 billion penalty is 23 percent of Facebook's after-tax profits for 2018—higher than the result achieved after hard-fought litigation in *Dish Network*, but would be obtained without a decade of litigation and its attendant risks.

Moreover, EPIC's brief reveals that its real agenda is to force the FTC to impose substantive new legal requirements on the tech industry, and to break apart Facebook. EPIC Brief at 19 ("EPIC has repeatedly urged the FTC to incorporate [EPIC's *Code of Fair Information Practices*] into the Commission's Consent Decrees."), 20 ("[T]he FTC should require Facebook to unwind the acquisition of both WhatsApp and Instagram."). Neither of these results can be squared with a resolution that is reasonably tailored to this targeted consumer-protection enforcement matter, and such measures would reach well beyond the parameters of the complaint that the Court would be resolving.

The *amici*'s opinions about their preferred results also illustrate an internal contradiction in their own arguments.  EPIC's brief acknowledges that evaluation of a consent settlement should include assessing "the possible risks involved in litigation if the settlement is not approved," EPIC Brief at 8, but both EPIC and Public Citizen then assume without any basis that the enforcement actions they want the government to bring would immediately succeed and lead to historic relief surpassing the already historic terms reached by the parties consensually.  A key virtue of the government's proposed resolution here is that this consent settlement would bring definite and substantial relief to consumers as soon as possible, as opposed to engaging in years of litigation and postponing the possibility of any relief for years.  The United States has recent experience with this:  it sued Dish Network for violating the FTC's Telemarketing Sales

Rule in 2009, and won $168 million at trial in 2017, but—due to a pending appeal before the Seventh Circuit—has still not recovered the civil penalties over ten years later.  And, in addition to bringing definite benefits to consumers now, settlement also saves the government the time and resources—and avoids the litigation risks—that any contested case entails.

At base, the *amici* simply disagree with a discretionary enforcement decision and seek to judicially impose a different decision to advance their preferred policy outcome. But the law has been clear for decades that private entities do not possess a veto over a federal agency's enforcement decisions.  *See West v. Lynch*, 845 F.3d 1228, 1237 (D.C. Cir. 2017) ("Courts do not lightly speculate how independent actors not before them might exercise their broad and legitimate discretion . . . especially when the independent actors are federal prosecutors."); *Ass'n of Irritated Residents v. E.P.A.*, 494 F.3d 1027, 1031 (D.C. Cir. 2007) ("Although the Supreme Court's decision in *Chaney* applies directly to agency decisions not to enforce a statute, we have also applied it to an agency's decision to settle an enforcement action.") (citing *Heckler v. Chaney*, 470 U.S. 821, 838 (1985)).

In fact, the D.C. Circuit has "narrowly construed a court's public interest authority" to review proposed consent decrees and specifically held that a consent order should be reviewed by this Court in a manner that "avoid[s] encroaching on the Executive's core discretion over enforcement decisions."  *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 744 (D.C. Cir. 2016).  EPIC's and Public Citizen's briefs invite just such a substantial encroachment on the executive branch's enforcement decisions. Beyond hyperbole and misstatements of the record, the *amici* fail to explain how a

monumental civil penalty and fundamental corporate privacy reforms do not meaningfully address the misconduct alleged. The government has decided after robust investigation and debate that this resolution is the appropriate way to handle Facebook's violations of the FTC's 2012 Order. That determination is reasonable, and the Court should enter the proposed resolution without delay.

> 2. **The *Amici* Mischaracterize the Proposed Release, Which Is a Typical Feature of an Enforcement Action**

In addition to the unprecedented civil penalty and injunctive relief, the proposed settlement includes release language to which several *amici* raise objections. The *amici*'s arguments on this topic substantially misinterpret the release. Releases are a common practice in settlements, and many Department of Justice and federal agency settlements have released companies, and their officers and directors, from liability for all conduct alleged (and similar conduct) under the applicable law.[3]

The proposed settlement here has two separate release provisions: (1) the Stipulated Order releases all claims for violations of the 2012 FTC Order before June 12, 2019; and (2) it releases consumer protection-related claims under Section 5 of the FTC Act that were *known* by the FTC before June 12, 2019. The *amici*'s objections to these release provisions rest on a misunderstanding of their scope and operation.

*First*, the *amici* claim the release would harm the public by extinguishing

---

[3] *E.g.*, *United States v. Chevron U.S.A., Inc.*, 380 F. Supp. 2d 1104, 1116 (N.D. Cal. 2005) (entering consent decree over *amici* objections to a release provision because, among other things, "the release was granted in exchange" for relevant requirements in the decree and because "when viewed in the context of the overall relief of the consent decree," even an area of concern related to the release "is not enough to merit rejection of the Consent Decree as a whole").

Facebook-related claims *amici* raised in petitions and notices to the FTC, as well as thousands of existing consumer complaints in the FTC's Consumer Sentinel database. Although this factual matter is not relevant to the questions before the Court, FTC staff have concluded that the *amici* vastly overstate the content and force of these submissions. More importantly, the proposed settlement does not in fact release any actual violations of the FTC Act beyond those discussed in the Complaint. This is because, after extensive investigation and review of submitted consumer complaints, the FTC knew of no other cognizable violations that occurred before June 12, 2019.[4] Therefore, if the FTC were subsequently to discover any deceptive or unfair practices, whether that practice occurred before or after June 12, 2019, it could bring an action to address that issue.

*Second*, the proposed settlement's release of known and unknown violations of the 2012 Order is essentially coextensive with the doctrine of *res judicata*, or claim preclusion. Generally, the doctrine of *res judicata* releases all claims, known and unknown, that could have been brought in an order-enforcement action. *See Apotex, Inc. v. Food & Drug Admin.*, 393 F.3d 210, 218 (D.C. Cir. 2004) ("Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."). Because the FTC investigated all aspects of Facebook's conduct under the 2012 Order since it took effect,

---

[4] *See* Statement of Chairman Joe Simons and Commissioners Noah Joshua Phillips and Christine S. Wilson Regarding the Matter of Facebook, Inc., at 7-8 (July 24, 2019), *available at* https://www.ftc.gov/system/files/documents/public_statements/ 1536946/092_3184_facebook_majority_statement_7-24-19.pdf. In particular, while not relevant, the vast majority of submitted consumer complaints involving Facebook did not even address a privacy issue or implicate the 2012 Order, and none known to the FTC raised a potential issue not covered by the proposed settlement.

*any* order enforcement action, whether concluded by settlement or a victory in court, would almost certainly have released all known and unknown claims for violations of the order arising before the enforcement action. *See Ananiev v. Freitas*, 37 F. Supp. 3d 297, 310 (D.D.C. 2014). The fact that the release provision is set forth explicitly in the Stipulated Order does not change the legal reality that such a release is not only common, but also generally prescribed by *res judicata* principles.

### 3. An Amended FTC Administrative Order Does Not Require Public Comment

EPIC incorrectly contends that the FTC "sidestepped" its own regulations in approving the settlement in this case. EPIC Brief at 22-23. The FTC is not required to seek public comment when it decides to modify an administrative order under its rules of practice.

To support its argument, EPIC relies on 16 C.F.R. § 2.34(c), which requires the FTC to seek public comment on a consent order—*i.e.*, an agreement to settle an administrative complaint, *see* 16 C.F.R. § 2.31. However, the FTC's modification of its existing orders is governed by 16 C.F.R. § 3.72, not § 2.34(c). In marked contrast to 16 C.F.R. § 2.34(c), § 3.72 has no public-comment requirement. In fact, it explicitly states that "[w]henever an order to show cause is not opposed . . . *the Commission*, in its discretion, may decide the matter . . . ." 16 C.F.R. § 3.72(b)(2) (emphasis added); *see United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 983 (9th Cir. 2008) ("Where an agency includes language in one section of the regulation and omits it in another, it is reasonable to presume that the agency acted intentionally in forgoing the language."). And EPIC does not identify any statute or other law that requires the United

States—the party bringing this action before this Court, *see* 15 U.S.C. § 56(a)—to conduct notice and comment before settling an FTC Act enforcement action.[5]

### 4. The Proposed Stipulated Order and Amended FTC Administrative Order Do Not Raise Fourth Amendment Concerns and Comply With the Fourth Amendment

The Center's brief is devoted to the incorrect argument that the Stipulated Order and Amended FTC Order raise Fourth Amendment concerns. There are numerous problems with this argument, including that: (1) the Center itself recognizes that current law forecloses its arguments; (2) neither order gives the government access to Fourth Amendment-protected information; and (3) in any event, the orders comply with relevant Fourth Amendment administrative precedent.

As discussed *supra* and in the government's previous filings, this Court's review of the proposed consent judgment is deferential. The Center's brief does not meaningfully reach the legal question before the Court and does not offer the Court any specific legal precedent suggesting that its speculative concerns warrant rejecting the settlement. On this ground alone, the Court could decline to consider the Center's brief.

But even if the Court were to consider the Center's arguments on their merits, it should reject those arguments because the Fourth Amendment does not protect the data that Facebook users voluntarily share with Facebook—a point repeatedly recognized by the Center. Brief at 11 (recognizing that the Center's position is more aligned with Supreme Court dissents than holdings); *see also id.* at 12-16. In fact, the D.C. Circuit

---

[5] EPIC also argues that, in lieu of a public-comment period, this Court should consider its comments on the Stipulated Order in this proceeding. EPIC Amicus Brief at 22-23. That is exactly what the Court is doing, without objection from the United States.

recently held that Facebook users lack a "reasonable expectation of privacy" in the Facebook content that they voluntarily post on Facebook. *Palmieri v. United States*, 896 F.3d 579, 588 (D.C. Cir. 2018) ("Obtaining . . . information [a person] knowingly and voluntarily shared with his Facebook friends is not a [Fourth Amendment] search.").

As to the Center's suggestions that the Fourth Amendment *should* someday cover the content at issue, the government respectfully declines to engage on the larger policy concerns the Center's *amicus* brief expresses. This is a civil-penalty matter referred to the Attorney General by the FTC pursuant to 15 U.S.C. § 56(a), and it is therefore cabined to the circumstances of this specific case. Neither the FTC, the Department of Justice, nor the Court should use this case to legislate Fourth Amendment rules.

Finally, the government strongly disagrees with the Center's characterization of the Amended FTC Order's recordkeeping provisions as some sort of Trojan horse through which the government intends to acquire and use Facebook user data for undisclosed purposes. The recordkeeping provisions are familiar parts of agency enforcement actions and are intended to ensure ongoing compliance with the order. *United States Dep't of Justice v. Daniel Chapter One*, 89 F. Supp. 3d 132, 144 (D.D.C. 2015) (collecting cases and noting that "courts may order record-keeping and monitoring to ensure compliance with a permanent injunction"). For example, the Amended FTC Order makes sure that Facebook retains documents related to its compliance with the order, ECF No. 4-1 at 19-20, and it, in conjunction with the Stipulated Order, gives the FTC and the Department of Justice the right to obtain information related to Facebook's privacy practices and its compliance with the order, *id*. at 20. But there is nothing in the

Amended FTC Order that requires Facebook to provide any information about any specific user to the government.

The Center's suggestions to the contrary are incorrect speculation. It argues that a provision requiring Facebook to create reports about its compliance with the order and to maintain relevant documents might deliver user data—such as Facebook users' telephone numbers, Center Brief (ECF No. 21) at 3—to the government. The first problem with these arguments is the basic fact that, for example, a Facebook user's telephone number is not protected by the Fourth Amendment. *See Smith v. Maryland*, 442 U.S. 735, 742 (1979) ("All telephone users realize that they must 'convey' phone numbers to the telephone company."); *Palmieri*, 896 F.3d at 588. But more importantly, multiple recordkeeping and disclosure provisions have been in place since the FTC's 2012 Facebook Order, and no disclosures of the sort the Center is concerned about have occurred. If the threat the Center invokes were real, tangible, and serious enough to counsel against entering the proposed consent settlement, that harm should have manifested itself at some point within the last seven years. But it has not.

More broadly, even if the Amended FTC Order could incorrectly be read to require production of Fourth Amendment-protected information, the Supreme Court and the D.C. Circuit have for nearly three-quarters of a century repeatedly rejected Fourth Amendment challenges to agency orders requiring document productions—as long as the agency's requests are reasonable and related to the agency's investigatory and enforcement powers. *E.g.*, *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 205 (1946); *SEC v. Arthur Young & Co.*, 584 F.2d 1018, 1023-24 (D.C. Cir. 1978) ("[I]t is sufficient [for Fourth Amendment purposes] if the inquiry is within the authority of the

agency, the demand is not too indefinite and the information sought is reasonably relevant.").

The Center does not even cite this standard, let alone meaningfully engage with it. The FTC is statutorily authorized to compel the production of "all . . . documentary evidence relating to any matter under investigation." 15 U.S.C. § 49. The provisions in the Amended Order—which universally focus on compliance monitoring and recordkeeping—are plainly within the agency's jurisdiction and are reasonably relevant to ensuring Facebook's compliance with the order. *Arthur Young & Co.*, 584 F.2d at 1024. The Amended Order therefore does not raise Fourth Amendment concerns.

## CONCLUSION

The United States respectfully disagrees with the objections to the settlement raised by the *amici* and requests that the Court enter the Proposed Stipulated Order without delay.

DATED: January 24, 2020

**FOR THE UNITED STATES:**

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

DAVID M. MORRELL
Deputy Assistant Attorney General

GUSTAV W. EYLER (997162)
Director
Consumer Protection Branch

ANDREW E. CLARK
Assistant Director

*/s/ Patrick R. Runkle*
LISA K. HSIAO (444890)
Senior Litigation Counsel
PATRICK R. RUNKLE
JASON LEE
Trial Attorneys
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044-0386
Telephone:  (202) 616-0219
Fax: (202) 514-8742
Lisa.K.Hsiao@usdoj.gov
Patrick.R.Runkle@usdoj.gov
Jason.Lee3@usdoj.gov

*Of Counsel:*

JAMES A. KOHM (426342)
Associate Director for Enforcement

LAURA KOSS (441848)
Assistant Director for Enforcement

ROBIN L. MOORE (987108)
REENAH L. KIM (478611)
LINDA HOLLERAN KOPP (472355)
Attorneys
Federal Trade Commission
600 Pennsylvania Avenue, NW,
Mail Stop CC-9528
Washington, DC 20580