**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>FACEBOOK, INC.,<br>a corporation,<br>Defendant. | Case No. 19-cv-2184 (TJK) |

**FACEBOOK, INC.'S RESPONSE TO AMICUS BRIEFS OF CENTER FOR LEGALIZATION OF PRIVACY, PUBLIC CITIZEN, ET AL., AND ELECTRONIC PRIVACY INFORMATION CENTER**

Pursuant to the Court's December 10, 2019 Order, Facebook, Inc. respectfully submits this Response to the Briefs of Amici Curiae (ECF Nos. 21, 25, 26) regarding the Court's approval of the order proposed by the parties to resolve this matter ("Stipulated Order") (ECF No. 4-1).

## I. INTRODUCTION

The Stipulated Order is the culmination of a lengthy investigation and negotiation between Facebook, FTC, and DOJ. It provides for immediate relief and a substantial and unprecedented $5 billion civil penalty. The FTC conducted a 10-month long investigation, during which Facebook produced thousands of pages of documents along with numerous substantive responses to FTC questions, in addition to countless hours-long meetings and phone calls to address the FTC's concerns. The parties negotiated, at arms-length, the detailed terms of the Stipulated Order for nearly five months. Only after these extensive negotiations and internal deliberations on both sides did the FTC vote to refer the proposed settlement to DOJ, which also

carefully reviewed it and ultimately submitted it to the Court for approval. The agreement is the product of more than one year of work by numerous government and Facebook attorneys, and it incorporates remedial measures that will not only reinforce the privacy of Facebook's users, but ensure greater accountability within the Company and its Board on matters of privacy. Chairman Simons summed up the historic significance of the Stipulated Order when he said that its "innovative, far-reaching conduct relief—imposing affirmative obligations and corporate governance reforms—extends well beyond the typical relief historically awarded by the courts in consumer protection cases . . . ." Majority Statement of Chairman Joe Simons and Commissioners Phillips and Wilson, at 6 (July 24, 2019), *available at* https://www.ftc.gov/system/files/documents/public_statements/1536946/092_3184_facebook_majority_statement_7-24-19.pdf. The Stipulated Order should be approved.

In the Stipulated Order, Facebook agrees to provide privacy protections far beyond those required by United States law, including an unsurpassed level of accountability by its executives. Facebook agreed to the sweeping terms in the Stipulated Order because it is committed to rebuilding the trust of its users and protecting consumers' privacy. By agreeing to the Stipulated Order, the Company is working to set a new standard for itself and the industry more broadly.

Under the Stipulated Order, Facebook will supplement its framework for protecting consumer privacy in many ways, utilizing robust processes to identify potential privacy risks and protect against those risks. Among many other measures, Facebook will introduce new safeguards for overseeing third-party developers with access to user data. The Stipulated Order also contains substantial oversight mechanisms to ensure Facebook complies with the commitments it is making, for example: a new, independent committee of Facebook's Board of Directors (the "Independent Privacy Committee" or "IPC") will be established to oversee the

Privacy Program; a third-party independent assessor will not only ensure that the Company has implemented and maintained Facebook's Privacy Program, but also will test the effectiveness of that program, generating biennial assessments that must be provided to the IPC and the FTC; Facebook will appoint one or more Designated Compliance Officer(s) ("DCO"), and the Company's DCO and CEO will provide the FTC quarterly and annual certifications that the Company is meeting its Privacy Program obligations and the requirements of the Order, respectively; and Facebook will be required to provide additional compliance reports to the FTC for the next 20 years.  The DOJ also may review any of the reports, assessments, certifications, or other compliance documentation that Facebook provides to the FTC.  These requirements will significantly impact Facebook's operations, and complying with the Order will entail an enormous investment by the Company.  Already, the Stipulated Order has been a catalyst for an evolution in the Company's culture and operations, and employees from across the Company have been working for months on implementing the proposed requirements of the Stipulated Order.

In addition, Facebook has agreed to pay a monetary penalty of $5 billion.  This penalty is the largest privacy penalty ever in the United States and is more than 20 times greater than the largest penalty in Europe, even after implementation of the European Union's General Data Protection Regulation.  It represents approximately 23% of Facebook's profit in 2018, a significant amount of money that reflects the seriousness with which Facebook takes privacy and its obligation to comply with the Stipulated Order.  As the FTC explained, "[i]f the FTC had litigated this case, it is highly unlikely that any judge would have imposed a civil penalty even remotely close to this one."  Majority Statement at 5.

In short, the Stipulated Order fairly and adequately resolves the dispute between the FTC and Facebook, addresses the privacy risks and allegations raised in the Complaint (ECF No. 3), and promotes the purposes of the Federal Trade Commission Act by protecting Facebook users. Entering the Stipulated Order will avoid years of protracted and costly litigation at the expense of taxpayers and will avoid draining judicial and agency resources for, at most, a significantly smaller penalty, fewer structural changes, and narrower injunctive relief. The Stipulated Order certainly provides the FTC and the public with far more substantial and sweeping relief against Facebook than the government could have achieved in litigation. As the D.C. Circuit has emphasized, "it is precisely the desire to avoid a protracted examination of the parties' legal rights which underlies consent decrees. Not only the parties, but the general public as well, benefit from the saving of time and money that results from the voluntary settlement of litigation." *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983).

This Court should approve the Stipulated Order.

## II. STANDARD OF REVIEW

"There is a strong policy favoring the voluntary settlement of civil matters." *Envtl. Tech. Council v. Browner,* No. 94–2346, 1995 WL 238328, at *2 (D.D.C. Mar. 8, 1995); *see also United States v. MTU Am. Inc.*, 105 F. Supp. 3d 60, 63 (D.D.C. 2015). A court reviewing a consent order need only "determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties." *Envtl. Def. v. Leavitt*, 329 F. Supp. 2d 55, 70 (D.D.C. 2004) (quoting *Citizens for a Better Env't*, 718 F.2d at 1126). Courts also assess whether the consent decree is in the public interest. *Citizens for a Better Env't*, 718 F.2d at 1126.

When evaluating a consent order's fairness, the Court looks "to the negotiating process and attempt[ing] to gauge its candor, openness, and bargaining balance." *United States v. District of Columbia*, 933 F. Supp. 42, 48 (D.D.C. 1996) (citation omitted); *see also MTU Am. Inc.*, 105 F. Supp. 3d at 63 (finding procedural fairness where "[t]here [was] no suggestion of impropriety in the negotiation of the agreement, and all the parties were represented and advised by competent technical and legal staff"). "Valid consent that resulted from good faith bargaining itself indicates that the agreement is procedurally fair." *United States v. Wells Fargo Bank, NA*, 891 F. Supp. 2d 143, 145 (D.D.C. 2012). And when assessing adequacy, reasonableness, and appropriateness, courts "focus on the extent to which the decree is confined to the dispute between the parties and whether the decree adequately accomplishes its purported goal." *MTU Am. Inc.*, 105 F. Supp. 3d at 63 (quoting *Leavitt*, 329 F. Supp. 2d at 71).

Ultimately, as the D.C. Circuit has observed, "the court's function is not to determine whether the resulting array of rights and liabilities 'is the one that will *best* serve society,' but only to confirm that the resulting 'settlement is within the *reaches* of the public interest.'" *United States v. W. Elec. Co.*, 900 F.2d 283, 309 (D.C. Cir. 1990) (emphasis in original). This is especially true where, as here, "a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement." *Leavitt*, 329 F. Supp. 2d at 70; *see also United States v. City of Los Angeles*, 288 F.3d 391, 402-03 (9th Cir. 2002) (noting that courts generally adopt a "presumption of adequacy of government representation"). The D.C. Circuit has emphasized that "[n]ot only the parties, but the general public as well, benefit" from settlement because it "avoid[s] a protracted examination of the parties' legal rights which underlies consent decrees." *Citizens for a Better Env't*, 718 F.2d at 1126.

A proposed order should not be denied entry simply because the court "believes the [g]overnment could have negotiated a more exacting decree." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 743 (D.C. Cir. 2016) (citation omitted). To that end, "[r]emedies which appear less than vigorous may well reflect an underlying weakness in the government's case, and for the district judge to assume that the allegations in the complaint have been formally made out is quite unwarranted." *Wells Fargo Bank*, *NA*, 891 F. Supp. 2d at 146 (citation omitted).

"[S]hort of a decree that makes a mockery of judicial power, the Court should accept an agreement between the parties." *Id.* at 145 (citation omitted).

## III. ARGUMENT

The Order is fair, adequate, reasonable and appropriate, and serves the public interest. *Citizens for a Better Env't*, 718 F.2d at 1126. *Amici* object to various aspects of the settlement but where, as here, "the essential dispute between *amici* and appellants [can be] cast as objections to the remedies sought, the district judge [is] not [] empowered to reject [the settlement] merely because he believed other remedies were preferable." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C. Cir. 1995). This Court should approve the Order.

Amici assert six principal objections to the Stipulated Order, each of which is meritless and none of which undermines the validity of the settlement.

### A. The Scope Of The Release

EPIC and Public Citizen argue that the Stipulated Order contains an overly broad release that effectively grants Facebook immunity for a variety of known and unknown claims that reach beyond the scope of the investigation and the Order. ECF No. 26 at 8; ECF No. 25 at 6. That is incorrect; releases of the type contained in the Stipulated Order are routinely approved as part of settlements like this one. Parties would never settle with the government if the settlement

agreement did not in fact *settle* the issues and allow the parties to move forward. *Hershon v. Gibraltar Bldg. & Loan Ass'n, Inc.*, 864 F.2d 848, 853 (D.C. Cir. 1989) (Releases are "designed to resolve disputes out of court—not to spawn litigation. Parties will enter settlement agreements only if they are assured that the language contained in such releases will be treated as definitive and final."). That is what the release in this case does.

The Stipulated Order resolves "all claims that [Facebook], prior to June 12, 2019, violated the [2012 Consent Order]" and "resolves all consumer-protection claims *known* by the FTC prior to June 12, 2019, that [Facebook] violated Section 5 of the FTC Act." Stipulated Order, ECF No. 4-1, at 1-2 (emphasis added). The FTC conducted a nearly year-long investigation of potential order violation claims and Section 5 claims, and those claims are either addressed in the Stipulated Order or were, in the FTC's discretion, deemed meritless. Releases are common in consent orders and all settlements, and it is unreasonable to expect Facebook to negotiate an order without the FTC agreeing to such a release. *See Ingram Corp. v. J. Ray McDermott & Co.*, 698 F.2d 1295, 1312 (5th Cir. 1983) (recognizing the "public policy of encouraging the settlement of differences and compromise of disputes in which the execution and exchange of releases is the common and legally accepted means of consummation"); *Altier v. Worley Catastrophe Response*, LLC, No. CIV.A 11-241, 2012 WL 161824, at *9 (E.D. La. Jan. 18, 2012) ("A release of all claims that the settling plaintiffs have against the settling defendant is extremely common in settlement agreements.").

Moreover, the release in the Stipulated Order is not unique and its language has been echoed repeatedly in other settlements, including the FTC's 2012 settlement with Google, the largest privacy violation case prior to this litigation. *See, e.g,* [Proposed] Stipulated Order For Permanent Injunction and Civil Penalty Judgment, *United States v. Google Inc.*, No. CV 12-

04177 SI (N.D. Cal. 2012), *available at* https://www.ftc.gov/sites/default/files/documents/cases/2012/08/120809googlestip.pdf ("The parties have consented to the entry of this Stipulated Order for Permanent Injunction and Civil Penalty Judgment ('Order') to resolve all matters of dispute between them in this action and any claim that Defendant's conduct in connection with the matters alleged in the Complaint violated the FTC Act or the FTC Decision and Order in FTC Docket No. C-4336 . . . ."); *see also* Majority Statement of Chairman Joe Simons and Commissioners Phillips and Wilson, at 7 (citing Agreement for Compromise Settlement and Release, *United States v. Barclays Capital, Inc.*, No. 16-CV7057(KAM/JO) (E.D.N.Y. Apr. 24, 2018), ECF No. 137, *available at* https://www.justice.gov/opa/pressrelease/file/1047101/download ("releasing Barclays and two officers from all claims that were or could have been asserted in the action, as well as any other civil claim under certain statutes and common law theories for conduct alleged in the complaint and conduct more broadly related to other residential mortgage-backed securities deals"); *United States v. Wells Fargo Bank, N.A.*, No. 12CIV7527JMFCF (S.D.N.Y. Apr. 8, 2016), ECF No. 320 ("releasing Wells Fargo, and its officers and directors, from any civil or administrative monetary claim under certain statutes and common law theories for conduct alleged in the complaint and conduct relating to single-family residential FHA loans").[1]

---

[1]  *See also* Royal Bank of Scotland Settlement Agreement, at 3 (Aug. 14, 2018) *available at* https://www.justice.gov/opa/press-release/file/1087146/download ("The United States fully and finally releases RBS, each of its current and former parents, subsidiaries and affiliated entities, and each of their respective successors and assigns (collectively, the "Released Entities"), from all civil claims that could have been asserted by the United States, as well as any other civil claim the United States has against the Released Entities for the Covered Conduct . . . ."); Nomura Holdings America Inc. Settlement Agreement, at 4 (Oct. 16, 2018) *available at* https://www.justice.gov/usao-edny/press-release/file/1101231/download ("The United States fully and finally releases Nomura, each of its current and former parents,

**B. Changes To Facebook's Business And Privacy Practices**

EPIC and Public Citizen argue that the Stipulated Order does not require Facebook to make meaningful changes to its business and privacy practices. ECF No. 26 at 12; ECF No. 25 at 2. That is also incorrect. The Stipulated Order represents a significant modification and expansion of the 2012 Order, and its injunctive provisions vastly exceed what could be achieved in litigation and give consumers meaningful protection now.

Notably, the Stipulated Order expands the Privacy Program requirements embodied in the 2012 Order and adds substantially more oversight and accountability measures. These expanded provisions include: (1) implementation of safeguards that control for material privacy risks (Order, § VII.E.2); (2) the appointment of the DCO responsible for overall compliance with the Privacy Program (*id*. §§ VII.C, VII.E.2.c); (3) new controls for overseeing third-party developers (*id*. § VII.E); and (4) the creation of a new Independent Privacy Committee of the Board of Directors that will directly oversee the Privacy Program (*id*. § X).

The Stipulated Order further requires major and unprecedented corporate governance changes, including the creation of two new committees of the Board. The Independent Privacy Committee of the Board will receive information about the functioning of Facebook's Privacy Program directly from an independent assessor, at least quarterly and at the end of each biennial cycle. In addition, the Principal Executive Officer, currently Mr. Mark Zuckerberg, and the DCO will be required to submit quarterly and annual certifications that Facebook is in compliance with its obligations pertaining to the Privacy Program and under the Order (*id*. § XI).

---

subsidiaries, and affiliates, each of their respective successors and assigns (collectively, the "Released Entities"), from any civil claims that could have been asserted by the United States, as well as any other civil claim the United States has against the Released Entities for the Covered Conduct . . . .").

Moreover, the Stipulated Order's compliance monitoring and discovery provisions (*id*. § XV) allow the FTC to quickly investigate and correct any perceived risks without the burden of launching a formal investigation.

The unprecedented changes required by injunctive provisions of the Stipulated Order are carefully calibrated to ensure the privacy of Facebook users' data. As Chairman Simons stated:

> "The Order's innovative, far-reaching conduct relief—imposing affirmative obligations and corporate governance reforms—extends well beyond the typical relief historically awarded by the courts in consumer protection cases involving legitimate companies. Even assuming the FTC would prevail in litigation, a court would not give the Commission carte blanche to reorganize Facebook's governance structures and business operations as we deem fit."

Majority Statement at 6.

Amici may not believe that the Stipulated Order does enough to "restrict Facebook's privacy practices" (ECF No. 26 at 13), but, as the FTC explained:

> The argument that 'more is better' is certainly appealing, but it relies on a false dichotomy: a hypothetical 'more' versus the extraordinary and certain relief the Commission has obtained . . . . [W]e can only get what we can win in litigation or via hard-fought negotiations. The FTC does not have the authority to regulate by fiat."

Majority Statement at 6.

In short, these new and strengthened provisions more than adequately resolve the dispute between the FTC and Facebook, address the privacy risks and allegations raised in the Complaint (ECF No. 3), promote the purposes of the Federal Trade Commission Act (the "FTCA") by protecting Facebook users, and are well "within the reaches of the public interest," *see W. Elec. Co.*, 900 F.2d at 309.

### C. The Monetary Penalty

EPIC and Public Citizen complain that the $5 billion penalty achieved by the FTC is insufficient. ECF No. 26 at 21; ECF No. 25 at 2. This is not a credible argument.

As an initial matter, this massive penalty is orders of magnitude greater than what the FTC could reasonably have achieved at trial. The FTC's statutory civil penalty authority is limited to $43,280 per violation.[2] 15 U.S.C. § 45(l). The FTC takes the position that each "page view" on Facebook constitutes a separate violation, but at trial, Facebook would have had compelling arguments that the maximum penalty must be calculated on a "per day" basis. *See United States v. Daniel Chapter One*, No. 10-cv-01362, ECF No. 68 at 11 (D.D.C. Apr. 14, 2014) ("each day that Defendants failed to comply with the FTC Order should be deemed a separate violation"); *United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811, 822 (N.D. Tex. 2008) (rejecting the FTC's penalty calculation). Under that methodology, the maximum possible civil penalty would be a small fraction of the $5 billion that Facebook has agreed to pay.

In addition, it is notable that the FTC's Complaint does not allege that consumer harm resulted from any of the alleged Consent Order violations. Because Facebook is a free service, consumers could not have suffered the type of economic harm that typically accompanies violations of FTC orders—e.g., paying an artificially inflated purchase price or failing to receive the benefit of the bargain as a result of the alleged order violations. Nor did the FTC assert any other type of consumer harm as a result of the alleged conduct. For example, the FTC did not (and could not) allege any identity theft-related financial harm to consumers, as consumers' sensitive financial information is not alleged to have been compromised in any way.

This is important because consumer harm is a statutory factor that courts must consider when deciding the monetary penalty to impose. *See, e.g.*, *Google Inc.*, No. 5:12-cv-04177-HRL, ECF No. 30 at 7 (N.D. Cal.) (articulating the factors). And the FTC's largest civil penalty for a

[2] Accounting for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990. 28 U.S.C. § 2461.

consent violation with no consumer redress to date was $22.5 million, levied against Google in 2012. That matter is instructive because it involved allegations focused on privacy-related misrepresentations and did not involve claims of consumer harm. Specifically, the FTC alleged that Google "misrepresented the extent to which users may exercise control over the collection or use of covered information" by overriding the cookie-blocking settings on Safari browsers used by tens of millions of people, secretly placing cookies, and using the information it obtained to serve targeted advertisements. *Google Inc.*, No. 5:12-cv-04177-SI, ECF No. 1 at ¶¶ 51, 54. The FTC agreed to settle those allegations through a judicial order imposing injunctive relief and requiring a civil penalty of $22.5 million. The Court approved the settlement, finding that the civil penalty amount was appropriate, in part because "the complaint never alleged that consumers suffered any monetary harm." *Google Inc.*, No. 5:12-cv-04177-SI, ECF No. 30 at 7.

At bottom, the FTC has never before obtained a civil penalty even remotely approaching $5 billion. The two largest fines imposed by the FTC in an order enforcement action during the past 25 years were a $100 million civil penalty levied against LifeLock and a $40 million civil penalty paid by National Urological Group, Inc., both of which included significant restitution for consumer redress. *FTC v. LifeLock, Inc.*, No. 2:10-cv-00530-JJT, ECF No. 67 at 4 (D. Ariz. Jan. 4, 2016); *FTC v. Nat'l Urological Grp., Inc.*, No. 1:04-cv-3294, ECF No. 966 at ¶ 130 (N.D. Ga. Oct. 10, 2017). Viewed against this backdrop, a $5 billion penalty is more than appropriate.

### D.   Specific Allegations Regarding Whatsapp, COPPA, And User Health Data

EPIC and Public Citizen assert that the injunctive relief fails to address claims related to Facebook's integration of user data from WhatsApp (ECF No. 26 at 19), Facebook's use of facial recognition, Messenger Kids and COPPA (ECF No. 25 at 16-17), and Facebook's handling of health data (*id.* at 17). These claims are groundless.

EPIC asserts that the Stipulated Order does not address concerns regarding the protection of WhatsApp user data. ECF No. 26 at 12. However, contrary to EPIC's allegations, the Stipulated Order does address WhatsApp by including it in the definition of "Respondent" throughout the Stipulated Order (Order at 4), and specifically requiring Facebook to expand its Privacy Program to cover WhatsApp (*id.* § VII). *See also* Majority Statement at 2 ("Pursuant to the Order, Facebook must expand its existing privacy program to cover WhatsApp and any Facebook product or service that receives personal information from Facebook or WhatsApp.") Further, with respect to EPIC's allegations that "the FTC has done nothing to protect WhatsApp users" from the integration of certain WhatsApp user data with Facebook data (ECF No. 26 at 20), EPIC ignores WhatsApp's policy updates in 2016. Natasha Lomas, *WhatsApp to share user data with Facebook for ad targeting – here's how to opt out*, TechCrunch (Aug. 25, 2016), *available at* https://techcrunch.com/2016/08/25/whatsapp-to-share-user-data-with-facebook-for-ad-targeting-heres-how-to-opt-out/.

EPIC further claims that the FTC "seeks to dispose of all facial recognition-related claims in the United States with a single paragraph in the settlement," allowing Facebook to retain information it obtained in violation of the 2012 Consent Order. ECF No. 26 at 16. Not so. The Stipulated Order specifically addresses concerns regarding biometric data in multiple provisions, including the Privacy Program section, which requires Facebook to obtain affirmative express consent before using facial recognition templates in a way that materially exceeds the type of uses disclosed to the user at the time the user agreed to Facebook's use of the template (Order, § VII.E.5.a); delete existing templates for users on the old face recognition setting (Tag Suggestions) within 90 days, and refrain from creating any new templates for such users, unless they affirmatively consent the disclosed uses (*id.* § VI); and prepare a Privacy Review Statement

for each new or modified product, service, or practice that involves biometric information, describing the information that "will be used, retained, and shared"; the "notice provided to Users" and the mechanism "by which Users will consent"; the "risks to the privacy, confidentiality, or Integrity" of the biometric data; "existing safeguards" and whether "new safeguards" need to be implemented to address any risks; and any "safeguards or other procedures" that could mitigate risks, which Facebook chose not to implement (*id.* § VII.E.2.b). Moreover, biometric data is considered "Covered Information" under the Stipulated Order and therefore all of the provisions of the Stipulated Order addressing "Covered Information" also apply to facial recognition data. *See id.* §§ I, III, V, VII, IX, X, XIV.

Public Citizen also asserts that the Stipulated Order does not direct Facebook to "limit its handling of health data." ECF No. 25 at 16. This is also not true. The Stipulated Order carefully protects "Covered Information," which is defined as "information from or about an individual consumer" including information such as "first or last name," "date of birth," and "Nonpublic User Information." *Id.* at 3. And, as is the case with Facebook's use of biometric data, the Stipulated Order requires Facebook to prepare Privacy Review Statements for new or modified "product(s), service(s), or practice(s) involving health . . . information." *Id.* § VII.E.2.b.

Finally, Public Citizen asserts that the injunctive relief fails to address complaints the FTC has received concerning the alleged collection of information by Messenger Kids without verifiable parental consent (ECF No. 25 at 17). But the FTC's Complaint does not allege the conduct that Public Citizen describes, and the Stipulated Order represents an unreviewable exercise of the FTC's discretion to resolve those issues as it sees fit. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (holding that "an agency's decision not to prosecute or enforce, whether

through civil or criminal process, is a decision generally committed to an agency's absolute discretion"). Moreover, Section VII of the Stipulated Order requires Facebook to engage in annual comprehensive assessments of the "internal and external risks in each areas of its operation . . . to the privacy, confidentiality, or Integrity of Covered Information" and to design safeguards that control for those risks. Order, § VII.D-E. Messenger Kids is included within the ambit of those safeguards and is thus subject to all of the oversight and reporting requirements imposed by the Stipulated Order.

**E. Notice And Comment**

EPIC asserts that the Stipulated Order violates the APA's notice and comment process and/or the FTC's own regulations because the FTC did not place the Order on the public record for a thirty-day period pursuant to 16 CFR § 2.34(c). ECF No. 26 at 22-23. But, as set forth in Facebook's Surreply to EPIC's Motion to Intervene (ECF No. 29 at 5), the FTC was not required to post notice or solicit public comments prior to seeking court entry of the Stipulated Order. *See*, *e.g.*, *In re Santa Fe Natural Tobacco Co. Mktg. & Sales Practices and Prod. Liab. Litig.*, 288 F. Supp. 3d 1087, 1221 (D.N.M. 2017) (FTC Rule 2.34(c) comment procedure for final consent orders "is optional, it is not subject to the APA's informal rulemaking standards, and it does not require the agency to respond to public comments"). Nothing in the text of Rule 2.34(c) requires that proposed judicial decrees be submitted for public comment, and the FTC's decision not to seek public comment for the proposed Stipulated Order is consistent with over a decade of FTC precedent. Indeed, there does not appear to be a single example of the FTC seeking public comment for a federal court order. S*ee, e.g.*, *FTC v. Vizio, Inc.*, No. 2:17-cv-00758 (D.N.J. 2017) (government filed a consent order for court approval *without* a notice and comment period); *United States v. Upromise, Inc.*, No. 1:17-cv-10442 (D. Mass. 2017)

(same); *FTC v. Ruby Corp.*, No. 1:16-cv-02438 (D.D.C. 2016) (same); *United States v. InMobi Pte Ltd.*, No. 3:16-cv-03474 (N.D. Cal. 2016) (same); *FTC v. Ramey Motors, Inc.*, No. 1:14-cv-29603 (S.D.W.V. 2015) (same); *FTC v. LifeLock, Inc.*, No. 2:10-cv-00530 (D. Ariz. 2015) (same); *United States v. Billion Auto, Inc.*, No. 14-4118 (N.D. Iowa 2014) (same); *United States v. Google*, No. 5:12-cv-04177 (N.D. Cal. 2012) (same); *FTC v. Toys "R" Us, Inc.*, No. 1:11-0635 (D.D.C. 2011) (same); *FTC v. Bristol-Myers Squibb Co.*, No. 1:09-cv-00576 (D.D.C. 2009) (same); *FTC v. CVS Pharmacy, Inc.*, No. 1:09-cv-00420 (D.R.I. 2009) (same).

### F. The Fourth Amendment

CLP's amicus brief says that the Stipulated Order implicates Facebook users' Fourth Amendment rights by supposedly granting DOJ and the FTC warrantless access to Facebook user data. ECF No. 21 at 2-5. CLP's contention is without merit. Any requests by the DOJ and FTC for user records or communications under the Stipulated Order would still be governed by the Stored Communications Act (the "SCA"). Nothing in the Stipulated Order purports to abrogate the requirements of the SCA (nor could it do so). *See* 18 U.S.C. § 2703.

Further, CLP's argument that Facebook cannot satisfy the Stipulated Order's Recordkeeping requirement to retain records "sufficient to show each User's consent" without submitting "specifically identifiable Facebook user data" misconstrues that requirement. ECF No. 21 at 4. Facebook can demonstrate compliance with this provision through the production of aggregated or de-identified data. Facebook does not need to produce personally identifiable information to satisfy the requirements of the Order.

## IV. CONCLUSION

The Court should approve the Stipulated Order and enter the settlement between the FTC and Facebook.

Dated: January 24, 2020

Respectfully submitted,

*/s/ Joshua S. Lipshutz*
Joshua S. Lipshutz (SBN 1033391)
jlipshutz@gibsondunn.com
Thomas G. Hungar (SBN 447783)
thungar@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W., Suite 300
Washington, DC 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

Orin Snyder (SBN 2116424)
osnyder@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

*Counsel for Defendant Facebook, Inc.*

FACEBOOK, INC.'S RESPONSE TO NON-PARTY CENTER FOR LEGALIZATION OF PRIVACY, PUBLIC CITIZEN, AND ELECTRONIC PRIVACY INFORMATION CENTER'S AMICUS CURIAE BRIEFS
CASE NO. 19-CV-2184
-17-