**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | Civil Action No. 19-2184 (TJK) |
| FACEBOOK, INC., | |
| *Defendant*. | |

## <u>MEMORANDUM OPINION</u>

Almost eight years ago, the Federal Trade Commission and Facebook agreed to settle allegations that Facebook's information-sharing and privacy practices violated Section 5 of the Federal Trade Commission Act because they were unfair and deceptive.  As part of that agreement, memorialized in an administrative order entered by the FTC, Facebook committed to maintaining a privacy program and to not misrepresenting the privacy protections it afforded its users.  But according to the United States, Facebook did not keep its word, and over the next months and years it violated both the FTC Act and the order in many ways.  Last year, the parties agreed to settle these fresh allegations about Facebook's privacy practices.  Before the Court is their consent motion to enter a proposed stipulated order.  Among other things, the order would require Facebook to pay a $5 billion civil money penalty—by far the largest penalty ever won by the United States on behalf of the FTC—and impose injunctive relief in the form of an amended administrative order to be entered by the FTC that would require Facebook to take a variety of additional measures to protect its users' personal information.

In the Court's view, the unscrupulous way in which the United States alleges Facebook violated both the law and the administrative order is stunning.  And these allegations, and the

briefs of some amici, call into question the adequacy of laws governing how technology companies that collect and monetize Americans' personal information must treat that information.  But those concerns are largely for Congress; they are not relevant here.  Mindful of its proper role, and especially considering the deference to which the Executive's enforcement discretion is entitled, the Court will grant the consent motion and enter the order as proposed.

## I.    Background

### A.    Facebook

Facebook, Inc. ("Facebook") operates a social-networking service through its website and mobile applications.  ECF No. 3 ("Compl.") ¶ 2.  Those applications connect Facebook's users, who each create a profile that includes their personal information, with "Friends" who also have Facebook accounts and profiles.  *Id*.  Through its service, Facebook collects and maintains huge amounts of its users' information.  *Id*.  As of 2018, Facebook had more than 2.2 billion monthly active users worldwide.  *Id*.  And over 100 million Americans use Facebook every day to share personal information, such as their name, date of birth, hometown, current city, employer, relationship status, political views, photos of minor children, and membership in health-related and other support groups.  *Id*.  In addition, Facebook users may install and use applications developed by third parties that allow users to share information with each other.  *Id*.  The collection and maintenance of its users' personal information is an essential part of Facebook's business model.  That model monetizes users' personal information by deploying it for advertising; indeed, almost all of Facebook's revenue comes from advertising.  *Id.* ¶ 3.

### B.    2012 Consent Agreement and Order

In 2012, the Federal Trade Commission (FTC) filed an administrative complaint alleging that Facebook engaged in unfair and deceptive acts or practices in violation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a) ("FTC Act").  *See In the Matter of Facebook,*

*Inc.*, Dkt. No. C-4365, 2012 WL 3518628 (F.T.C.) (July 27, 2012) ("2012 Action"). The FTC

brought eight counts alleging, among other things, that Facebook misled its users about (1) its

privacy settings and privacy policy changes, *see id.* ¶¶ 10–29; (2) how much it shared its users'

personal information with third-party application developers; *id.* ¶¶ 30–33; (3) how much it

shared its users' personal information with outside advertisers, *see id.* ¶¶ 34–42; (4) the steps it

took to verify the security and privacy practices of third-party application developers, *see id.*

¶¶ 43–49; (5) how much it shared its users' personal information, including photos and videos,

with third parties after a user deleted its account, *see id.* ¶¶ 50–55; and (6) its compliance with

international privacy protocols, *see id.* ¶¶ 56–63.

Facebook and the FTC reached a settlement in August 2012. Compl. ¶ 28. The FTC

then issued an order ("2012 Order")—which Facebook's General Counsel signed on the

company's behalf—outlining remedial actions Facebook had to take. *See id.* ¶¶ 28–34.

Facebook was prohibited from making misrepresentations about the extent to which it maintains

the privacy or security of its users' personal information; the extent to which its users can control

the privacy of that information, and how they can do so; and the extent to which it makes its

users' personal information accessible to third parties. *See id.* ¶ 29. Facebook was also required

to establish and maintain "a comprehensive privacy program that [was] reasonably designed to

(1) address privacy risks related to the development and management of new and existing

products and services for consumers, and (2) protect the privacy and confidentiality of [its users'

personal] information." *Id.* ¶ 31. Facebook's privacy program was also required to consider

reasonably foreseeable risks to users' privacy, and Facebook had to monitor and evaluate the

program on an ongoing basis. *See id.* The order expires in July 2032, or 20 years from the date

the FTC filed its administrative complaint. *See* 2012 Action at *83.

C.     **This Action**

1.     **Complaint**

The United States now alleges that Facebook violated the 2012 Order by "subvert[ing] users privacy choices to serve its own business interests" in several ways, starting almost immediately after agreeing to comply with the 2012 Order.  Compl. ¶ 4.  Although Facebook led its users to believe they could restrict who could view their personal information, it allegedly shared that information with third parties without the user's knowledge.  *See* Compl. ¶¶ 35–50. For example, Facebook allegedly told its users that they could limit those who could see their posts to just "Friends," when in reality—and without warning to the user—doing so would also allow developers of third-party applications used by their "Friends" to access the post.  *See id.* 46–48.  Facebook allegedly permitted third-party developers to access these posts even though it was aware of how that practice compromised its users' privacy interests.  *See id.* ¶¶ 81–91.  And Facebook allegedly continued to allow a subset of third-party developers to access its users' personal formation in this way without their users' knowledge even after it announced, *two different times*, that it would stop doing so.  *See id.* ¶¶ 92–100; 106–13.  Facebook also allegedly automatically activated certain facial recognition technologies on a subset of about 60 million user accounts and maintained that technology's activation while telling its users that it would only do so if a user requested it.  *See id.* ¶¶ 144–54.

The United States also alleges that Facebook's privacy settings and policies compromised its users' privacy in various other ways.  For example, Facebook allegedly misled its users through its desktop and mobile interfaces by causing them to default to settings that were not privacy-protective; removing key disclaimers; and making interfaces hard to navigate, especially when it came to users' ability to stop the sharing of their personal information with developers of third-party applications used by their "Friends."  *See id.* ¶¶ 51–80.  Moreover, Facebook's so-

called "Privacy Checkup," a tool that it represented would allow users to control who had access to their information, allegedly failed to alert users that third-party developers could continue to view their information no matter what settings were selected through the "Privacy Checkup." *See id.* ¶¶ 101–105.  And even though Facebook agreed to maintain a reasonable privacy program, it allegedly failed to screen third-party application developers before giving them access to users' information and did not consistently enforce the few policies it had about the protection and use of its users' information when developers violated those policies.  *See id.* ¶¶ 114–24.  In fact, Facebook's enforcement decisions allegedly "took into account the financial benefit that Facebook considered the developer to offer."  *Id.* ¶ 123.  Moreover, because of Facebook's deficient controls, the company allegedly still did not know at the time the Complaint was filed how much data it improperly released to third-party application developers, exactly to which developers the data was released, or the purposes for which the developers used it.  *See id.* ¶¶ 126–27.

Facebook is also alleged to have misled users about what information it shared with advertisers.  Facebook purportedly encouraged users to provide their telephone numbers so that they could protect their accounts with two-factor authentication.  *See id.* ¶¶ 128–30.  Facebook did not, however, warn these users that it would also use these telephone numbers for advertising purposes.  *See id.* ¶¶ 131–43.

Based on this alleged conduct, the Complaint filed by the United States includes five counts accusing Facebook of violating the 2012 Order by misrepresenting to its users how much control they had over their personal information and how much third-party application developers could access that information, *see id.* ¶¶ 155–75, 183–86, and by failing to maintain a reasonable privacy program, *see id.* ¶¶ 176–82.  The Complaint also includes one count alleging

that Facebook violated Section 5 of the FTC Act by failing to disclose to its users that it would

use the telephone numbers they provided to it for two-factor authentication for advertising

purposes as well.  *See id.* ¶¶ 187–90.

### 2.      Stipulated Order

The parties represent that they have reached a settlement.  *See* ECF No. 4 ("Consent

Mtn.") at 1.  The United States has moved, with Facebook's consent, for the Court to enter a

stipulated order that imposes a $5 billion civil money penalty on Facebook and imposes

injunctive relief in the form of an amended administrative order to be entered by the FTC.  *See*

ECF No. 4-1 ("Stipulated Order") at 1–4.  The amended administrative order, included as

Attachment A to the Stipulated Order, requires Facebook to take a series of remedial steps,

including: (1) ceasing its misrepresentations about a host of matters, including its collection, use,

and disclosure of its users' personal information; the extent to which it maintains the privacy or

security of that information; the extent to which users can control the privacy of that information,

and how they can do so; and the extent to which it makes its users' personal information

accessible to third parties; (2) clearly disclosing when it will share its users' personal information

with third parties, and obtaining a user's express consent to do so if the information sharing goes

beyond the restrictions imposed by the user's privacy settings; (3) deleting or de-identifying

users' personal information within a reasonable time after a user deletes it or closes her account;

(4) stopping using telephone numbers provided by users for security purposes for advertising

purposes as well; (5) obtaining a user's specific consent before applying facial recognition

technology to their account; (6) implementing a more robust privacy program, which must

include safeguards that apply to third parties with access to a user's personal information; (7)

creating an independent committee of Facebook's board of directors to oversee information

privacy efforts; (8) designating a corporate officer in charge of monitoring its privacy program

and ensuring the program is effective—and who only can only be removed with a majority vote of the newly created board committee; (9) commissioning regular, independent assessments of its privacy practices and providing them to the FTC; (10) alerting the FTC when it discovers that more than 500 users' personal information has been compromised in some way; and (11) undertaking other reporting and recordkeeping obligations, including annually certifying compliance with the order and facilitating any FTC investigation into its compliance. *See id.* at 8–29.[1]  In exchange, under the Stipulated Order, Facebook receives considerable reprieve from liability.  The "Stipulated Order resolves all consumer-protection claims known by the FTC prior to June 12, 2019, that [Facebook], its officers, and directors violated Section 5 of the FTC Act." *See id.* at 1–2.  The amended administrative order terminates 20 years after it is issued, or 20 years after the United States or the FTC files a complaint against Facebook alleging that it violated the order.  *See id.* at 28–29.

## II.    Legal Standard

"[P]rior to approving a consent decree a court must satisfy itself of the settlement's overall fairness to beneficiaries and consistency with the public interest." *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (internal quotation marks omitted).  But the Court's role is not to "inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy." *Id.* (internal quotation omitted).  Rather, it "need only determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties." *Id.*; *see also United States v. Wells Fargo Bank, NA*, 891 F. Supp. 2d 143, 145 (D.D.C. 2012) ("[S]hort of a decree that

---

[1] Because the Stipulated Order and the amended administrative order are both included in ECF No. 4-1, the Court cites to page numbers in the document's ECF header.

'make[s] a mockery of judicial power,' the Court should accept an agreement between the parties.") (quoting *United States v. Microsoft Corp.*, 56 F.3d 1448, 1462 (D.C. Cir. 1995)).  Both the judiciary and the public at large have an interest in avoiding costly litigation, and so voluntary settlements are highly favored.  *Citizens for a Better Env't*, 718 F.2d at 1126.

## III.   Analysis

Applying this deferential standard—and despite the underhanded conduct of which the FTC accuses Facebook—the Court finds that the Stipulated Order passes muster.  Specifically, the Court finds that the parties consented to the order, and that it is fair, reasonable, and in the public interest.

### A.   Consent

The parties represent that they consent to the Court's entry of the Stipulated Order to settle the allegations in the Complaint.  *See* Consent Mtn. at 1–2; *see also* Stipulated Order at 6–8.  They also represent that it emerged from lengthy negotiations, *see* Consent Mtn. at 7, and the Court notes that both parties are sophisticated and ably represented by counsel.  These facts amply support the Court's conclusion that the parties have validly consented to the Stipulated Order.  *See Wells Fargo*, 891 F. Supp. 2d at 145.

### B.   Fairness

Procedurally, "[v]alid consent that resulted from good faith bargaining itself indicates that the agreement is procedurally fair," *id.*, and there is no evidence of any conflicts of interest that might have tainted the negotiating process, *see id.*  Substantively, the Stipulated Order reflects a compromise and includes benefits to both parties.  The United States receives what it asserts is by far the largest civil money penalty ever obtained on behalf of the FTC, and the second largest in any context, Consent Mtn. at 4, as well as extensive injunctive relief, described in more detail below.  Facebook obtains a release from Section 5 violations known to the FTC.

Stipulated Order at 1–2.  And both parties avoid the cost and uncertainty associated with lengthy

litigation.  That Facebook does not admit the allegations in the Complaint does not suggest that

the resolution is unfair.  *See* Stipulated Order at 2; *Microsoft*, 56 F.3d at 1461; *see also Wells*

*Fargo*, 891 F. Supp. 2d at 145.

     **C.**     **Reasonableness**

     The D.C. Circuit has explained that a district court evaluating a consent agreement should

be cautious about second guessing the parties' judgments.  *See Microsoft*, 56 F.3d at 1460–61.

After all, "[r]emedies which appear less than vigorous may well reflect an underlying weakness

in the government's case, and for the district judge to assume that the allegations in the

complaint have been formally made out is quite unwarranted."  *Id.* at 1461.  Although the

allegations the United States levels against Facebook for duplicitous privacy-related

representations to its users are shocking, it is not appropriate for the Court to judge the Stipulated

Order as if it were proposed after the United States had already proven those allegations up at

trial.  *See id.* (noting that it is "inappropriate for the judge to measure the remedies in the decree

as if they were fashioned after trial").  Rather, the Court's analysis must focus on whether the

proposed order achieves its stated objective.  *See Envtl. Def. v. Leavitt*, 329 F. Supp. 2d 55, 71

(D.D.C. 2004) ("The factors for determining the adequacy, reasonableness and appropriateness

of a consent decree focus on the extent to which the decree is confined to the dispute between the

parties and whether the decree adequately accomplishes its purported goal.").  In other words,

the Court must assess whether the Stipulated Order is a reasonable resolution of the allegations

outlined in the Complaint.

     Judged by that standard, the Court concludes the Stipulated Order clears the modest bar

of reasonableness.  The allegations in the Complaint reflect many ways in which Facebook

purportedly acted improperly.  Some of these allegations represent discrete and poorly

considered decisions, such as allegedly encouraging users to provide phone numbers to better secure their accounts, but then using those same numbers for advertising without telling users beforehand.  Others appear to reflect Facebook's willingness to deceive its users outright, such as allegedly telling the public that it would not share their personal information with third parties when it was continuing to do so.  And still others represent systemic oversight failures, such as allegedly allowing third parties to access users' personal information without the users' knowledge and without controlling how those third parties would use the information.  Most of these allegations represent violations of the 2012 Order; several are new violations of law.  But all of them suggest that the privacy-related decisionmaking of Facebook's executives was subject to grossly insufficient transparency and accountability.

The Stipulated Order appears reasonably calculated to address these allegations.  To begin with, it imposes a $5 billion fine to deter similar conduct by Facebook in the future.  Stipulated Order at 3.  That is, by any measure, a significant amount.  The United States contends it is "the largest civil penalty ever obtained . . . on behalf of the FTC—dwarfing the previous record of $168 million."  ECF No. 28 at 3.  The United States also argues that the total breaks down to $5.56 per violation, "commensurate with . . . civil penalties obtained in contested cases similarly involving millions of FTC Act violations by large corporations."[2]  Consent Mtn. at 4.  Facebook also claims that the fine looms even larger when compared to the largest civil penalty ever assessed by the FTC where—as here—no consumer harm is alleged to have been caused: $22.5 million.  *See* ECF No. 30 at 11-12.  The fine is also significant when compared to Facebook's bottom line; the parties agree it represents nearly a quarter of Facebook's after-tax

---

[2] *See, e.g., United States v. Dish Network*, 256 F. Supp. 3d 810, 970, 991 (C.D. Ill. 2017) ($168 million civil penalty on 66 million FTC Act violations, or $2.54 per violation).

profit in 2018.  *Id.* at 3.  Facebook also argues that the fine "is orders of magnitude greater than

what the FTC could reasonably have achieved at trial" given the statutory penalties and the

arguments available to it concerning how to calculate its alleged violations.  ECF No. 30 at 11.

And the United States, citing the FTC's "hard-fought" victory in *United States v. Dish Network*,

256 F. Supp. 3d 810 (C.D. Ill. 2017), appears to acknowledge that it would have been unlikely to

obtain more after a trial.  *See* ECF No. 28 at 7–8.  The Court has no reason to doubt that

judgment.

As important, the injunctive relief in the amended administrative order to be entered by

the FTC contains new measures aimed at ensuring that Facebook complies with its legal

obligations going forward.  Under the amended administrative order, Facebook will have to

consider privacy at every stage of its operations and provide substantially more transparency and

accountability for its executives' privacy-related decisions.

The amended administrative order will require Facebook, through its enhanced privacy

program, to consider and document in writing privacy risks, safeguards, training, and procedures

related to each of its products and services—including new safeguards for overseeing third-party

application developers with access to users' information.  At the operational level, the order will

require Facebook to designate one or more corporate officers in charge of monitoring its privacy

policies and ensuring they are effective—and who only a committee of its board of directors can

remove.  At the corporate governance level, Facebook must stand up a new independent board

committee dedicated to information privacy—again, whose members enjoy significant removal

protections.  Under the order, an independent, third-party assessor approved by the FTC will

evaluate and test Facebook's privacy efforts, producing annual reports that must be provided to

the FTC and Facebook's new independent board committee.  Significantly, Facebook's Chief

Executive Officer will have to certify regularly that Facebook is meeting its obligations under both its privacy program and the order, potentially subjecting him to civil or criminal penalties. Facebook will have to alert the FTC when significant privacy-related breaches occur.  And the order will empower both the Department of Justice and the FTC to demand extensive information from Facebook to evaluate its compliance for themselves.

Finally, it bears mentioning that the requirements in the Stipulated Order are clear.  *See Microsoft*, 56 F.3d at 1461–62 (observing that "the district judge who must preside over the implementation of the decree is certainly entitled to insist on that degree of precision concerning the resolution of known issues as to make his task, in resolving subsequent disputes, reasonably manageable").  The Stipulated Order spells out Facebook's obligations precisely, it defines key terms in detail, and it incorporates specific deadlines for completion of its obligations.

Amici urge the Court to reject the Stipulated Order in part because they argue it does not go far enough.  For example, the Electronic Privacy Information Center (EPIC) argues that the $5 billion penalty is too low and that the injunctive relief is insufficient.  ECF No. 26 at 18–22. EPIC complains that the Stipulated Order does not "require meaningful changes in Facebook's business practices or establish new privacy protections for Facebook users." *Id.* at 16.  It suggests, for example, that the United States should have required Facebook to adopt the "Code of Fair Information Practices," which "have been incorporated into other privacy laws and frameworks across the world," *id.* at 22–23, or forced Facebook to unwind its acquisitions of WhatsApp and Instagram. *Id.* at 24.  Other amici would have liked to see more protections related to children included. *See* ECF No. 25 at 16–20.

As the United States concedes, amici raise some "broad and conceptually interesting policy questions about data-privacy law in the United States generally." ECF. No. 28 at 1.  But

the overall terms of the Stipulated Order are not unreasonable simply because they do not apply

an entirely different privacy-focused legal regime to Facebook or require the company to be

broken apart.  And the Court's role is not to play the Executive's part in deciding how to enforce

the law.  *See Microsoft*, 56 F.2d at 1462 (cautioning that "when the government is challenged for

not bringing as extensive an action as it might, a district judge must be careful not to exceed his

or her constitutional role"); *see also Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1031

(D.C. Cir. 2007) ("Although the Supreme Court's decision in *Chaney* applies directly to agency

decisions not to enforce a statute, we have also applied it to an agency's decision to settle an

enforcement action.") (citing *Heckler v. Chaney*, 470 U.S. 821, 838 (1985)).  As noted above, in

evaluating the Stipulated Order's reasonableness, the Court may not even assume that Facebook

violated the FTC Act or the 2012 Order in the first place.  *See Microsoft*, 56 F.3d 1461.  While

the Court might well have fashioned different remedies were it doing so out of whole cloth after

a trial, none of amici's criticisms call into question the Stipulated Order's reasonableness, or

whether it is otherwise appropriate.

For these reasons, the Court finds that proposed remedies in the Stipulated Order are

reasonable in light of the allegations in the Complaint.

### D.    Public Interest

Finally, the Court must consider whether entering the Stipulated Order accords with the

public interest; "in other words, that the agreement is 'not unlawful, unreasonable, or against

public policy.'"  *Wells Fargo*, 891 F. Supp. 2d at 146 (quoting *United States v. District of

Columbia*, 933 F. Supp. 42, 47 (D.D.C. 1996).  As discussed above, the Stipulated Order

contains an unprecedented civil money penalty as well as a series of measures designed to

address the allegations in the Complaint.

In addition, though, this inquiry calls on the Court to consider whether entering the order will "automatically affect the rights of third parties." *Id.* Amici spill considerable ink on this point. As discussed above, the Stipulated Order would release Facebook from all claims that it violated the 2012 Order as well as "all consumer-protection claims known by the FTC prior to June 12, 2019 that [Facebook], its officers, and directors violated Section 5 of the FTC Act." Stipulated Order at 1–2. Amici argue that the breadth of this release is unprecedented and reason alone to reject the Stipulated Order. *See* ECF No. 25; ECF No. 26 at 13. They point to the statements of two dissenting FTC Commissioners who both cited the scope of the release as a reason they voted against the Stipulated Order. *See* ECF No. 25 at 13 n.3, 16; ECF No. 26 at 13, 15. Amici also argue that the they will be harmed by the scope of the Stipulated Order because it would preclude the FTC from bringing other enforcement actions based on complaints amici and others have filed with the agency, including for alleged violations of the 2012 Order. *See* ECF No. 25 at 15–25; ECF No. 26 at 15–16.

These arguments by amici do not ultimately cast doubt on whether the Stipulated Order is in the public interest. First, the Stipulated Order does not strip amici—or anyone else in a similar situation—of any rights, because they have no right to enforce either Section 5 of the FTC Act or the 2012 Order. As even they acknowledge, Section 5 of the FTC Act does not contain a private right of action. *See* ECF No. 25 at 31; *see also United States v. Philip Morris Inc.*, 263 F. Supp. 2d 72, 78 (D.D.C. 2003). And as for the FTC's administrative orders, the D.C. Circuit "has opted for a bright line rule . . . that third parties to government consent decrees cannot enforce those decrees absent an explicit stipulation by the government to that effect." *SEC v. Prudential Sec. Inc.*, 136 F.3d 153, 158 (D.C. Cir. 1998). Finally, amici do not suggest that the Stipulated Order will somehow preclude them from doing what they *have* a right to do:

file complaints with the FTC accusing Facebook of violating the FTC Act or any applicable administrative order.

Second, the admittedly broad scope of the release does not mean that the settlement is not in the public interest.  As the United States explains, the Stipulated Order does not stop the FTC from bringing new enforcement actions against Facebook should it learn of additional violations of Section 5 of the FTC Act, even if those violations occurred before July 12, 2019.  *See* ECF No. 28 at 11.  And the United States represents that the proposed settlement "does not in fact release any actual violations of the FTC Act beyond those discussed in the Complaint."  *Id.*  That is so because, after "extensive investigation and review of submitted consumer complaints, the FTC [knows] of no other cognizable violations that occurred before June 12, 2019."  *Id.*; *see also id.* at 11 n.4 (adding that "the vast majority of submitted consumer complaints involving Facebook did not even address a privacy issue or implicate the 2012 Order, and none known to the FTC raised a potential issue not covered by the proposed settlement").  Additionally, a majority of the agency's Commissioners have represented that the Stipulated Order sufficiently addresses all known violations of the 2012 Order as well.  Statement of Chairman Joe Simons and Commissioners Noah Joshua Phillips and Christine S. Wilson Regarding the Matter of Facebook, Inc., at 7–8 (July 24, 2019), https://www.ftc.gov/system/files/documents/public_statements/1536946/092_3184_facebook_m ajority_statement_7-24-19.pdf.  Thus, it seems evident that the United States made a carefully considered judgment to resolve these violations as it proposes through the Stipulated Order, a judgment this Court is ill-equipped to second-guess.[3]  Amici and even some FTC Commissioners

---

[3] Unlike violations of the FTC Act, the Stipulated Order also releases Facebook from violations of the 2012 Order that are unknown to the United States, *see* Stipulated Order at 1–2.  That is,

may disagree with that decision, but it does not follow that the Stipulated Order is not in the

public interest.  *See United States v. W. Elec. Co.*, 900 F.2d 283, 309 (D.C. Cir. 1990) ("The

Court's function is not to determine whether the resulting array of rights and liabilities is the one

that will best serve society, but only to confirm that the resulting settlement is within the *reaches*

of the public interest.") (cleaned up)); *see also Citizens for a Better Env't*, 718 F.2d 1126 ("Not

only the parties, but the general public as well, benefit from the saving of time and money that

results from the voluntary settlement of litigation.").

     For these reasons, the Court holds that entering the Stipulated Order is in the public

interest.

## IV.     Conclusion

     For all these reasons, the Court will grant the Consent Motion for Entry of Stipulated

Order, ECF No. 4, and enter the Stipulated Order.  The Court ends by noting that under the

Stipulated Order it retains jurisdiction over this matter, including to enforce its terms.  *See*

Stipulated Order at 5.  In the event that the parties return to this Court because the United States

alleges—once again—that Facebook has reneged on its promises and continued to violate the

law or the terms of the amended administrative order, the Court may not apply quite the same

deference to the terms of a proposed resolution.  As the D.C. Circuit has explained, a district

court must be especially deferential "when the proposed decree comes to a district judge in the

---

undoubtedly, a concession to Facebook.  Still, the Court finds that the Stipulated Order is in the
public interest and is otherwise reasonable, given that it preserves the FTC's right to bring
enforcement actions for any presently unknown violation of the law.  Moreover, a majority of the
agency's Commissioners are satisfied, given the FTC's extensive investigation, that the terms of
the Stipulated Order are "more than adequate to remedy any as-yet-unknown violation" of the
2012 Order.  Statement of Chairman Joe Simons and Commissioners Noah Joshua Phillips and
Christine S. Wilson Regarding the Matter of Facebook, Inc., at 7–8 (July 24, 2019),
https://www.ftc.gov/system/files/documents/public_statements/1536946/092_3184_facebook_m
ajority_statement_7-24-19.pdf.

first instance as a settlement between the parties." *Microsoft*, 56 F.3d at 1461.  But, on the other hand, when "a district judge has administered a consent decree for some period of time," and is therefore likely more familiar with the relevant context, "the lack of an initial trial is, at least marginally, less of an inhibition" when weighing the appropriateness of a proposed remedy.  *Id.*

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: April 23, 2020