**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

               Plaintiff,

               v.

FACEBOOK, INC.,
a corporation,

               Defendant.

Case No. 1:19-cv-02184-TJK

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S
MOTION TO ENFORCE THE STIPULATED ORDER AND TO ENJOIN THE
ADMINISTRATIVE REOPENING PROCEEDING OF THE FEDERAL TRADE
COMMISSION**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

PROCEDURAL HISTORY...................................................................................6

    A.    The 2012 Order........................................................................6

    B.    The FTC's Decision to Proceed in Federal Court and the 2019 Consent
Motion.........................................................................................7

    C.    The 2019 Settlement Obtained Relief Unavailable through Litigation of the
Complaint on the Merits ..........................................................9

    D.    Entry of the Stipulated Order & Final Judgment by this Court ............................10

    E.    The Initial Assessment...........................................................11

    F.    The FTC Issues an Order to Show Cause and Proposed Order and Seeks to
Reopen this Court's Stipulated Order ................................11

ARGUMENT ......................................................................................................13

I.    The FTC Lacks the Jurisdictional and Statutory Authority to Bring Its Reopening
Proceeding..................................................................................15

    A.    The FTC's OTSC Illegally Seeks to Usurp This Court's Exclusive
Jurisdiction...............................................................................15

        1.    This Court Expressly Retained Jurisdiction Over Modification and
Enforcement of the Stipulated Order .........................15

        2.    The FTC Is Judicially Estopped from Contesting the Court's
Jurisdiction.................................................................18

    B.    The Stipulated Order Is a Final Judgment with *Res Judicata* Effect....................19

        1.    The FTC Seeks to Evade the Strict Standards for Modifying a Final
Judgment ....................................................................20

        2.    The FTC's Proposed Modification of a Final Judgment Violates Article
III................................................................................23

    C.    The Commission's Limited Reopening Authority Is Not a Basis to Modify
this Court's Order .....................................................................23

        1.    Section 5(b) Does Not Apply to an Order Entered by a District Court .....24

        2.    The OTSC Far Exceeds the Commission's Reopening Authority............26

D.   The Commission's Unprecedented Abuse of Its Limited Reopening Authority to Assert Violations of Law Would Violate Meta's Due Process Rights ................................................................................................31

E.   The Structure of the FTC's Administrative Proceeding is Unconstitutional ........35

1.   The Commission's Dual Role as Prosecutor and Judge Violates Due Process ................................................................................................35

2.   The Commission's Protections Against Removal Violate Article II .........37

3.   Congress Unconstitutionally Delegated the Commission Unfettered Authority To Choose Between Administrative and Judicial Enforcement ................................................................................................39

4.   The Commission Cannot Constitutionally Adjudicate Private Rights ......41

II.   Meta Will Suffer Irreparable Harm Absent Injunctive Relief ...........................................43

III.   The Balance of Equities Favors Meta .................................................................................44

IV.   The Public Interest Favors Granting Injunctive Relief.......................................................45

CONCLUSION....................................................................................................................................46

# TABLE OF AUTHORITIES

### Cases

Page(s)

*Am. Horse Prot. Ass'n v. Lyng*,
  690 F. Supp. 40 (D.D.C. 1988) .......................................................................... 44

*Arlington v. FCC*,
  569 U.S. 290 (2013) ........................................................................................... 39

*Armstrong v. Manzo*,
  380 U.S. 545 (1965) ........................................................................................... 34

*\*Axon Enter., Inc. v. Fed. Trade Comm'n*,
  143 S. Ct. 890 (2023) ......................................................................... 6, 35, 42, 43

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
  986 F.3d 1173 (9th Cir. 2021), *cert. granted in part*, 211 L. Ed. 604, 142 S. Ct. 895 (2022),
  and *rev'd and remanded*, 143 S. Ct. 890 (2023) .................................................. 37

*Bank Markazi v. Peterson*,
  578 U.S. 212 (2016) ........................................................................................... 23

*Beckett v. Air Line Pilots Ass'n*,
  995 F.2d 280 (D.C. Cir. 1993), *rehearing denied*, 59 F.3d 1276 (D.C. Cir. 1995) ............... 16

*Best Foods, Inc v. United States*,
  158 F. Supp. 583 (Cust. Ct. 1957) ..................................................................... 27

*Caperton v. A.T. Massey Coal Co.*,
  556 U.S. 868 (2009) ........................................................................................... 35

*CFTC v. Schor*,
  478 U.S. 833 (1986) ........................................................................................... 42

*Chicago & S. Air Lines v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948) ........................................................................................... 23

*Cnty. of San Miguel v. Kempthorne*,
  587 F. Supp. 2d 64 (D.D.C. 2008) ..................................................................... 18

*Cobell v. Norton*,
  391 F.3d 251 (D.C. Cir. 2004) ............................................................................ 14

*Collins v. Yellen*,
  141 S. Ct. 1761 (2021) ........................................................................................ 38

*Comcast Corp. v. F.C.C.*,
 579 F.3d 1 (D.C. Cir. 2009) ................................................ 28

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
 592 F. Supp. 3d 568 (E.D. Tex. 2022) ................................ 38

*Cook v. Billington*,
 2003 WL 24868169 (D.D.C. Sept. 8, 2003) ........................ 22

*Daylo v. Adm'r of Veterans' Affairs*,
 501 F.2d 811 (D.C. Cir. 1974) ............................................ 23

*Dodocase VR, Inc. v. MerchSource, LLC*,
 2018 WL 1475289 (N.D. Cal. Mar. 26, 2018) ..................... 44

*In re Dow Chem. Co.*,
 2010 WL 2143901 (F.T.C. May 21, 2010) ........................... 27

*Dunn v. N.Y.S. Dep't of Labor*,
 47 F.3d 485 (2d Cir. 1995) ................................................. 17

*Exec. Benefits Ins. Agency v. Arkison*,
 573 U.S. 25 (2014) ............................................................. 41

*Ezell v. City of Chicago*,
 651 F.3d 684 (7th Cir. 2011) .............................................. 43

*FDIC v. Bank of New York*,
 479 F. Supp. 2d 1 (D.D.C. 2007), *aff'd*, 508 F.3d 1 (D.C. Cir. 2007) ................. 14, 43, 44, 45

*Fed. Trade Comm'n v. Evans Prod. Co.*,
 775 F.2d 1084 (9th Cir. 1985) ............................................ 41

*Fed. Trade Comm'n v. Facebook, Inc.*,
 581 F. Supp. 3d 34 (D.D.C. 2022) ..................................... 36

*Fed. Trade Comm'n v. Garden of Life, Inc.*,
 2012 WL 1898607 (S.D. Fla. May 25, 2012) ...................... 22

*Flanagan v. Arnaiz*,
 143 F.3d 540 (9th Cir. 1998) .............................................. 16

*Fonar Corp. v. Deccaid Servs., Inc.*,
 983 F.2d 427 (2d Cir. 1993) ............................................... 17

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
 561 U.S. 477 (2010) ..................................................... 37, 38

*Frew ex. rel. Frew. V. Hawkins*,
 540 U.S. 431 (2004) ........................................................... 21

*Gen. Protecht Grp., Inc. v. Leviton Mfg. Co., Inc.,*
  651 F.3d 1355 (Fed. Cir. 2011) ................................................ 44, 45

*Goldie's Bookstore, Inc. v. Superior Court,*
  739 F.2d 466 (9th Cir. 1984) ................................................... 44

*Gundy v. United States,*
  139 S. Ct. 2116 (2019) ........................................................... 41

*Humphrey's Ex'r v. United States,*
  295 U.S. 602 (1935) ........................................................... 38, 39

*Jarkesy v. SEC,*
  34 F.4th 446 (5th Cir. 2022) ............................................. 39, 41, 42

*J.D. v. Azar,*
  925 F.3d 1291, (D.C. Cir. 2019) ............................................. 34

*Keepseagle v. Vilsack,*
  118 F. Supp. 3d 98 (D.D.C. 2015), *appeal dismissed,* 2015 WL 9310099 (D.C. Cir. Dec. 17, 2015) ................................................................. 20

*Kingvision Pay-Per-View Ltd. v. Lake Alice Bar,*
  168 F.3d 347 (9th Cir. 1999) ................................................. 31

*Kirwa v. United States Dep't of Def.,*
  285 F. Supp. 3d 21 (D.D.C. 2017) .......................................... 43

*Kuretski v. Comm'r,*
  755 F.3d 929 (D.C. Cir. 2014) ............................................... 41

*League of Women Voters v. Newby,*
  838 F. 3d 1 (D.C. Cir. 2016) ................................................. 45

*Liu v. Admin. Off. of the U.S. Cts.,*
  2022 WL 1538717 (D.D.C. May 16, 2022) ............................... 20

*In re Louisiana-Pac. Corp.,*
  112 F.T.C. 547 (1989) ....................................................... 27, 29

*Luokung Tech. Corp. v. Dep't of Def.,*
  538 F. Supp. 3d 174 (D.D.C. 2021) ......................................... 45

*Magnolia v. Conn. Gen. Life Ins. Co.,*
  157 F. Supp. 2d 583 (D. Md. 2001) ........................................ 16

*In re March,*
  988 F.2d 498 (4th Cir. 1993) ................................................. 45

*MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.,*
  512 U.S. 218 (1994) ........................................................... 27

*Metro. Dev. Grp. at Cool Spring, LLC v. Cool Spring Rd., LLC*,
 2022 WL 951995 (D. Md. Mar. 30, 2022) ........................................................ 25

*Morrison v. Olson*,
 487 U.S. 654 (1988) ........................................................................................ 39

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
 339 U.S. 306 (1950) ........................................................................................ 34

*In re Murchison*,
 349 U.S. 133 (1955) ........................................................................................ 36

*New Hampshire v. Maine*,
 532 U.S. 742 (2001) ........................................................................................ 18

*N. Mariana Islands v. U.S.*,
 686 F. Supp. 2d 7 (D.D.C. 2009) ................................................................... 45

*Oceanic Steam Nav. Co. v. Stranahan*,
 214 U.S. 320 (1909) ........................................................................................ 39

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
 138 S. Ct. 1365 (2018) .................................................................................... 41

*PETA v. U.S. Dep't of Health & Hum. Servs.*,
 901 F.3d 343 (D.C. Cir. 2018) ....................................................................... 20

*Petoskey Inv. Grp., LLC v. Bear Creek Twp.*,
 2005 WL 1796130 (W.D. Mich. July 27, 2005) ............................................ 16

*Pigford v. Vilsack* (Pigford II),
 777 F.3d 509 (D.C. Cir. 2015) ....................................................................... 16

*Plaut v. Spendthrift Farm, Inc.*,
 514 U.S. 211 (1995) ........................................................................................ 23

*Propert v. D.C.*,
 948 F.2d 1327 (D.C. Cir. 1991) ..................................................................... 35

*R.I.L-R v. Johnson*,
 80 F. Supp. 3d 164 (D.D.C. 2015) ............................................................ 44, 45

*Ruckelshaus v. Monsanto Co.*,
 467 U.S. 986 (1984) ........................................................................................ 31

*Rufo v. Inmates of Suffolk Cty. Jail*,
 502 U.S. 367 (1992) ........................................................................................ 21

*Salazar by Salazar v. D.C.*,
 896 F.3d 489 (D.C. Cir. 2018) ........................................................ 5, 21, 22, 30

*Sanchez v. Off. of State Superintendent of Educ.*,
   45 F.4th 388 (D.C. Cir. 2022) ........................................................... 40

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
   140 S. Ct. 2183 (2020) ........................................................ 37, 38, 39

*Sierra Club v. Meiburg*,
   296 F.3d 1021 (11th Cir. 2002) ...................................................... 29

*Sierra Club v. Van Antwerp*,
   719 F. Supp. 2d 77 (D.D.C. 2010) ................................................. 28

*Smalls v. United States*,
   471 F.3d 186 (D.C. Cir. 2006) ....................................................... 20

*Smith v. United States*,
   74 F.2d 941 (5th Cir. 1935) ........................................................... 28

*Stern v. Marshall*,
   564 U.S. 462 (2011) ........................................................... 41, 42, 43

*Stewart v. O'Neill*,
   225 F. Supp. 2d 6 (D.D.C. 2002) ................................................... 22

*\*Syngenta Crop Prot., Inc. v. Henson*,
   537 U.S. 28 (2002) ..................................................................... 4, 14

*Temple Univ. Hosp., Inc. v. NLRB*,
   929 F.3d 729 (D.C. Cir. 2019) ....................................................... 18

*Thomas v. Albright*,
   77 F. Supp. 2d 114 (D.D.C. 1999), *aff'd sub nom. Thomas v. Powell*, 247 F.3d 260
   (D.C. Cir. 2001) ............................................................................. 45

*Twelve John Does v. District of Columbia*,
   841 F. 2d 1133 (D.C. Cir. 1988) ..................................................... 20

*Ultimate Creations, Inc. v. McMahon*,
   2006 WL 8443450 (D. Ariz. July 7, 2006), *aff'd*, 2008 WL 4946339 (9th Cir. 2008) .......... 16

*United States v. Armour & Co.*,
   402 U.S. 673 (1971) ................................................................. 22, 35

*United States v. ASCAP*,
   32 F.3d 727 (2d Cir. 1994) ............................................................ 16

*United States v. Baroid Corp.*,
   130 F. Supp. 2d 101 (D.D.C. 2001) ........................................... 29, 30

*United States v. Carter*,
   421 F.3d 909 (9th Cir. 2005) .......................................................... 27

*United States v. Hall,*
    801 F.2d 356 (8th Cir. 1986) ................................................ 27

*United States v. J. B. Williams Co.,*
    498 F.2d 414 (2d Cir. 1974) ................................................ 30

*United States v. N.Y. Tel. Co.,*
    434 U.S. 159 (1977) ................................................ 14, 43

*United States v. Sellers,*
    784 F.3d 876 (2d Cir. 2015) ................................................ 28

*Washington Metro. Area Transit Auth. v. Loc. 689, Amalgamated Transit Union,*
    113 F. Supp. 3d 121 (D.D.C. 2015) ................................................ 44

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ................................................ 40

*Wildberger v. Am. Fed'n of Gov't Emps., AFL-CIO,*
    86 F.3d 1188 (D.C. Cir. 1996) ................................................ 36

*Williams v. Pennsylvania,*
    579 U.S. 1 (2016) ................................................ 35, 36

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................ 15

*Wise v. Glickman,*
    257 F. Supp. 2d 123, 129 n.4 (D.D.C. 2003) ................................................ 19

*In re Zdravkovich,*
    634 F.3d 574 (D.C. Cir. 2011) ................................................ 36

## STATUTES & RULES

15 U.S.C. § 41 ................................................ 38

15 U.S.C. § 45 ................................................ *passim*

15 U.S.C. § 45(a) ................................................ 6

*15 U.S.C. § 45(b) ................................................ *passim*

15 U.S.C. § 45(c) ................................................ 24, 36

15 U.S.C. § 45(l) ................................................ *passim*

15 U.S.C. § 53(b) ................................................ *passim*

16 C.F.R. § 2.32 ................................................ 26

16 C.F.R. § 3.11 ................................................................................................ 33

16 C.F.R. § 3.31(c)(1) ...................................................................................... 32

16 C.F.R. § 3.41(c) ........................................................................................... 33

16 C.F.R. § 3.43 ................................................................................................ 32

16 C.F.R. § 3.72 .......................................................................................... 27, 28

*16 C.F.R. § 3.72(b) ................................................................................. *passim*

16 CFR § 3.72(b)(2) .......................................................................................... 36

28 U.S.C. § 1651(a) ...................................................................................... 14, 43

Fed. R. Civ. P. 26(d)(1) ................................................................................... 19

*Fed. R. Civ. P. 60(b) ............................................................................... *passim*

*Fed. R. Civ. P. 65(d)(1) ............................................................................. 17, 18

## OTHER AUTHORITIES

Brief for the Commission,
   *AMG Capital Mgmt., LLC v. Fed. Trade Comm'n*, No. 19-508 (U.S.), 2020 WL 7093938 .. 40

Brief of the Commission,
   *Fed. Trade Comm'n v. Hoyal & Assocs.*, No. 19-35668 (9th Cir.), 2020 WL 3316889 ........ 40

Supp. Mem. of the Commission,
   *Fed. Trade Comm'n v. Wyndham Hotels & Resorts*, No. 14-3514 (3d Cir.),
   2015 WL 1517040 .......................................................................................... 40

William Blackstone, *Commentaries on the Laws of England 1765-1769* ................................... 42

Merriam-Webster's Collegiate Dictionary (11th ed. 2020) ........................................................ 28

Child.'s Online Priv. Prot. Act ("COPPA") ........................................................... 3, 7, 12, 31, 32

FTC Act of 1938, 52 Stat. 111 ....................................................................................... 30

Lina M. Khan & David E. Pozen, *A Skeptical View of Information Fiduciaries*,
   133 Harv. L. Rev. 497 (2019) ........................................................................................ 37

Black's Law Dictionary (11th ed. 2019) ............................................................................... 27

Black's Law Dictionary (8th ed. 2004) ................................................................................. 28

U.S. Const., art. II § 1, cl. 1 ............................................................................................ 37

# PRELIMINARY STATEMENT[1]

Defendant Meta Platforms, Inc. ("Meta")—previously, Facebook, Inc.—brings this Motion to enjoin the Federal Trade Commission's ("FTC" or the "Commission") unlawful proceeding seeking to reopen and rewrite this Court's prior order and final judgment in violation of this Court's exclusive jurisdiction and Meta's constitutional rights.  Meta seeks this relief on both a preliminary and permanent basis.  Meta must respond in the administrative proceeding by August 1, 2023.  Absent further action by this Court, Meta would at that time have no choice but to participate in the FTC's *ultra vires* and unconstitutional proceeding, as a consequence of which it would suffer irreparable harm.

The FTC originally initiated this action before this Court to obtain relief that only this Court could provide.  In 2019, the FTC invoked this Court's jurisdiction by asking it to reduce to judgment a painstakingly negotiated settlement that resolved allegations that Meta had violated an earlier administrative order (the "2012 Order").[2]  That settlement, entered in final judgment of the FTC's complaint before this Court, consisted of a Stipulated Order that required Meta to pay a $5 billion civil penalty and imposed a comprehensive set of remedial measures, including Attachment A to the Stipulated Order, which the Court directed the FTC to enter in its administrative proceeding in the form of a consent order to supersede the 2012 Order (together, the "Stipulated Order").[3]  This Court ordered this relief under two statutes—15 U.S.C. § 45(l) and 15 U.S.C. § 53(b)—that allow *only* district courts to impose the remedies (both monetary and injunctive) requested by the FTC.  And the FTC ensured that *only* this Court would have the

---

[1] Unless otherwise noted, emphasis has been added to quotations, and internal quotations, brackets, citations, and footnotes have been omitted.

[2] *See* Dkt. No. 1-1 (2012 FTC Order).

[3] *See* Dkt. No. 35 (Stip. Order) at 5.

authority to modify that relief by including separate provisions in both the Stipulated Order and its Attachment A that stated unambiguously that *this Court* retains jurisdiction over the matter.

At the time, all parties acknowledged the obvious. The parties' agreement included relief that the FTC could not have obtained had Meta (then Facebook) not agreed to it, had Meta not forgone its right to defend itself, and had the parties not come to this Court to obtain relief that only this Court could legally grant. The Commission rightly observed: "[I]t is highly unlikely the Commission could have obtained this magnitude of injunctive relief if we had proceeded with litigation," nor does the FTC "have the authority to regulate by fiat."[4]

Now, the FTC purports to have found that very authority to regulate by fiat in 15 U.S.C. § 45(b), and 16 C.F.R. § 3.72(b). On May 3, citing those provisions, the FTC issued Meta an order to show cause ("OTSC") why it should not modify the Stipulated Order, attaching a Proposed Order that bears little resemblance to the Stipulated Order this Court entered and over which this Court retains jurisdiction.[5] But those provisions do not allow the Commission to "alter, modify, or set aside" the orders of Article III courts, and the Commission is seeking to deploy this seldom-used procedural mechanism—analogous to district courts' reopening authority under Rule 60(b)—to usurp this Court's jurisdiction and rewrite the Stipulated Order.

Among the more than 800 changes reflected in the FTC's Proposed Order are sweeping new prohibitions and requirements that the FTC's Chair has publicly admitted are aimed at

---

[4] Rouhandeh Decl. Ex. A (July 24, 2019 Comm'rs Simons, Phillips, Wilson Statement) at 6. Citations to "Rouhandeh Decl. Ex. __" refer to the Exhibits annexed to the Declaration of James P. Rouhandeh in Support of Defendant's Motion To Enforce the Stipulated Order and To Enjoin the Administrative Proceeding of the Federal Trade Commission, dated May 31, 2023.

[5] *See* Rouhandeh Decl. Ex. B (FTC Order to Show Cause); Rouhandeh Decl. Ex. C (2023 Proposed Decision and Order, hereinafter "Proposed Order").

Meta's underlying business model,[6] such as a so-called "blanket prohibition" on Meta's ability to provide its core products and services to teen users; a prohibition on the introduction of new products and services absent the approval of an independent privacy assessor; an exponential expansion of Meta's mandated privacy program to cover topics as far afield as "economic harm," "reputational harm," and "relationship harm"; and a requirement that Meta add to its Board of Directors an individual with experience at a "civil liberties . . . nonprofit."[7]  As one Commissioner acknowledged, these wholesale changes include relief that has little or no nexus to the Complaint the FTC filed or the Stipulated Order this Court entered in 2020.[8]

The Commission's principal basis for commencing its self-described "enforcement action" is the outdated, two-year-old initial report prepared by the independent assessor (the "Assessor") retained pursuant to the Stipulated Order to evaluate Meta's privacy program.  Meta provided that initial report, which covered the first six months of Meta's privacy program (between October 2020 and April 2021) to the Commission nearly two years ago.  In the OTSC, the Commission claims to have "reason to believe" that Meta did not "establish and implement an effective privacy program as mandated by Part VII of [Attachment A to the Stipulated Order]," and that even older conduct—disclosed publicly and to the Commission years ago—violated Meta's 2012 Order, Section 5 of the FTC Act, the Children's Online Privacy Protection Act ("COPPA") and the COPPA Rule.[9]  But the Commission has no intention of ever having to *prove* these allegations.  Instead of alleging them in a complaint and being put to its proof

---

[6] *See* Rouhandeh Decl. Ex. D (Chair Khan Podcast) at 37:44-38:36.

[7] *See* Rouhandeh Decl. Ex. C (Proposed Order) at 4-27.

[8] *See* Rouhandeh Decl. Ex. E (May 3, 2023 Comm'r Bedoya Statement).

[9] *See* Rouhandeh Decl. Ex. C (Proposed Order) at 12.

through a trial on the merits, the FTC has asserted them as proposed facts in a proceeding that does not apply to enforcement actions and that does not afford Meta the most basic rights to which those alleged to have violated the law are entitled.

The FTC's assertions lack merit. But this Motion is not about the merits of the FTC's assertions nor the rigor of Meta's compliance efforts. Rather, this Motion is about where, how, and by whom those issues must be resolved. The Supreme Court has instructed that where, as here, a party is subject to a rival proceeding seeking to reopen a district court's consent decree, the proper course of action is to "apply to the court that approved a settlement [this Court] for an injunction requiring dismissal of [the] rival action."[10] For this and other, independent reasons, the FTC lacks the authority to proceed through its OTSC and should be enjoined from doing so.

Most importantly, this Court has exclusive jurisdiction to modify the Stipulated Order. The Stipulated Order states that "this Court shall retain jurisdiction in this matter for purposes of construction, modification, and enforcement of the Stipulated Order."[11] And Attachment A to the Stipulated Order provides, in its very first numbered paragraph, that the "Court has jurisdiction over this matter."[12] Case law is clear that these retention-of-jurisdiction provisions vest district courts with *exclusive* jurisdiction.

The OTSC is also precluded by the *res judicata* effect of the Stipulated Order, entered, as the FTC put it, to "resolve a complaint filed in *this Court*."[13] The Stipulated Order—a final judgment of this Court—can be modified, if at all, under Federal Rule of Civil Procedure 60(b).

---

[10] *Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 34 n.* (2002).

[11] Dkt. No. 35 (Stip. Order) at 2.

[12] Dkt. No. 35 (Stip. Order, Attach. A) at 1.

[13] Dkt. No. 27 (Surreply) at 7 (emphasis in original).

These principles apply with even greater force where, as here, the final judgment is embodied in a consent decree.  As the D.C. Circuit recently held, "Courts may not, under the guise of modification, impose entirely new injunctive relief.  That practice would end-run the demanding standards for obtaining injunctive relief in the first instance, would deny the enjoined party the contractual bargain it struck in agreeing to the consent decree at the time of its entry, and would destroy the predictability and stability that final judgments are meant to provide."[14]  If Article III courts may not do so, then administrative agencies certainly cannot, and efforts by a federal agency to remake a final district court judgment run far afoul of the separation of powers.  Nor does the FTC's limited reopening authority under Section 5(b) even apply here, let alone give it the authority to proceed as it has proposed.

Separately, the OTSC plainly deprives Meta of its due process rights by seeking to impose onerous injunctive relief without ever having to prove a violation of law.  When the FTC has "reason to believe" that laws or orders have been violated and seeks to adjudicate those violations, it issues *a complaint*.  The FTC has instead invoked that same standard and commenced a proceeding that its own procedures classify as non-adjudicative—that does not afford Meta the same rights to defend itself, or even a right to a hearing on the ultimate question of whether Meta violated any law or order. Given the sweeping, transformational changes in the Proposed Order, the Due Process Clause requires much more.

This Court should also enjoin the Commission's reopened administrative proceeding because it would subject Meta to "unconstitutional agency authority" in several respects that are exacerbated by the Commission's misuse of its reopening authority to impose sweeping new

---

[14] *Salazar by Salazar v. D.C.*, 896 F.3d 489, 498 (D.C. Cir. 2018).

relief in an "enforcement action."[15]  The Commission's dual role as both prosecutor (it commenced the FTC's "enforcement action") and judge (among other things, it will determine whether the facts warrant a hearing and, if so, on what issues) violates the Due Process Clause. The Commission's exercise of executive authority while protected against the President's unrestricted removal power violates Article II.  The Commission's exercise of an unfettered delegation of legislative authority to assign a matter to administrative adjudication violates Article I.  And the Commission's adjudication of Meta's private rights, including in defiance of the judgment of this Court, violates Article III.  There is perhaps no greater example of administrative adjudication by diktat, and no clearer evidence of the fundamental unconstitutionality of the FTC's adjudicative process than is presented by the FTC's actions here.

Accordingly, Meta respectfully requests that this Court enforce its Stipulated Order, enjoin the FTC's reopened administrative proceeding, and mandate that the FTC comply with this Court's exclusive authority over modification and enforcement of its orders.

## PROCEDURAL HISTORY

### A.    The 2012 Order

On April 29, 2011, Meta agreed to settle administrative allegations that it engaged in unfair and deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).  The settlement was memorialized in the 2012 Order, entered by the FTC in its administrative proceeding against Meta on July 27, 2012.  (See Dkt. No. 1-1 (2012 FTC Order) at 2).  Unlike the Stipulated Order at issue here, the 2012 Order provided that the FTC "has jurisdiction of the subject matter of this proceeding." (*Id.*)

---

[15] *Axon Enter., Inc. v. Fed. Trade Comm'n*, 143 S. Ct. 890 (2023).

B.    **The FTC's Decision to Proceed in Federal Court and the 2019 Consent Motion**

On July 24, 2019, the FTC invoked this Court's jurisdiction by filing a Complaint together with the Department of Justice, seeking civil penalties, an injunction and other equitable relief.  (*See* Dkt. No. 1 (Compl.) at ¶1.)  The Complaint included five counts alleging violations of the 2012 Order and a claim that Meta violated Section 5 of the FTC Act in connection with its use of phone numbers provided by users for account authentication purposes.  (*See id.* at ¶¶ 155-90.)  As the Complaint correctly states, *only* Article III courts have the authority to impose the relief sought, including both civil penalties and injunctive relief.   (*See. id.* at ¶¶ 191-93.)  Specifically, with respect to injunctive relief, the Complaint "request[ed that] this Court, pursuant to 15 U.S.C. §§ 45(l) and 53(b), and pursuant to the Court's own equitable powers . . . [e]nter an injunction."  (*Id.* at ¶ 194.)  Those statutory provisions authorize this Court, not the Commission, to impose injunctive relief.  *See* 15 U.S.C. § 45(l) (stating that in civil penalty actions, "*United States district courts* are empowered to grant mandatory injunctions and such other and further equitable relief as they deem appropriate"); *id.* § 53(b) ("[I]n proper cases the Commission may seek, and after proper proof, *the court* may issue, a permanent injunction.").  As in the 2012 Action, the Complaint did not allege violations of COPPA or the COPPA Rule.

On July 25, 2019, the Commission filed a Consent Motion for Entry of Stipulated Order for Civil Penalty, Monetary Judgment, and Injunctive Relief (the "Consent Motion").  (*See* Dkt. No. 2 (Consent Mot.) at 1.)  In announcing the Stipulated Order, the FTC made clear that it would only "have the force of law when approved and signed by the district court judge." (Rouhandeh Decl. Ex. F (July, 24, 2019 FTC Press Release).)  The Consent Motion stated that the parties had reached a settlement as to the Complaint's allegations and sought the entry of a Stipulated Order that required Meta to pay a $5 billion civil penalty and imposed new injunctive relief in the place of the 2012 Order.  (*See* Dkt. No. 2 (Consent Mot.) at 1)  As is relevant here,

injunctive relief to which the parties agreed was set out in Attachment A to the Stipulated Order.

Under the Stipulated Order, Meta consented to the entry of Attachment A in the FTC's

administrative proceeding.  (*See* Dkt. No. 35 (Stip. Order) at 4 ("IT IS FURTHER ORDERED

that Defendant . . . shall consent to: (i) reopening of the proceeding in FTC Docket No. C-4365;

(ii) waiver of its rights under the show cause procedures set forth in Section 3.72(b) of the

Commission's Rules of Practice; and (iii) modifying the Decision and Order in *In re Facebook,

Inc*., with the Decision and Order set forth in Attachment A.").)

In agreeing to the Stipulated Order, Meta did not admit or deny any of the allegations in

the Complaint, and the Stipulated Order resolved all claims for violations of the 2012 Order, and

"all consumer-protection claims known by the FTC" prior to June 12, 2019.  (Dkt No. 35 (Stip.

Order) at 1-2.)

The Stipulated Order specified both that "[t]his Court has jurisdiction over the subject

matter and all of the parties," and that "this Court shall retain jurisdiction in this matter for

purposes of construction, modification, and enforcement of this Stipulated Order."  (*Id.* at 2, 5.)

Similarly, Attachment A to the Stipulated Order provided, under an FTC caption, that "[t]his

Court has jurisdiction over this matter."  (Dkt No. 35 (Stip. Order, Attach. A) at 1.)  Attachment

A to the Stipulated Order also included separate provisions in reliance on this Court's ongoing

jurisdiction.  Part XV allows the FTC to obtain discovery from Facebook under the Federal

Rules of Civil Procedure "without further leave of court," and Part XVI extends the term of the

agreement upon the filing of "a complaint . . . in federal court alleging any violation of this

Order."  (*Id.* at 20.)  The Stipulated Order, and the relief it encompasses, was the culmination of

a 17-month process that involved "lengthy negotiations," (Dkt. No. 34 (Mem. Op.) at 8),

between Meta, the FTC, and DOJ, including almost 100 calls and meetings with the FTC

enforcement staff and/or commissioners.  Those negotiations involved voluminous document
productions and presentations by Meta, and detailed discussions regarding almost every aspect of
the Stipulated Order's language and its interpretation.

**C.** **The 2019 Settlement Obtained Relief Unavailable through Litigation of the
Complaint on the Merits**

The FTC approved the settlement agreement reflected in the Stipulated Order by a 3-2
vote. Commissioners Rohit Chopra and Rebecca Kelly Slaughter dissented.

Stakeholders appeared to agree that the settlement enabled the FTC to obtain relief that it
could not have achieved through litigation, and that any judgment after trial would have been
unlikely to include the same requirements to which Meta ultimately agreed.  The Commissioners
who approved the settlement released a statement noting, "the relief we have secured today is
substantially greater than what we realistically might have obtained by litigating, likely for years,
in court."  (Rouhandeh Decl. Ex. A (July 24, 2019 Comm'rs Simons, Phillips, Wilson Statement)
at 5.)  With respect to the injunctive relief required under the Stipulated Order, they stated:

> The Order's innovative, far-reaching conduct relief—imposing affirmative
> obligations and corporate governance reforms—extends well beyond the typical
> relief historically awarded by the courts in consumer protection cases involving
> legitimate companies. Even assuming the FTC would prevail in litigation, a court
> would not give the Commission carte blanche to reorganize Facebook's governance
> structures and business operations as we deem fit. Instead, the court would impose
> the relief. Such relief would be limited to injunctive relief to remedy the specific
> proven violations and to prevent similar or related violations from occurring in the
> future. Thus, it is highly unlikely the Commission could have obtained this
> magnitude of injunctive relief if we had proceeded with litigation.

(*Id.* at 6.)  The FTC's Associate Director for Enforcement confirmed to the public and the press
that the FTC, through the settlement, "got a lot of relief that we couldn't otherwise have
obtained."  (Rouhandeh Decl. Ex. G (July 24, 2019 FTC Press Conference) at 26:20-27:06; *see
also* Dkt No. 34 (Mem. Op.) ("[T]he United States. . . appears to acknowledge that it would have
been unlikely to obtain more after a trial. The Court has no reason to doubt that judgment.").)

9

In connection with these statements, the three Commissioners indicated that the FTC had considered, as part of the deliberations over the proposed settlement, whether the Stipulated Order should "impose more limitations on data collection and use." (Rouhandeh Decl. Ex. A at 6.) However, the Commission recognized that the "FTC does not have the authority to regulate by fiat," and that the FTC Act "does not give [the FTC] free rein to impose" restrictions on the "extent to which Facebook, or any other company, should be able to collect, use, aggregate, and monetize data." *Id.* In her dissent, Commissioner Slaughter concurred that many of the public calls for greater, more intensive restrictions on Facebook's "privacy and data practices . . . demanded outcomes that far exceed the FTC's power or legal authority." (Rouhandeh Decl. Ex. H (Comm'r Slaughter Dissent) at 15.)

### D.   Entry of the Stipulated Order & Final Judgment by this Court

In an opinion dated April 23, 2020 ("Memorandum Opinion"), this Court granted the Consent Motion, and agreed to enter the Stipulated Order, including its Attachment A. (*See* Dkt. No. 34 (Mem. Op.).) The Court found that the "proposed remedies in the Stipulated Order are reasonable in light of the allegations in the Complaint," and that "entering the Stipulated Order is in the public interest." (*Id.* at 13, 16.) The Court also noted that "under the Stipulated Order it retains jurisdiction over this matter, including to enforce its terms." (*Id.* at 16.)

On April 27, 2020, as directed by this Court, the FTC voted to enter Attachment A to the Stipulated Order in agreed form in its administrative proceeding against Meta. The FTC entered Attachment A as a "final order," while specifically stating that the "Court has jurisdiction over this matter." (Rouhandeh Decl. Ex. I (2020 FTC Order) at 1, 20.) In announcing this step, the FTC explained that, "[p]ursuant to the 2019 settlement, the FTC could not amend its 2012 administrative order with Facebook with the updated consumer protections until the federal court entered its order" because it was ordered pursuant to this Court's exclusive statutory authority to

enter such relief under 15 U.S.C. §§ 45(l) and 53(b).  (Rouhandeh Decl. Ex. J (April 28, 2020 FTC Press Release).)

### E.    <u>The Initial Assessment</u>

The Stipulated Order required Meta to "establish and implement, and thereafter maintain a comprehensive privacy program (the "Privacy Program"), within six months (*i.e.*, by October 25, 2020), and to retain an Assessor who would conduct biennial assessments of the Privacy Program over the course of twenty years, in addition to an "initial Assessment" covering its first 180 days (from October 25, 2020 through April 22, 2021).  (Dkt. No. 35 (Stip. Order, Attach. A) at 13.)  Meta invested billions of dollars in designing and implementing a comprehensive Privacy Program, and facilitating rigorous oversight by the Assessor.  Meta is confident that these efforts were more than sufficient to meet the Stipulated Order's compliance requirements.

The First Assessment was submitted to the FTC and DOJ on July 1, 2021.  Between August 2021 and May 2022, Meta responded to numerous requests from the FTC under Part XV of Attachment A to the Stipulated Order relating to the Assessor's findings.  ((Rouhandeh Decl. ¶ 2.)  Its responses included multiple depositions, hundreds of pages of narrative responses, and nearly 30,000 pages of underlying source material concerning its extensive efforts to design and implement a new privacy program.  (*Id.*)  After completing its responses in May 2022, Meta did not hear further from the FTC concerning these issues for nearly a year.  (*Id.*)

### F.    <u>The FTC Issues an Order to Show Cause and Proposed Order and Seeks to Reopen this Court's Stipulated Order</u>

On May 3, 2023, slightly more than three years into the 20-year term of the Stipulated Order, the three-member Commission issued its OTSC, directing Meta to show cause why the FTC should not modify Attachment A to the Stipulated Order and enter a new Proposed Order. The FTC purported to issue the OTSC pursuant to its reopening authority under Section 5(b) of

the FTC Act, 15 U.S.C. § 45(b), and Rule of Practice 3.72(b), 16 C.F.R. 3.72(b). The Commission commenced this proceeding, citing findings from the 2021 Assessment, just minutes before its first meeting with the Assessor to preview findings from the *current* Assessment (the first full biennial Assessment) which the FTC will receive this summer.

The OTSC states that the FTC's reopening is an "enforcement action" because the Commission has "reason to believe" that Meta (1) failed to implement an effective Privacy Program under Part VII of Attachment A; (2) made misrepresentations between 2017 and 2019 with respect to its Messenger Kids product that violated the *2012* Order, Section 5 of the FTC Act, COPPA, and the COPPA Rule; and (3) made misrepresentations between 2018 and 2020 with respect to which third-party developers could receive nonpublic information that violated Section 5 of the FTC Act and both the 2012 Order and the Stipulated Order.  (*See* Rouhandeh Decl. Ex. B at 11-12.)

On the basis of these assertions, the Proposed Order would substantially rewrite Attachment A to the Stipulated Order, imposing expansive and unprecedented new injunctive and equitable requirements and prohibitions on Meta—many of which were among those called for by the Commissioners who dissented from the 2019 settlement.  A comparison between the two documents shows more than 800 changes to what was a 23-page document, including:

- A requirement that at least one member of Meta's Independent Privacy Committee hold, or have held within the last five years, a position at a nonprofit where that person worked to advance civil liberties, privacy, consumer or data security-related goals, (*See* Rouhandeh Decl. Ex. C at Definition M ("Independent Privacy Committee"));

- A prohibition on collecting, using, sharing or otherwise benefitting from Covered Information from so-called Youth Users, except as is necessary to operate Meta's services, (*id.* at Part I);

- A prohibition on the introduction of any new or modified products, services, or features, unless the most recent Assessment showed that the Privacy Program meets all Part VIII requirements and that the Assessor did not identify any material gaps or

weaknesses—and if the most recent Assessment did identify material gaps or weaknesses, Meta could not proceed until the Assessor provided written confirmation to the FTC that Meta has fully remediated them, (*id.* at Part X); and

- Expanding the breadth of the Privacy Program to cover all of Meta's affiliates and subsidiaries and to include not only the "privacy, confidentiality, security, and Integrity" of user information, but such far-flung topics as "physical harm, emotional distress or mental health harm, economic harm, reputational harm, relationship harm, discrimination, or harm to an individual's autonomy (*e.g.*, impairing an individual's ability to make his or her own informed decisions, such as through coercion, manipulation, thwarted expectations, or failure to inform the individual of material facts)," (*id.* at Definition T ("Privacy Risks and Harms"), Part VIII).

The FTC's Proposed Order would impose conflicting requirements with this Court's Stipulated Order.  For example, the Proposed Order would change the authority of the Associate Director for Enforcement to approve the Assessor "in his or her sole discretion."  (Rouhandeh Decl. Ex. C at 19.)  But the Stipulated Order gives the Department of Justice "the same right as the Associate Director for Enforcement . . . to approve the person(s) selected to conduct the Assessments," (Dkt. No. 35 (Stip. Order) at 4), which is necessarily irreconcilable with a "sole discretion" standard. Meta would have overlapping, dueling independent assessments concerning starkly different privacy programs, be required to provide different documents to the DOJ and the FTC on different schedules, and be subject to incompatible obligations.

The FTC initially ordered Meta to respond to its OTSC no later than June 2, 2023.  On May 22, the FTC granted Meta's unopposed motion seeking an additional 60 days in which to respond to the OTSC.  (See Rouhandeh Decl. Ex. K (FTC Order Granting Extension) at 2.) Absent further action by this Court, Meta now must respond to the OTSC no later than August 1, 2023.

## ARGUMENT

The Supreme Court has instructed that where, as here, a party (Meta) is subject to a rival proceeding seeking to reopen a district court's consent decree (the Commission's OTSC

proceeding), the proper course of action is to "apply to the court that approved a settlement [this Court] for an injunction requiring dismissal of [the] rival action." *Syngenta Crop Protection, Inc. v. Henson*, 537 U.S. 28, 34 n.* (2002).

Under the All Writs Act, this Court has authority to "issue all writs necessary or appropriate in aid of [its] jurisdiction[ ]." 28 U.S.C. § 1651(a); *see United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977) (the Supreme Court "has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained"); *see also Cobell v. Norton*, 391 F.3d 251, 257 (D.C. Cir. 2004) (emphasizing a court's "discretion as a court of equity in fashioning a remedy to … enforce a consent decree").  "Basic power to protect the preclusive effects of a federal judgment by injunction may well inhere in the very existence of federal courts.  If a more definite grant of general authority is needed, it can be found in the All Writs Act." *FDIC v. Bank of New York*, 479 F. Supp. 2d 1, 18 (D.D.C. 2007), *aff'd*, 508 F.3d 1 (D.C. Cir. 2007).

This inherent authority—as codified in the All Writs Act—is sufficient, without more, to support injunctive relief—preliminary or permanent—preventing the FTC from usurping this Court's exclusive jurisdiction over this matter.  For the reasons set out in Point I, *infra*, this Court should issue such an injunction, and has broad discretion to fashion additional relief, as necessary to enforce its Stipulated Order.

This inherent authority aside, the circumstances here also satisfy the more traditional standards for a preliminary injunction: (1) likelihood of success on the merits, (2) irreparable harm if the preliminary injunction is not granted, (3) a balance of equities favoring the movant, and (4) that the injunction is in the public interest.  *See Winter v. Natural Resources Defense*

*Council, Inc.*, 555 U.S. 7, 20 (2008).  Here, without more permanent relief, a preliminary

injunction is necessary to protect Meta from the harm it would otherwise face as early as August

1, 2023, the current date by which the FTC has ordered Meta to respond to the OTSC.   Absent

injunctive relief from this Court, at that time, Meta would be subject to—and irreparably harmed

by—the FTC's unlawful proceeding.

**I.     The FTC Lacks the Jurisdictional and Statutory Authority to Bring Its Reopening
         Proceeding**

**A.     The FTC's OTSC Illegally Seeks to Usurp This Court's Exclusive Jurisdiction**

**1.     This Court Expressly Retained Jurisdiction Over Modification and
         Enforcement of the Stipulated Order**

The FTC's OTSC proceeding should be enjoined because this Court—not the FTC—has

exclusive jurisdiction.  In 2019, the Commission invoked this Court's jurisdiction to seek relief

that only an Article III court could order.  *See* 15 U.S.C. § 45(l) ("[T]he United States district

courts are empowered to grant mandatory injunctions and such other and further equitable relief

as they deem appropriate in the enforcement of such final orders of the Commission.").

As the Court explained, the Stipulated Order "require[d] Facebook to pay a $5 billion

civil money penalty . . . and impose[d] injunctive relief in the form of an amended administrative

order to be entered by the FTC."  (Dkt. No. 34 (Mem. Op.) at 1; *see also id.* at 6.)  Thus, the

injunctive relief *ordered by the Court* was embodied in an administrative order appended to the

Stipulated Order as Attachment A.

In the Stipulated Order, the Court also expressly provided that it "shall retain jurisdiction

in this matter for purposes of construction, modification, and enforcement of this Stipulated

Order."  (Dkt. No. 35 (Stip. Order) at 5.)  The first page of Attachment A itself further states that

the "Court has jurisdiction over this matter."  Courts in this Circuit routinely enforce consent

decrees that use similar language to reserve the district court's jurisdiction. *See, e.g.*, *Pigford v.*

*Vilsack (Pigford II)*, 777 F.3d 509, 514, 516 (D.C. Cir. 2015); *Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 286 (D.C. Cir. 1993), *rehearing denied*, 59 F.3d 1276 (D.C. Cir. 1995).

Where a court retains jurisdiction to enforce an order, that jurisdiction is exclusive.  *See e.g.*, *Flanagan v. Arnaiz*, 143 F.3d 540, 545 (9th Cir. 1998) ("The reason why exclusivity is inferred is that it would make no sense for the district court to retain jurisdiction to interpret and apply its own judgment to the future conduct contemplated by the judgment, yet have a [rival] court construing what the federal court meant in the judgment"); *see also United States v. ASCAP*, 442 F.2d 601, 603 (2d Cir. 1971) (holding that under retention of jurisdiction clause the district court retained exclusive jurisdiction over suits related to the consent judgment); *Ultimate Creations, Inc. v. McMahon*, 2006 WL 8443450, at *2 (D. Ariz. July 7, 2006) (retention provision "implies exclusivity"), *aff'd*, 2008 WL 4946339 (9th Cir. 2008); *Petoskey Inv. Grp., LLC v. Bear Creek Twp.*, 2005 WL 1796130, at *8 (W.D. Mich. July 27, 2005) (same)*; Magnolia v. Conn. Gen. Life Ins. Co.*, 157 F. Supp. 2d 583, 587 (D. Md. 2001) ("It is apparent from language of the Final Order that the California Court intended to retain exclusive jurisdiction.").

Thus, to the extent that the FTC believes Meta has not complied with the Stipulated Order, including Attachment A, it was free to invoke this Court's jurisdiction to enforce it. Instead, contrary to this Court's continuing, exclusive jurisdiction over "construction, modification, and enforcement" of the Stipulated Order (Dkt. No. 35 at 5), the FTC's OTSC provides that based on Meta's supposed noncompliance with the Stipulated Order (among other provisions), the agency will *unilaterally* "modif[y]" the injunctive relief ordered by the Court unless Meta makes an unspecified showing, (Rouhandeh Decl. Ex. B at 1).  The FTC's articulated bases for "modifying" Attachment A include, for example, allegations that Meta

violated Parts I and VII.  (*Id.* at 12.)  The FTC's OTSC, on its face, purports to usurp this Court's jurisdiction to determine what constitutes a violation of the Stipulated Order, whether to modify it, and how to enforce it.  In short, the FTC seeks to substitute itself for this Court by taking "further enforcement action" and "modifying" the Stipulated Order itself.  (*Id.*)

The Court's exclusive jurisdiction is consistent with the law governing injunctive relief, which requires that injunctions be contained in a single, static order.  The FTC's apparent view is that it can modify Attachment A separate and apart from the Stipulated Order to which it is attached.  This result would contravene Federal Rule of Civil Procedure 65(d)(1).  In its "Stipulated Order for Civil Penalty, Monetary Judgment, and Injunctive Relief" this Court granted injunctive relief.  To comply with Rule 65(d)(1), an "order granting an injunction" cannot "refer[] to [any] other document."  It must set forth within "the four corners of the order precisely what acts are forbidden" or required.  *Fonar Corp. v. Deccaid Servs., Inc.*, 983 F.2d 427, 430 (2d Cir. 1993). Courts have therefore rejected any suggestion that Rule 65(d) would allow an injunction to incorporate a document that is subject to even the possibility of future modification.  *Dunn v. N.Y.S. Dep't of Labor*, 47 F.3d 485, 489 (2d Cir. 1995) ("[E]ven if it were permissible for an injunction to incorporate another document by reference, there is no indication that the *Sitkin* consent judgment is a fixed document.").  Here, Attachment A is not incorporated by reference: it is an integrated part of the Court's Stipulated Order. Indeed, this is the position the FTC itself took in its motion asking the court to enter the Stipulated Order.  (*See* Dkt. No. 2 (Consent Mot.) at 1) ("[t]he Stipulated Order . . . imposes significant injunctive relief, primarily in the form of an amended administrative order that will be entered by the FTC."); *id.* at 4  ("The proposed settlement has two main components:  a civil penalty award and *injunctive relief imposing new compliance terms on Facebook*."); *id.* (referring to "[t]he injunctive relief set forth

in the Stipulated Order and attached Amended Order"); *id.* at 5 ("[T]he injunctive-relief provisions articulate specific but flexible compliance terms . . .").)  In seeking to modify Attachment A as though it is separate from the Stipulated Order, the FTC therefore necessarily runs afoul of Rule 65(d)(1).

## 2.    The FTC Is Judicially Estopped from Contesting the Court's Jurisdiction

The FTC cannot now be heard to challenge this Court's continuing jurisdiction granted in a Stipulated Order that the FTC urged this Court to adopt.  *See*, *e.g.*, *Temple Univ. Hosp., Inc. v. NLRB*, 929 F.3d 729, 733 (D.C. Cir. 2019) (judicial estoppel "protects the integrity of the judicial process … by prohibiting parties from deliberately changing positions according to the exigencies of the moment") (quoting *New Hampshire v. Maine*, 532 U.S. 742, 743 (2001)).[16] The FTC expressly agreed to the Stipulated Order, including Attachment A, in which the Court retained jurisdiction.  The FTC then separately ratified the Court's continuing jurisdiction by issuing Attachment A as an administrative order.

In its Proposed Order, however, the FTC conspicuously removes the language from Attachment A stating that "[t]his Court has jurisdiction over this matter"—a clear attempt to make its usurpation of this Court's jurisdiction permanent.  The jurisdictional language in both the Stipulated Order and Attachment A reflects an intentional choice by the FTC, through negotiations with Meta, to submit to the exclusive authority of this Court—and only this Court—with respect to the enforcement and modification of the Stipulated Order.

---

[16] Unlike other estoppel doctrines, judicial estoppel "applies equally against the government as a litigant," unless the government shows that an established exception applies. *Cnty. of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64, 73 (D.D.C. 2008) (citing *New Hampshire v. Maine*, 532 U.S. 742, 775-76 (2001)).  None of those exceptions applies here or allows the FTC to contradict its prior positions on an issue as basic as construing the Stipulated Order that the FTC moved the Court to enter, including the Court's retention of jurisdiction, according to its plain meaning.

Other terms in Attachment A are consistent with the deliberate choice the FTC urged this Court to adopt.  For instance, Part XVI expressly contemplates enforcement of Attachment A by this Court, not administratively.  (Dkt No. 35 (Stip. Order, Attach. A) at 20 (providing that the Order will terminate 20 years "from the date of its issuance . . . [or] from the most recent date that the United States or the Commission files a complaint (with or without an accompanying settlement) in federal court alleging any violation of this Order").)  Similarly, Part XV.A states that "[t]he Commission is . . . authorized to obtain discovery, *without further leave of court*, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 … , 31, 33, 34, 36, 45, and 69."  (*Id.*)  The emphasized clause is consistent with the Court's continuing exclusive jurisdiction over this federal court action, in which the timing of discovery is governed by the federal rules unless otherwise "authorized … by court order."  Fed. R. Civ. P. 26(d)(1).  Having successfully advocated for the Court to impose these terms, the FTC is estopped from advancing the opposite position.

Accordingly, the Court should enjoin the FTC's reopened administrative proceeding, and mandate that the FTC comply with this Court's exclusive authority over modification and enforcement of the Stipulated Order.

**B.**   **The Stipulated Order Is a Final Judgment with *Res Judicata* Effect**

The FTC's proceeding should be enjoined for an independent reason:  the final judgment rule and the doctrine of *res judicata* bar the administrative procedure by which the FTC proposes to "modify" the Stipulated Order unilaterally.

The Stipulated Order, including Attachment A, is this Court's "final judgment[] on the merits and accorded *res judicata* effect."  *Wise v. Glickman*, 257 F. Supp. 2d 123, 129 n.4 (D.D.C. 2003); *see Keepseagle v. Vilsack*, 118 F. Supp. 3d 98, 115 (D.D.C. 2015) ("[T]he importance of respecting the finality of a judgment is deeply embedded in our legal system."),

*appeal dismissed*, 2015 WL 9310099 (D.C. Cir. Dec. 17, 2015).  By its own terms, the Stipulated

Order "resolve[d] the claims for civil penalties and injunctive relief set forth in the Complaint,"

as well as "any and all claims" covered by the release negotiated by the parties.  (Dkt. No. 35 at

1.)  This Court's final judgment now may be modified only under Rule 60 of the Federal Rules

of Civil Procedure.  But that requires the party seeking modification to move or initiate an

independent action before a court.  *See* Fed. R. Civ. P. 60(b).  Neither the FTC nor the United

States on its behalf has invoked Rule 60.

### 1. The FTC Seeks to Evade the Strict Standards for Modifying a Final Judgment

By purporting to "modify" the Stipulated Order administratively, the FTC is attempting

to end-run the applicable judicial standards, which are especially rigorous when a *plaintiff* seeks

to modify a consent decree, and under which the FTC could not obtain the radical revisions set

forth in its Proposed Order.  Because disturbing the "sanctity of final judgments" is highly

disfavored, a party seeking to modify a final judgment bears a substantial burden under Rule

60(b).  *Twelve John Does v. District of Columbia*, 841 F. 2d 1133, 1138 (D.C. Cir. 1988); *PETA*

*v. U.S. Dep't of Health & Hum. Servs.*, 901 F.3d 343, 355 (D.C. Cir. 2018) (holding that final

judgments should be disturbed in only "extraordinary circumstances"); *see also Smalls v. United*

*States*, 471 F.3d 186, 192 (D.C. Cir. 2006) (noting that review of a final judgment "is limited by

the finality considerations underlying Rule 60(b)").  Such relief from a final judgment "should be

only sparingly used, and reserved for extraordinary circumstances."  *PETA*, 901 F.3d at 355; *Liu*

*v. Admin. Off. of the U.S. Cts.*, 2022 WL 1538717, at *1 (D.D.C. May 16, 2022) (Kelly, J.)

(same).  To meet this high bar, the movant must prove to a court that "a significant change in

circumstances" justifies revision of the order.  *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367,

383 (1992).  And even when those extraordinary circumstances exist, modifications must be

exceedingly narrow.  "Any adjustment of the order must be suitably tailored to the changed

circumstance[s], and a court should do no more than is necessary."  *Salazar*, 896 F.3d at 498.

These general principles apply with even greater force where, as here, a plaintiff seeks to

modify a final judgment embodied in a consent decree. A consent decree "embodies an

agreement of the parties and is also an agreement that the parties desire and expect will be

reflected in, and be enforceable as, a judicial decree that is subject to the rules generally

applicable to other judgments and decrees." *Frew ex. rel. Frew. V. Hawkins*, 540 U.S. 431, 437

(2004).  In *Salazar*, the D.C. Circuit reversed the district court's order modifying the parties'

consent decree at the plaintiffs' request.  The court observed that "the overwhelming majority of

motions to modify the terms of a consent decree are filed by the enjoined party seeking 'relief

from' the court's judgment." *Salazar*, 896 F.3d at 498.

In the atypical situation, however, in which the plaintiff seeks to enhance the terms of a

consent decree, it cannot impose new injunctive relief under the guise of "modification":

> [Where] a *plaintiff* seeks to *enhance* a consent decree's terms, courts must be
> careful to ensure that the new injunctive terms give effect to and enforce the
> operative terms of the original consent decree.  *Courts may not, under the guise of
> modification, impose entirely new injunctive relief.*  That practice would end run
> the demanding standards for obtaining injunctive relief in the first instance, would
> deny the enjoined party the contractual bargain it struck in agreeing to the consent
> decree at the time of its entry, and would destroy the predictability and stability that
> final judgments are meant to provide.

*Id.*  This prohibited result is precisely what the FTC now proposes.

Courts in this Circuit have also consistently rejected the argument, like that made in the

OTSC, (Rouhandeh Decl. Ex. B at 12), that new violations of law or the parties' consent decree

are "changed conditions" warranting modified injunctive relief.  On the contrary, because alleged

order violations are foreseeable, they "fall[] far short of the type of 'changed circumstance' that

might warrant the amendment of a settlement agreement—in the negotiation of a settlement, the

negotiation of incentives and penalties that will ensure the opposing parties' compliance is an omnipresent concern." *Stewart v. O'Neill*, 225 F. Supp. 2d 6, 9 (D.D.C. 2002). And in *Salazar*, the D.C. Circuit held that "[i]mposing a new structural injunction based on new facts found to demonstrate a violation of a whole new statute—none of which were adjudicated within the original Consent Decree, let alone consensually agreed to . . . is out of Rule 60(b)'s bounds." *Salaza*r, 896 F.3d at 499; *see also Cook v. Billington*, 2003 WL 24868169, at *4 (D.D.C. Sept. 8, 2003) (holding that "violation of the Settlement Agreement . . . does not constitute the type of 'changed circumstance' which justifies modification"). Indeed, the FTC knows this well, having unsuccessfully raised identical arguments under Rule 60(b) before. In *Fed. Trade Comm'n v. Garden of Life, Inc.*, as here, the Commission sought to use allegations of order noncompliance as a basis to substantially expand that order's injunctive relief. 2012 WL 1898607, at *5-6 (S.D. Fla. May 25, 2012). The court rejected that argument, holding it "insufficient to constitute a significant change in factual circumstances." *Id.* at *5.

It is also irrelevant that the Commission now believes that the "public interest" requires that the parties' agreement must be modified to "better achieve its objectives." (Rouhandeh Decl. Ex. B at 12.) A consent decree "cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve." *United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971).

Put simply, had the FTC filed a Rule 60(b) motion to modify the Stipulated Order in the manner proposed in the OTSC, that motion would be frivolous—running contrary to decades of settled law and precluded by binding authority from the Supreme Court and the D.C. Circuit. It

defies law and logic that the FTC, citing no legal precedent whatsoever in the OTSC, could magically conjure the authority to do so itself.

      **2.**    **The FTC's Proposed Modification of a Final Judgment Violates Article III**

"Judgments, within the powers vested in courts by the Judiciary Article of the Constitution, may not be unlawfully revised, overturned or refused faith and credit by another Department of Government." *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948). Judgments issued by Article III courts are "subject to review *only* by superior courts in the Article III hierarchy." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218-19 (1995) (emphasis in original). To hold otherwise would "subject all judicial action to superior" review by coequal branches of government—an outcome "subversive of the constitutional independence of the judicial branch of government." *Daylo v. Adm'r of Veterans' Affairs*, 501 F.2d 811, 816 (D.C. Cir. 1974). For that reason, "decisions of Article III courts" are not subject to reopening or review by Congress or "officials of the Executive Branch." *Bank Markazi v. Peterson*, 578 U.S. 212, 225-26 (2016).

Accordingly, the Court should exercise its continuing jurisdiction over this matter to enforce its Stipulated Order, entered in final judgment of the Commission's Complaint, and enjoin the FTC's reopened administrative proceeding, which seeks impermissibly to modify it.

      **C.**    <u>**The Commission's Limited Reopening Authority Is Not a Basis to Modify this Court's Order**</u>

Recognizing the obvious—that it could never obtain such an extreme overhaul of the Stipulated Order from an Article III court—the FTC instead seeks to do so under the guise of its limited authority to reopen and "alter, modify, or set aside" its orders. The FTC has never invoked this authority to wholesale rewrite a consent decree as part of an "enforcement action."

(Rouhandeh Decl. Ex. B at 12.)  Nor can it do so lawfully (or constitutionally).  *See infra* Points I.D, I.E.

### 1.    Section 5(b) Does Not Apply to an Order Entered by a District Court

The OTSC (Rouhandeh Decl. Ex. B at 1) is premised on the FTC's authority under Section 5(b) of the FTC Act to "reopen and alter, modify, or set aside, in whole or in part, any . . . order made or issued by it under this section, whenever in the opinion of the Commission conditions of fact or of law have so changed as to require such action or if the public interest shall so require."  15 U.S.C. § 45(b).[17]  The FTC's lack of jurisdiction over the Stipulated Order aside, this reopening authority does not extend to Attachment A.

First, Section 5(b) is titled "Proceeding by Commission," and expressly discusses orders issued by the Commission through the *administrative adjudication* process, not through litigation in federal court.  For example, the provision begins by authorizing the *Commission* to issue a complaint, set a hearing, and enter "an order requiring [the respondent] to cease and desist from using . . . such act or practice."  15 U.S.C. § 45(b).  The Commission's reopening authority is, by its plain language, limited to orders "made or issued *by it* under this Section."  *Id.*  By contrast, the Commission obtained its injunctive relief in the Stipulated Order through Sections 5(l) and 13(b), both of which allow such relief to be entered only by federal district courts.  15 U.S.C. §§ 45(l), 53(b).  (*See* Dkt. No. 35 at 1.)  Section 5(c), in turn, allows a party subject to a Commission order issued under Section 5(b) to "obtain a review of such order in the court of appeals of the United States."  Id. § 45(c).  Nothing in Section 5 contemplates, let alone

---

[17] 16 C.F.R. § 3.72(b) allows the Commission to initiate such a reopening proceeding by an order to show cause.

authorizes, the reopening of an order entered by a federal district court, which definitionally cannot be the subject of a petition for review under Section 5(c).

Second, the Commission ignores the first half of the sentence invoked in the OTSC—that it may reopen an order *only* "*[a]fter* the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time."[18]  *Id.*  The word "after" is a hornbook example of language that creates a condition precedent.  *See, e.g.*, *Metro. Dev. Grp. at Cool Spring, LLC v. Cool Spring Rd., LLC*, 2022 WL 951995, at *8 (D. Md. Mar. 30, 2022).  By its terms, this language limits the Commission's reopening authority under Section 5(b) to orders for which the respondent was "allowed" to file a petition for review of an order by the Commission.  Attachment A was not such an order because this Court specifically reviewed and entered it in final judgment of the Complaint, meaning that any further proceedings would have required an *appeal* of that judgment to the D.C. Circuit, not a petition for review of the Commission's action.

The parties understood this distinction at the time.  Virtually every FTC consent agreement, including the agreement preceding Meta's 2012 Order, contains identical language that the proposed respondent waives "all rights to seek judicial review or otherwise to challenge or contest the validity of the order entered pursuant to this agreement."  (Rouhandeh Decl. Ex. L (2011 Consent Agreement) at *1 ¶ 3(C).)  Recognizing that the "judicial review" language was inapplicable to an order entered by a federal district court, the 2020 Order provides, by contrast, that, "Respondent *and the Commission* waive all rights *to appeal* or otherwise challenge or contest the validity of this Order."  (Dkt. No. 35 (Stip. Order, Attach. A) at 1 ¶ 4.)  In other

---

[18] The preceding sentence sets forth the Commission's reopening authority during the time allowed for filing of a petition for review. 15 U.S.C. § 45(b).

words, the parties acknowledged that because Meta had no right to file a petition for review of a court order (as opposed to a Commission order), the relevant rights subject to waiver were Meta's and the Commission's respective rights to appeal the Court's order.

Third, unlike virtually every FTC consent agreement, the 2020 Order contains no language *acknowledging* the Commission's reopening authority.  As set forth in 16 C.F.R. § 2.32, the Commission requires respondents settling administrative complaints to specifically acknowledge that their orders "may be altered, modified, or set aside in the same manner provided by statute for [other] Commission orders."  (*See, e.g.*, Rouhandeh Decl. Ex. L at 1.) Because the Stipulated Order was a settlement of a federal court complaint, Attachment A lacks any language suggesting that it could be "altered, modified, or set aside in the same manner" as other Commission orders.[19]

For these reasons, the Commission's reopening authority under Section 5(b) does not reach Attachment A.

### 2.      The OTSC Far Exceeds the Commission's Reopening Authority

Even if the Commission had the authority to modify Attachment A, the OTSC drastically outstrips the Commission's 5(b) authority both as to the circumstances in which a matter may be reopened and, more obviously, the scope of the changes.

The Commission has historically used this authority sparingly—and nearly always to provide respondents *relief* from its orders.  Parroting Rule 60(b), the Commission has stated that "[m]odification of a final order is warranted when significant unanticipated changes in circumstances or considerations of the public interest eliminate the need for the order or make

---

[19] By contrast, Parts II and III of Attachment A contain specific provisions stating that Meta "may seek modification" of those sections "to address relevant developments" such as "technological changes." There would be no need for those provisions (incorporated in the Stipulated Order) if Attachment A were otherwise subject to modification under Section 5(b) in the same manner as other Commission orders.

continued application of the order inequitable or harmful to competition." *In re Louisiana-Pac. Corp.*, 112 F.T.C. 547, at *4 (1989). But modifications on the Commission's own motion are extraordinarily rare. As the Commission itself put it, "[o]rders to show cause under Rule 3.72(b) are not common," citing as illustrative and representative examples of its "recent" use (1) "reopening an order to correct inaccuracies," and (2) "when the Commission determined to modify an order, but in a manner different from that requested" in a reopening petition filed by the respondent. *In re Dow Chem. Co.*, 2010 WL 2143901, at *3 (F.T.C. May 21, 2010). Neither the statute nor the FTC's rules permit the type of changes sought in the OTSC.

First, unlike Federal Rule of Civil Procedure 60(b), which contains no textual limitation on courts' ability to modify their orders, Section 5(b) and Rule 3.72 allow the Commission only to "alter, modify, or set aside" its orders. Each of these terms has a specific and established meaning. "Modify" is a legal term that has a well-established definition: "to make small changes." *Modify*, Black's Law Dictionary (11th ed. 2019); *see, e.g.*, *MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225 (1994) ("The word 'modify' . . . has a connotation of increment or limitation. Virtually every dictionary we are aware of says that 'to modify' means to change moderately or in minor fashion."). Indeed, "the verb 'modify,' both by derivation and dictionary meaning, connotes a limitation, not an extension, of that which is modified." *Best Foods, Inc v. United States*, 158 F. Supp. 583, 589 (Cust. Ct. 1957). Similarly, courts have uniformly interpreted "alter" to encompass only slight amendments, not transformational changes. *See United States v. Hall*, 801 F.2d 356, 359 (8th Cir. 1986) ("The verb 'alter' is defined 'to cause to become different in some particular characteristic (as measure, dimension, course, arrangement, or inclination) without changing into something else.'") (quoting Webster's Third New International Dictionary); *United States v. Carter*, 421 F.3d 909, 913 (9th Cir. 2005)

(finding alter means "some degree of change or modification, but not a changed meaning."); *see also* Merriam-Webster's Collegiate Dictionary (11th ed. 2020) (defining "alter" as "to make different *without changing into something else*.").[20]

Here, there can be no serious suggestion that the radical rewriting of Attachment A to the Stipulated Order constitutes mere "alteration" or "modification" as those terms have consistently been construed by courts.  The Commission itself trumpeted its desired changes as fundamental and sweeping.  (*See* Rouhandeh Decl. Ex. M (May 3, 2023 Press Release).)  There is also nothing "moderate" or incremental about the Proposed Order, with its hundreds of changes, fundamental transformation of existing requirements, and slew of entirely new (and legally untested) requirements and prohibitions.  *See supra* Point F.  The scope of these proposed changes would "destroy[] the identity of the thing changed"—here, the extensively negotiated provisions of the Stipulated Order, which reflected a carefully considered mutual agreement between the two parties.  *Smith v. United States*, 74 F.2d 941, 942 (5th Cir. 1935) (construing "alter").  Using Section 5(b) for these purposes strains "modify" and "alter" far beyond what they can reasonably sustain.

Second, Section 5(b) applies only where "conditions of fact or of law have so changed as to require such action or if the public interest shall so require."  15 U.S.C. § 45(b).  Cases applying the analogous standards under Federal Rule of Civil Procedure 60(b) to consent decrees

---

[20] Like Rule 60(b), Section 5(b) and Rule 3.72 allow the Commission to "set aside" its orders.  "Set aside" means to "annul or vacate a judgment or an order" and thus is not applicable here—although its inclusion in Section 5(b) and Rule 3.72(b) lends further support to the view that "modify" and "alter" are intended to connote, at most, modest changes.  *United States v. Sellers*, 784 F.3d 876, 883 (2d Cir. 2015); *see also Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010) ("set aside means to annul or vacate" (quoting Black's Law Dictionary (8th Ed. 2004))); *Comcast Corp. v. F.C.C.*, 579 F.3d 1, 10 (D.C. Cir. 2009) (Randolph, J., concurring) ("Set aside means vacate, according to the dictionaries and the common understanding of judges.").

hold that these are mutually exclusive standards.  The "public interest" standard applies only

where the parties *agree* on the modifications.  As Judge Lamberth explained:

> [T]wo standards govern the modification of a consent decree. If all parties to the
> agreement consent to the modification, a court need only review the modification
> to ensure that it is in the "public interest." . . . In cases where there is a disagreement
> as to the proposed modification, however, a more stringent standard is necessarily
> in order. This is only logical, as the unelected . . . antitrust officials must be
> constrained in some way from imposing their interpretation of the "public interest"
> on unwilling parties. Thus, as the Supreme Court and the Court of Appeals have
> held, when parties disagree over proposed modifications to a consent decree, the
> party seeking modification of a final judgment or consent decree in an antitrust case
> must show that a significant change in facts or law warrants revision of the decree
> and that the proposed modification is suitably tailored to the changed circumstance.

*United States v. Baroid Corp.*, 130 F. Supp. 2d 101, 103-04 (D.D.C. 2001).  Where, as here, the

parties disagree over the proposed modifications, the modifications must be justified by changed

circumstances.  The Commission has typically construed this provision to require "significant

unanticipated changes in circumstances."  *In re Louisiana-Pac. Corp.*, 112 F.T.C. 547 (1989).

Under established law, there are no "changed circumstances" here.  As discussed above, courts

applying Rule 60(b)'s analogous standard have routinely held that allegations of post-Order

violations are not "changed circumstances."  *See supra* Point B.1.

Nor is the "public interest" standard relevant, as Meta has not consented to the FTC's

proposed modifications.  *See Baroid Corp.*, 130 F. Supp. 2d at 103.  Regardless, a consent decree

cannot be modified to require whatever the agency thinks "might be necessary and appropriate."

*Sierra Club v. Meiburg*, 296 F.3d 1021, 1031–32 (11th Cir. 2002).  And even where the "public

interest" standard does apply, it certainly does not give the Commission a perpetual roving

license to modify orders at its discretion.  As the Court stated in approving the Stipulated Order,

the public interest standard requires little more than a determination that the agreement is "not

unlawful, unreasonable, or against public policy."  (Dkt. No. 34 (Mem. Op.) at 13.)  Surely, the

Commission does not contend that FTC Commissioners can, with each passing whim "impos[e]

their interpretation of the 'public interest'" to modify consent decrees as they see fit. *Baroid Corp.*, 130 F. Supp. 2d at 103-04.

Third, like Federal Rule of Civil Procedure 60(b), Section 5(b) was never intended for "order enforcement," as the Commission proposes in the OTSC. The 1938 amendments to the FTC Act—by which Congress added the Section 5(b) language the FTC relies on in its OTSC—maintained the FTC Act's historical distinction between order modification and enforcement. The 1938 amendments retained the FTC's authority to modify orders—but included a new Section 5(l), which authorized the FTC to seek civil penalties for order violations in district court, and authorized district courts to impose injunctive relief. *See* FTC Act of 1938, 52 Stat. 111. Reviewing this history, the Second Circuit concluded that no authority supported the proposition that "Congress has vested the FTC with power not only to make orders but to determine whether they have been violated," holding that power falls within the "enforcement responsibility of the courts." *United States v. J. B. Williams Co.*, 498 F.2d 414, 422 (2d Cir. 1974) (quoting *Fed. Trade Comm'n v. Morton Salt Co.*, 334 U.S. 37, 54 (1948)); *see also* 15 U.S.C. § 45(l) (empowering district courts "to grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the Commission").

Unlike the "less demanding" standard for obtaining a consent decree, to obtain a "running structural injunction" the plaintiff bears the steep burden of proving that "such intrusive" relief is warranted. *Salazar*, 896 F.3d at 497. The FTC's OTSC debases that standard, doing precisely what the D.C. Circuit decried (and reversed) in *Salazar*—imposing entirely new injunctive relief "under the guise of modification," seeking to "end run the demanding standards for obtaining injunctive relief in the first instance," and denying Meta "the contractual bargain it struck in

agreeing to the consent decree at the time of its entry." *Id.* at 498.  The Commission cannot abuse its reopening authority to circumvent this Court's Stipulated Order or its ongoing jurisdiction, and should be enjoined from seeking to do so.

> ### D.   The Commission's Unprecedented Abuse of Its Limited Reopening Authority to Assert Violations of Law Would Violate Meta's Due Process Rights

According to the Commission, it can impose sweeping, breathtaking changes through mere assertions that Meta violated its prior orders, Section 5 of the FTC Act, and COPPA without ever having to assert them as formal allegations, let alone prove them.  That is wrong. The Due Process Clause does not permit the FTC to proceed by OTSC.

As an initial matter, the Proposed Order threatens core rights that are protected by the Due Process Clause, including Meta's rights to develop products, govern its corporate affairs, and innovate to better serve its users and advertisers.  *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984) (holding that a company has a property interest in its trade secrets and data, as well as "the products of [its] 'labour and invention'").  Indeed, Attachment A to the Stipulated Order, which the Commission purports to modify, is itself property that triggers Due Process.  *See Kingvision Pay-Per-View Ltd. v. Lake Alice Bar*, 168 F.3d 347, 352 (9th Cir. 1999) ("A judgment is property, so taking it away requires due process of law.").

Given the limitations of its reopening authority, the Commission affords correspondingly few procedural protections.  While the respondent may "file an answer" to the OTSC, the Commission "in its discretion" determines whether "the pleadings do not raise issues of fact to be resolved."  16 C.F.R. § 3.72(b).  If it determines there are no such factual issues, it can decide the matter or order a hearing "limited to the filing of briefs and may include oral argument when deemed necessary by the Commission."  *Id.*  Only if the Commission decides that "the pleadings raise *substantial* factual issues" will it "direct such hearings as it deems appropriate, including

31

hearings for the receipt of evidence by it or by an Administrative Law Judge." *Id.*  But such hearings are limited to resolving whatever factual issues the Commission identifies—not the ultimate question of the propriety of the modifications. *Id.*

Whatever the adequacy of that process when used consistent with its narrow purpose, those meager procedural safeguards are constitutionally deficient where the FTC seeks to use it as an "enforcement action" to impose drastic new remedies for alleged violations.  The OTSC proposes to radically remake the Stipulated Order because the Commission "has reason to believe" that Meta violated particular provisions of the 2012 Order and Stipulated Order, as well as Section 5 of the FTC Act and COPPA.  (Rouhandeh Decl. Ex. B at 12.)  When the Commission "has reason to believe" that a person violated the law, it files a complaint.[21] (Rouhandeh Decl. Ex. N ("A Brief Overview of the Federal Trade Commission's Investigative, Law Enforcement, and Rulemaking Authority") ("When the Commission has 'reason to believe' that a law violation has occurred, the Commission may issue a complaint setting forth its charges.") at Part II.)  When it does so, the respondent has a right to put the Commission to its burden of *proving* those charges, *see* 16 C.F.R. § 3.43 ("Counsel representing the Commission . . . shall have the burden of proof."); it will be entitled to broad discovery as to all material that "may be reasonably expected to yield information relevant to the allegations of the complaint, to the proposed relief, or to the defenses of any respondent," *id.* § 3.31(c)(1); and it will receive a hearing on not only the ultimate issue of its liability, but the appropriate remedy, if any, *id.* § 3.43.  At that hearing, it "shall have the right of due notice, cross-examination, presentation of

---

[21] 15 U.S.C. § 45(b) ("Whenever the Commission shall have *reason to believe* that any such person, partnership, or corporation has been or is using any unfair method of competition or unfair or deceptive act or practice in or affecting commerce, and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect and containing a notice of a hearing.").

evidence, objection, motion, argument, and all other rights essential to a fair hearing." *Id.* §

3.41(c).[22]

By contrast, through the Commission's looking glass, Meta has no right or expectation of

any of these fundamental procedural protections.  The Commission takes the position that,

having issued its OTSC, Meta now bears the burden of proof.  (Rouhandeh Decl. Ex. O (2020

FTC Order FAQ) at *1 (Meta "will have the opportunity to explain why the FTC should not

proceed as proposed, and to ask for further fact finding").)  The OTSC purports to deny any *right*

to any hearing and any *opportunity* for a hearing on either the merits of the Commission's

spurious assertion that Meta violated its legal obligations or on the propriety of the changes in

the Proposed Order.

The Commission's use of its reopening authority to avoid *proving* that Meta violated any

legal obligations perverts its own rules and procedures.  According to the Commission, it

determines compliance with the law "in an adjudicative proceeding." (Rouhandeh Decl. Ex. N at

Part II.2.A.)  But adjudicative proceedings are "commenced when an affirmative vote is taken by

the Commission *to issue a complaint*," 16 C.F.R. § 3.11, and come with the panoply of

procedural rights described above.  Because they are not commenced by complaint, proceedings

to reopen orders, by contrast, are listed as nonadjudicative in the Commission's procedures,

which explain that such proceedings do "*not relate to the formal administrative trial (pursuant to*

*Part 3 of the Rules of Practice) of an individual or a company alleged to have violated laws*

*administered by the Commission.*"  (Rouhandeh Decl. Ex. P (FTC Procedures Manual) at 6-7.)

In other words, they were neither designed nor intended to be proceedings to adjudicate alleged

---

[22] As set out in Point I.E, below, even these procedural protections would not be sufficient to remedy the Due Process concerns raised by the dual role of the Commissioners here as both the prosecutors who authorized the OTSC and the ultimate adjudicator of its merits.

violations of law.  The Commission is seeking to exploit the nonadjudicative reopening process to avoid proving its alleged violations, while simultaneously denying Meta the formal, fundamental rights to defend itself—rights to which it is entitled.  "A fundamental requirement of due process is the opportunity to be heard . . . at a meaningful time and in a meaningful manner."  *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).  This means that notice and opportunity for hearing must be "appropriate to the nature of the case."  *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950).  The Commission cannot plausibly show that its reopening process affords Meta rights that are commensurate with the sweeping and drastic changes it proposes.

The fact that the Commission is proposing to make radical changes to a heavily negotiated consent decree makes matters even worse.  Meta waived its right to contest liability on the Complaint based *solely* on its willingness to accept the parties' agreement governing its future conduct in specific, circumscribed ways.  As the Commission acknowledged to the public and to this Court, it could not have obtained anything approaching the wide-ranging injunctive relief in the Stipulated Order had Meta not agreed to it.  *See supra* Point E.[23]  To use that agreement as a false baseline for exponentially *more* onerous and restrictive relief that would bind Meta for two decades—while denying Meta both the right to adequately contest the Commission's new allegations and the right to contest the original Complaint, which Meta waived—is a flagrant violation of due process.  "Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause,

---

[23] *J.D. v. Azar*, 925 F.3d 1291, (D.C. Cir. 2019) ("[A]n injunction must be narrowly tailored to remedy the harm shown.").

the conditions upon which he has given that waiver must be respected." *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971).

### E.    The Structure of the FTC's Administrative Proceeding is Unconstitutional

Under the Supreme Court's recent decision in *Axon Enter., Inc. v. Fed. Trade Comm'n*, 143 S. Ct. 890, 897 (2023), this Court has subject matter jurisdiction over Meta's constitutional challenges to the Commission's reopened administrative proceeding, which reflect the unconstitutional structure of the Commission.  Further, subjecting Meta to "unconstitutional agency authority" imposes a "here-and-now injury" on Meta that "is impossible to remedy once the [administrative] proceeding is over."  *Id.* at 903; *see also id.* at 904 (invoking "the 'here-and-now' injury of subjection to an unconstitutionally structured decisionmaking process").  Thus, unless the Commission's reopened proceedings are enjoined, Meta "will lose [its] rights not to undergo the complained-of agency proceedings."  *Id.*

#### 1.    The Commission's Dual Role as Prosecutor and Judge Violates Due Process

It is axiomatic that "[n]o man is allowed to be a judge in his own cause."  *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009).  Due process requires "at a minimum, that the affected [person] must have a meaningful opportunity to present his case before a neutral decisionmaker."  *Propert v. D.C.*, 948 F.2d 1327, 1333 (D.C. Cir. 1991).  Even an "unacceptable risk of actual bias" violates due process.  *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016).

The Supreme Court has squarely held that due process prohibits review by judges who previously decided to prosecute a case.  *See Williams*, 579 U.S. at 9 ("The due process guarantee that 'no man can be a judge in his own case' would have little substance if it did not disqualify a former prosecutor from sitting in judgment of a prosecution in which he or she had made a

critical decision."); *In re Murchison*, 349 U.S. 133, 137 (1955) ("Fair trials are too important a part of our free society to let prosecuting judges be trial judges of the charges they prefer.").

In violation of due process, the OTSC reopened a proceeding in which the Commission functions as both prosecutor and judge.  As prosecutor, the Commission authorized DOJ to file an enforcement action before this Court in 2020.  *See Fed. Trade Comm'n v. Facebook, Inc.*, 581 F. Supp. 3d 34, 63 (D.D.C. 2022) (analogizing "Chair Khan's actions in voting to file this case" to the role of "a prosecutor").  The Commission will now act as both prosecutor and adjudicator in the reopened enforcement proceeding.  In fact, it already has. As prosecutor, the Commission made the "critical decision," *Williams*, 579 U.S. at 9, to force Meta to disprove the "need[]" to "strengthen" the Stipulated Order.  (Rouhandeh Decl. Ex. B at 12.)  Unlike the usual course in which the Commission authorizes a complaint, the Commission here has already determined that it "has good cause to believe" that Meta violated the requirements set out in Appendix A to the Stipulated Order, that this "non-compliance" necessitates "further enforcement action by the Commission," and, among other things, will determine whether the facts warrant a hearing and, if so, on what issues.  *Id.*  If Meta opposes the "proposed" order, the Commission will adjudicate the matter.[24]  Its decision will be subject to a deferential standard of review. 15 U.S.C. § 45(c).

Courts have, in different circumstances, upheld the combination of certain prosecutorial and adjudicative functions in an agency.  *See*, *e.g.*, *In re Zdravkovich*, 634 F.3d 574, 579 (D.C. Cir. 2011).  But where, as here, "evidence casts doubt on the partiality of the [agency], the combination of prosecutorial and adjudicatory functions in a single person" violates due process. *Wildberger v. Am. Fed'n of Gov't Emps., AFL-CIO*, 86 F.3d 1188, 1195 (D.C. Cir. 1996).

---

[24] The Commission could hear evidence, and any role by an ALJ would be limited to receiving evidence and making recommendations.  *See* 16 CFR § 3.72(b)(2).  As shown above, the OTSC process would entail several violations of due process beyond the Commission's dual role as prosecutor and judge.  *See supra* Point I.D.

Moreover, there is evidence of actual bias in general and as to Meta. As the Ninth Circuit observed, "Axon claims—and FTC does not appear to dispute—that FTC has not lost a single [administrative] case in the past quarter-century." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 986 F.3d 1173, 1187 (9th Cir. 2021), *cert. granted in part*, 211 L. Ed. 604, 142 S. Ct. 895 (2022) and *rev'd and remanded*, 143 S. Ct. 890 (2023). A former Commissioner called that record "a strong sign of an unhealthy and biased institutional process." (Rouhandeh Decl. Ex. Q (Comm'r Wright Remarks) at 6.) The bias is even more clear here than in a typical FTC adjudication, because the three Commissioners of the FTC, who authorized the issuance of and will adjudicate the OTSC, have already proposed the remedy.

The Commission's pursuit of an administrative enforcement proceeding through its reopening authority in defiance of this Court's consent decree and the Commission's own rules is itself evidence of bias against Meta. Further, prior to joining the Commission, its Chair criticized Meta in statements showing she had pre-judged information-collection issues implicated by the OTSC. For example, she called for imposing on Meta "special duties of care, confidentiality and loyalty" akin to fiduciary duties based on Meta's "particularly stark . . . inadequacies" in handling data from users. *See* Lina M. Khan & David E. Pozen, *A Skeptical View of Information Fiduciaries*, 133 Harv. L. Rev. 497, 500, 501 n.14 (2019).

## 2. The Commission's Protections Against Removal Violate Article II

Under Article II of the Constitution, "the 'executive Power'—all of it—is 'vested in a President.'" *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020) (quoting U.S. Const., art. II § 1, cl. 1). The Constitution permits the President to delegate executive power subject to the President's "unrestricted" removal power. *Seila Law*, 140 S. Ct. at 2198.

The prosecutorial powers that the Commission is exercising against Meta are executive. In *Free Enterprise Fund*, the Supreme Court held that Article II was violated by protecting

against removal of the five-member PCAOB "empowered to take significant enforcement actions," including "initiat[ing] formal investigations and disciplinary proceedings" and engaging in the "daily exercise of prosecutorial discretion."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 485, 504 (2010); *see also Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 592 F. Supp. 3d 568, 585 (E.D. Tex. 2022) (holding that insulating from removal a commission whose five members serve staggered seven-year terms violated Article II).  In *Seila Law*, the Supreme Court reached the same conclusion as to the CFPB director, who "set enforcement priorities, initiate[d] prosecutions, and determine[d] what penalties to impose on private parties," yet was "insulat[ed] from removal" by the President.  140 S. Ct. at 2204; *see also Collins v. Yellen*, 141 S. Ct. 1761, 1772 (2021) (holding that Article II was violated by insulating from removal an agency director with "broad investigative and enforcement authority").  These are the types of prosecutorial powers that the Commission is exercising against Meta in the OTSC.  *See supra* Point I.D.  Because the Commissioners are not subject to the President's unrestricted removal power and can only be removed for "inefficiency, neglect of duty, or malfeasance in office," *see* 15 U.S.C. § 41, the Commission's exercise of executive powers violates Article II.  *See*, *e.g.*, *Collins*, 141 S. Ct. at 1783; *Seila Law*, 140 S. Ct. at 2206; *Free Enterprise Fund*, 561 U.S. at 496.

The Commission is not insulated from scrutiny under Article II by *Humphrey's Ex'r v. United States*, 295 U.S. 602, 619 (1935).  In *Seila Law*, the Supreme Court explained that in *Humphrey's Executor*, "[r]ightly or wrongly, the Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'"  *Seila Law*, 140 S. Ct. at 2198 (quoting *Humphrey's Executor*, 295 U.S. at 628); *see also Humphrey's Executor*, 295 U.S. at 624 ("[The

Commission's] duties are neither political nor executive, but predominantly quasi-judicial and quasi-legislative.").  The *Seila Law* Court elaborated:

> The Court's conclusion that the FTC did not exercise executive power has not withstood the test of time.  As we observed in *Morrison v. Olson*, 487 U.S. 654 (1988), "[I]t is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree."  *Id.*, at 690, n. 28 [ ].  *See also Arlington v. FCC*, 569 U.S. 290, 305, n.4 [ ] (2013) (even though the activities of administrative agencies "take 'legislative' and 'judicial' forms," "they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power'").

140 S. Ct. at 2198 n.2.

In any event, the Commission is exercising against Meta executive powers that it contends rest on statutory language added after *Humphrey's Executor* and that, under governing precedent, clearly conflict with the Commissioners' statutory protections against removal.  The Commission invokes language in Section 5(b) of the FTC Act addressing its ability to revise its orders.  (*See* Rouhandeh Decl. Ex. B at 1.)  Assuming, for the sake of argument, that the language authorizes the prosecutorial role for which the Commission cites it, it is not protected by *Humphrey's Executor* because it was added to the FTC Act in 1938.  Further, unlike the Commission at the time of *Humphrey's Executor*—which was "a multimember body of experts, balanced along partisan lines," *Seila Law*, 140 S. Ct. at 2199— the Commission's OTSC was authorized by a three-member Commission composed of members of a single political party. In its "enforcement action," the FTC is clearly exercising executive power, and the Commissioners' removal protections violate Article II.

### 3. Congress Unconstitutionally Delegated the Commission Unfettered Authority To Choose Between Administrative and Judicial Enforcement

The Supreme Court has held that the power to decide to adjudicate a matter administratively is "peculiarly within the authority of the legislative department of the government."  *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 339 (1909); *accord Jarkesy*

*v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022).  Further, "when Congress confers [legislative] decisionmaking authority upon agencies *Congress* must lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).  The administrative enforcement proceeding that the Commission reopened in its OTSC was initiated through the Commission's exercise of a delegated power that lacks any intelligible principle guiding its exercise.  The Commission's proceeding should be enjoined as the fruit of that unconstitutional delegation.

As the Commission has explained:

> Congress has provided two different avenues for the Commission to enforce the [FTC] Act: an administrative one in which the Commission acts as an adjudicative body, and a judicial one in which the Commission sues in federal district court and acts as a litigant.  The Commission has discretion to decide which route is appropriate for any given matter.

Brief for the Commission, *AMG Capital Mgmt., LLC v. Fed. Trade Comm'n*, No. 19-508 (U.S.), 2020 WL 7093938 at *3-*4; *compare* 15 U.S.C. § 45(b) (authorizing administrative adjudication to issue cease-and-desist order) *with id.* § 53(b) (authorizing Commission "[i]n proper cases" to seek permanent injunction in federal court).

But Congress has not "la[id] down by legislative act an intelligible principle to which the [Commission] is directed to conform" in exercising its legislative authority to opt for administrative adjudication.  *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 401 (D.C. Cir. 2022).  The Commission itself takes the position that it has unfettered discretion to choose between administrative and judicial enforcement,[25] and at least some courts have agreed,

---

[25] The Commission has argued it may sue in federal court for any violation "of 'any provision of law enforced by [it],'" and "the 'proper cases' language [in Section 13(b)] does not further limit the cases in which the Commission may 'seek' permanent equitable relief."  Supp. Mem. of the Commission, *Fed. Trade Comm'n v. Wyndham Hotels & Resorts*, No. 14-3514 (3d Cir.), 2015 WL 1517040, at *6.  It invokes "proper case" "as a grant, not a limitation, of authority" that "leaves to [its] discretion the cases in which it wishes to invoke judicial rather than administrative enforcement."  *Id.*; *see also* Brief of the Commission, *Fed. Trade Comm'n v. Hoyal & Assocs.*,

broadly constructing Section 13(b), 15 U.S.C. § 45(b).  *See*, *e.g.*, *Fed. Trade Comm'n v. Evans Prod. Co.*, 775 F.2d 1084, 1086 (9th Cir. 1985) (adopting the Commission's argument that a "proper case" under Section 13(b) is "1) any case involving a law enforced by the FTC, or 2) any case involving a likelihood that a past violation of a law enforced by the FTC will recur").  But such unlimited discretion between the two paths is impermissible.  "If the intelligible principle standard means anything, it must mean that a total absence of guidance is impermissible under the Constitution." *Jarkesy*, 34 F.4th at 462; *see Gundy v. United States*, 139 S. Ct. 2116, 2123-2124 (2019) (plurality) (grant by Congress of "plenary" legislative authority would go beyond the "permissible bounds" of delegation).

### 4.    The Commission Cannot Constitutionally Adjudicate Private Rights

The U.S. Constitution requires "[t]he judicial Power of the United States" to be vested in Article III courts.  *Stern v. Marshall*, 564 U.S. 462, 469 (2011).  Pursuant to this limitation, "cases involving 'private rights,' . . . may not" be removed from Article III courts, *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 32 (2014), whereas Congress has "significant latitude to assign adjudication of public rights to entities other than Article III courts," *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018).

While the Supreme Court "has not definitively explained the distinction between public and private rights," *Oil States Energy*, 138 S. Ct. at 1373, private rights have been described as "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," *Kuretski v. Comm'r*, 755 F.3d 929, 939 (D.C. Cir. 2014), and as "embrac[ing] the three absolute

---

(continued . . .) No. 19-35668 (9th Cir.), 2020 WL 3316889, at *50 ("a 'proper case' under Section 13(b) is one involving violations of any provisions of law enforced by the Commission") (quotation omitted).

rights, life, liberty, and property," which are "not dependent upon the will of the government." *Axon*, 143 S. Ct. at 907 (Thomas, J., concurring).

"Congress cannot convert any sort of action into a 'public right' simply by finding a public purpose for it and codifying it in federal statutory law."  *Jarkesy*, 34 F.4th at 456-57. Similarly, the Supreme Court's decisions have "stressed that the government's involvement alone does not convert a suit about private rights into one about public rights."  *Id.* at 458.

Here, the FTC's proposed administrative order would, among innumerable infringements on Meta's rights, restrict Meta's property rights and its right to develop new products and services.  Those restrictions plainly implicate Meta's private rights in its property, and thus require adjudication before an Article III court.  *See, e.g.*, *Axon*, 143 S. Ct. at 911 (Thomas, J., concurring) (Commission's attempt to require business "to transfer intellectual property" implicates "the core private right to property").  Under the pre-Founding common law, the right to property "consist[ed] in the free use, enjoyment, and disposal of all his acquisitions, without any control or diminution, save only by the laws of the land," and "to vindicate these rights, when actually violated or attacked, the subjects of England [were] entitled, in the first place, to the regular administration and free course of justice in the courts of law."  1 William Blackstone, *Commentaries on the Laws of England 1765-1769* 138.

The Commission is not helped by cases permitting Congress to assign the adjudication of a private right to an administration agency when "the administrative adjudicator had only limited authority to make specialized, narrowly confined factual determinations regarding a particularized area of law and to issue orders that could be enforced only by action of the District Court."  *Stern*, 564 U.S. at 489 n.6; *see also CFTC v. Schor*, 478 U.S. 833, 853 (1986) ("CFTC orders, like those of the agency in *Crowell*, . . . are enforceable only by order of the district

court."). In those cases, "the agency . . . functioned as a true 'adjunct' of the District Court."
*Stern*, 564 U.S. at 489 n.6. Here, in contrast, the Commission is not seeking to enforce the
Stipulated Order in this Court, but instead is defying this Court and attempting to enforce that
order administratively. Article III stands as yet another obstacle to that attempt to evade this
Court's jurisdiction and provides an additional independent ground to enjoin the Commission's
enforcement proceeding.

## II.     Meta Will Suffer Irreparable Harm Absent Injunctive Relief

Under the All Writs Act, the Court has authority to "issue all writs necessary or
appropriate in aid of [its] jurisdiction[ ]." 28 U.S.C. § 1651(a). Accordingly, Meta need not
show irreparable harm for an injunction to issue here. It is enough that a rival action—the FTC's
reopening proceeding—threatens the finality and preclusive effect of *this Court's* prior orders.
*See New York Tel. Co.*, 434 U.S. at 172; *FDIC,* 479 F. Supp. 2d at 18.

In any event, the harm Meta would suffer if it were forced to proceed before the FTC
*would be* irreparable—and in the absence of further action by this Court, such harm would arise
as early as August 1, 2023, the date by which the FTC has ordered Meta to respond to its OTSC.

First, the harm Meta alleges—being subjected to an administrative proceeding that both
exceeds the Commission's statutory authority and runs afoul of the Due Process Clause, as well
as Articles I, II, and III of the Constitution—is "a here-and-now injury" that "is impossible to
remedy once the proceeding is over." *See Axon*, 143 S. Ct. at 903. Put simply, Meta's claims
"[are] about subjection to an illegitimate proceeding, led by an illegitimate decisionmaker[,]
[a]nd as to that grievance, the court of appeals can do nothing . . . . Judicial review of [Meta's]
structural constitutional claims would come too late to be meaningful." *Id.* at 903–04; *see also
Kirwa v. United States Dep't of Def.*, 285 F. Supp. 3d 21, 42 n.22 (D.D.C. 2017); *see Ezell v.
City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (where constitutional rights are at issue,

"irreparable harm is presumed," and "no further showing of irreparable injury is necessary."); *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984) ("An alleged constitutional infringement will often alone constitute irreparable harm."); *see also supra* Point I.E.

Second, courts in this Circuit have repeatedly held that forcing a party to relitigate a matter that was finally decided constitutes clear irreparable harm. *See FDIC*, 479 F. Supp. 2d at 19 (relitigating "an issue already finally decided by this Court" is irreparable harm); *Washington Metro. Area Transit Auth. v. Loc. 689, Amalgamated Transit Union*, 113 F. Supp. 3d 121, 129 (D.D.C. 2015) (holding that a party demonstrated irreparable harm by establishing that it "could be subject to inconsistent determinations"). In the absence of preliminary injunctive relief, Meta would be forced to "face an expensive, time-consuming action, as well as a vexatious attempt to relitigate issues already decided and to raise issues that more properly can be determined by this Court." *Am. Horse Prot. Ass'n v. Lyng*, 690 F. Supp. 40, 44 (D.D.C. 1988). Moreover, it would be forced to do so in a forum other than that for which it expressly bargained, which itself constitutes irreparable harm. *See Gen. Protecht Grp., Inc. v. Leviton Mfg. Co., Inc.*, 651 F.3d 1355, 1363 (Fed. Cir. 2011) (upholding finding of irreparable harm because the movant "would be deprived of its bargained-for forum" and "forced to litigate the same issues on multiple fronts at the same time"); *Dodocase VR, Inc. v. MerchSource, LLC*, 2018 WL 1475289, at *11–12 (N.D. Cal. Mar. 26, 2018) (finding that the movant will suffer irreparable harm if deprived of its "bargained-for forum").

## III.   The Balance of Equities Favors Meta

The balance of equities favors Meta.  Whereas Meta will suffer an irreparable injury in the absence of a preliminary injunction, as demonstrated above, the FTC "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required," *R.I.L-R*

*v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015).  The FTC "should not be permitted to make an end-run around this Court's judgment . . . by collaterally attacking this Court's judgment in another forum."  *FDIC*, 479 F. Supp. 2d at 19; *see also In re March*, 988 F.2d 498, 500 (4th Cir. 1993) (explaining that the All Writs Act "empowers a federal court to . . . prevent collateral attack of its judgments").  Nor can the FTC "count as hardship its inability to avail itself of a forum it knowingly bargained away"—here, by agreeing to this Court's exclusive jurisdiction over enforcement and modification of the Stipulated Order.  *See Gen. Protecht Grp., Inc.*, 651 F.3d at 1365 (finding that the opposing party "should not be heard to argue that the enforcement of the [contractual forum selection clause] into which it freely entered would cause hardship").

## IV.     The Public Interest Favors Granting Injunctive Relief

There is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."  *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 195 (D.D.C. 2021); *see also N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("[P]ublic interest is served when administrative agencies comply with their obligations.").  In addition, the "public interest favors finality of Court judgments." *Thomas v. Albright*, 77 F. Supp. 2d 114, 124 (D.D.C. 1999), *aff'd sub nom. Thomas v. Powell*, 247 F.3d 260 (D.C. Cir. 2001).

By contrast, there is "generally no public interest in the perpetuation of unlawful agency action," *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016), or in violating "previously negotiated contractual undertaking to litigate in a particular forum," *Gen. Protecht Grp., Inc.*, 651 F.3d at 1365. Public interest thus clearly favors a preliminary injunction that prevents the FTC from disobeying this Court's prior judgment, evading its exclusive jurisdiction and violating Meta's constitutional rights.

## CONCLUSION

For the foregoing reasons, Meta respectfully requests that this Court enforce its continuing, exclusive jurisdiction over this matter by enjoining the FTC's unlawful administrative reopening proceeding. In the interim, Meta respectfully requests that the Court enter preliminary injunctive relief sufficient to protect Meta from the irreparable harm it would face if required to participate in that proceeding, which harm will arise as early as August 1, 2023, absent further action by this Court.

DATED: May 31, 2023

Respectfully submitted,

*/s/ James P. Rouhandeh*

James P. Rouhandeh (DDC Bar No. NY0390)
Michael Scheinkman (DDC Bar No. NY0381)
David B. Toscano (*pro hac vice* application forthcoming)
John A. Atchley III (*pro hac vice* application forthcoming)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4000
rouhandeh@davispolk.com
michael.scheinkman@davispolk.com
david.toscano@davispolk.com
john.atchley@davispolk.com

Paul J. Nathanson (admission pending)
DAVIS POLK & WARDWELL LLP
901 15th Street, NW
Washington, DC 20005
Tel: (202) 962-7000
paul.nathanson@davispolk.com