# Exhibit H



UNITED STATES OF AMERICA
Federal Trade Commission
WASHINGTON, D.C. 20580

Office of Commissioner
Rebecca Kelly Slaughter

### DISSENTING STATEMENT OF
### COMMISSIONER REBECCA KELLY SLAUGHTER
In the Matter of FTC vs. Facebook
July 24, 2019

#### Introduction

For years, when Facebook asked you "who do you want to see your post?" and you chose to share your information only with your "friends," Facebook provided that data not only to your friends but also to any of the millions of third-party apps that those friends used.[1]

This was precisely the type of misleading conduct that the Federal Trade Commission's 2012 order sought to prevent. Yet evidence suggests that Facebook's practices violated the order early and often. In April 2014, Facebook's CEO and founder, Mark Zuckerberg, publicly assured Facebook users that third-party access to "friend" data would stop. It did not. One of the many beneficiaries of this continued access to third-party friend data for more than a year after Mr. Zuckerberg's announcement was the personality quiz app that funneled information to Cambridge Analytica.

The complaint filed today alleges continuous law violations by Facebook: deceptive privacy settings, failure to maintain safeguards over third-party access to data, serving ads by using phone numbers provided to Facebook for the purpose of account security, and lying to certain users that its facial recognition technology was off by default, when in fact it was on. The evidence the Commission amassed in its investigation more than justified initiating litigation against Facebook and Mr. Zuckerberg alleging violations of the Commission's order.

The Commission's vote, however, was not whether to initiate litigation; our task was to evaluate a proposed settlement and decide whether to proceed. Make no mistake, the settlement announced today is exceptional: A $5 billion fine dwarfs all prior order enforcement settlements; the order's data security requirements and oversight provisions set vigorous new standards; the accountability and certification provisions strive to hold the company and its leadership directly responsible for privacy decisions; and specific provisions address some of the specific harms outlined in the complaint. The settlement intends to signal to other would-be violators that the FTC is taking a more aggressive approach to privacy and order violations than it ever has in the past.

Although this order is exceptional compared to prior settlements, the facts and defendant before us are exceptional as well. During the years of Facebook's continuous alleged lawlessness, its

---

[1] *See* Compl. ¶¶ 55–58, 93, *United States v. Facebook* ("Facebook Compl.").

gross annual revenue increased from $5 billion to over $55 billion. Facebook's collection and use of personal data have grown in unprecedented, unchecked, and often unseen ways.

Even though this settlement is historic, in order to support it I would have to be confident that its combined terms would effectively deter Facebook from engaging in future law violations and send the message that order violations are not worth the risk. I do not believe that is the case. My principal objections are:

(1) The negotiated civil penalty is insufficient under the applicable statutory factors we are charged with weighing for order violators: injury to the public, ability to pay, eliminating the benefits derived from the violation, and vindicating the authority of the FTC.

(2) While the order includes some encouraging injunctive relief, I am skeptical that its terms will have a meaningful disciplining effect on how Facebook treats data and privacy. Specifically, I cannot view the order as adequately deterrent without both meaningful limitations on how Facebook collects, uses, and shares data and public transparency regarding Facebook's data use and order compliance.

(3) Finally, my deepest concern with this order is that its release of Facebook and its officers from legal liability is far too broad.

Rather than accepting this settlement, I believe we should have initiated litigation against Facebook and its CEO Mark Zuckerberg. The Commission would better serve the public interest and be more likely to effectively change Facebook by fighting for the right outcome in a public court of law.

For these reasons, I respectfully dissent.

Any potential resolution to an investigation must be evaluated on a principled basis against the facts of the case. In explaining my vote, I therefore begin with an explanation of the principles I apply when deciding matters before the Commission. I then turn to an analysis of how these principles map onto the matter before us and explain why, in my view, this specific settlement comes up short.

## Principles for Evaluating Whether to Litigate or Settle

When considering how to resolve investigations that identify violations of the law—including violations of prior Commission orders—the FTC has two options: negotiate a settlement with the defendant or litigate. Each option has particular benefits and drawbacks.

Settlement provides certainty and preserves resources for other important work of the agency. Negotiated settlements can also include relief that exceeds what a court might be willing to impose, in terms of both quality and quantity. On the other hand, a negotiated settlement by definition encompasses only those terms to which the defendant will agree. And settled cases often lack full public disclosure of the evidence underlying the investigation, which in turn may inhibit accountability.

Litigation comes with substantial risk. That risk includes not only losing the particular case but also creating precedent that could imperil future actions. An unfavorable court decision can create bad law that jeopardizes pending cases and chills future enforcement. Even if the agency

wins on liability, the remedy imposed by the court might fall short of what could have been negotiated. Because litigation is resource-intensive, we must also be confident that going to court is an appropriate use of scarce agency resources and that such resources would not be better deployed to other enforcement efforts.

At the same time, litigation can provide significant public benefit. In an open court of law, both the FTC and defendants are publicly accountable for their allegations and their defenses. Documents and testimony can be compelled—a process that is challenging in administrative investigations.[2] A finding of liability in a court of law, even without any remedy, carries significant weight for investor confidence and a firm's business relationships. Even an adverse finding or lackluster remedy can further the public good: Disappointing results help build the public case that there are deficits in the law that Congress must address.[3]

To decide whether litigation or settlement is the appropriate course of action in any particular case, the Commission must weigh which path best advances agency enforcement goals, and by extension, the interests of the American public.

### Enforcement Goals

The Federal Trade Commission uses its law enforcement authority to achieve dual goals: remediate harm[4] and deter future law violations. The latter involves both specific and general deterrence. With each enforcement action the Commission aims to ensure not only that the specific defendant firm or individual will not violate the law again but also that other firms and individuals have the information and incentive to refrain from law violations.

Whether a proposed settlement constitutes an appropriate resolution depends on how effective it is in achieving these goals. If a defendant will not agree to terms that adequately remediate harm and deter both specifically and generally,[5] the Commission should reject the proposed settlement and vote instead to litigate.

---

[2] I recognize that the burdens and benefits of federal court discovery are a two-way street and that discovery is not a guarantee of meaningful disclosure. Still, discovery presents the best chance to ask relevant questions and compel meaningful responses from a defendant.

[3] I am cognizant that these types of benefits inure to future consumers and not necessarily to the current victims of a defendant's law violation, which is why I believe that all settlement offers must be carefully considered, as outlined below.

[4] Remediation, often in the form of equitable monetary relief, has important enforcement objectives, such as "depriv[ing] wrongdoers of unjust enrichment" and "restor[ing] their victims to the positions they would have occupied but for the illegal behavior." Withdrawal of the Commission Policy Statement on Monetary Equitable Remedies in Competition Cases, 77 Fed. Reg. 47,070, 47,070 (Aug. 7, 2012). Remediation is difficult to weigh in data privacy cases and did not materially factor in to the adjudication of this case, so I limit my discussion here to the deterrence calculation. I am not at all opposed to the Commission's finding creative ways to measure and remediate harm in data privacy and order-violation cases. As a general matter, I would rather see money returned to consumers (as are redress awards) than deposited in the U.S. Treasury (as are civil penalties).

[5] How best to achieve specific and general deterrence varies based on the individual facts and case; in some instances the Commission may have to strategically balance these two aspects of deterrence.

Even if the Commission is not ultimately successful through litigation in achieving a broader remedy than the defendant would accept in settlement negotiations, the process of public litigation and the potential of a finding of liability can help effectuate both specific and general deterrence.[6] Perhaps most importantly, as a steward of public dollars and the public trust, the government has an obligation to seek justice even if it is not guaranteed to achieve it.

In addition to these general principles, two additional factors are worth considering in how to resolve a civil penalty order-violation case, such as this matter. First, the decision of whether to litigate is not left to the FTC alone under the law, because the agency does not have independent litigating authority for civil penalty cases. Second, it is difficult to estimate what relief a court is likely to grant because there is very little precedent for litigation of order-violation allegations.

### Specific Concerns in Civil Penalty Cases

The lack of independent litigating authority materially ties the FTC's hands when determining how to resolve a civil penalty case. Under the law, the FTC cannot decide unilaterally whether and how to settle or litigate when we seek a civil penalty.[7] Instead, it must refer a complaint and, if applicable, proposed settlement to the Department of Justice (DOJ).[8] The DOJ then has sole authority to decide how to proceed down one of several tracks: take over the litigation of the case on its own, send it back to the FTC to litigate, or settle the case—including on terms that the Commission may already have rejected. The FTC retains control of the case only if the DOJ fails to act or elects to send it back to the Commission within the 45-day statutory window.[9]

As a matter of practice, DOJ has rarely opted to renegotiate settlements the Commission has voted to approve, choosing instead to file those settlements as-is on our behalf.[10] Nonetheless,

---

[6] The lengthy antitrust trial against Microsoft beginning in 1998 is often regarded as an example of the disciplining impact of public litigation. *See, e.g.*, Richard Blumenthal & Tim Wu, *What the Microsoft Antitrust Case Taught Us*, N.Y. Times (May 18, 2018), https://www.nytimes.com/2018/05/18/opinion/microsoft-antitrust-case.html ("The discovery of candid internal company memos, a famously revealing deposition of Bill Gates and a full trial made it clear that Microsoft saw the internet as a major threat to its monopoly rule and was seeking to tame it."); Victor Luckerson, *'Crush Them': An Oral History of the Lawsuit That Upended Silicon Valley*, The Ringer (May 18, 2018), https://www.theringer.com/tech/2018/5/18/17362452/microsoft-antitrust-lawsuit-netscape-internet-explorer-20-years (quoting Gary Reback as saying, "I like to say to people the trial is the remedy.").

[7] While the FTC lacks independent litigating authority to pursue cases seeking civil penalties, the FTC does have independent litigation authority to pursue other types of cases, including when seeking injunctive relief under Section 13 of the FTC Act or consumer redress under Section 19. 15 U.S.C. § 56(a)(2).

[8] *See* 15 U.S.C. § 56(a)(1).

[9] *See id*.

[10] *See, e.g.*, Press Release, Fed. Trade Comm'n, *Video Social Networking App Musical.ly Agrees to Settle FTC Allegations That it Violated Children's Privacy Law* (Feb. 27, 2019), https://www.ftc.gov/news-events/press-releases/2019/02/video-social-networking-app-musically-agrees-settle-ftc (announcing settlement, filed by the DOJ on the FTC's behalf, with the makers of the popular app Musical.ly, now known as TikTok); Press Release, Fed. Trade Comm'n, *FTC Takes Action against the Operators of Copycat Military Websites* (Sept. 6, 2018), https://www.ftc.gov/news-events/press-releases/2018/09/ftc-takes-action-against-operators-copycat-military-websites (announcing settlement orders, filed by the DOJ on the FTC's behalf with Sunkey Publishing, Inc. and Fanmail.com, LLC). Similarly, when the DOJ elects to litigate a complaint on the FTC's behalf, it typically works closely with FTC staff.

despite a long history of close collaboration on matters referred by the FTC,[11] the DOJ has the authority to pursue an outcome that departs from the FTC's recommendation, and the possibility of such a departure is an additional factor we must weigh. The Commission may understandably want to avoid the outcome in which we vote to pursue litigation but DOJ instead accepts a settlement on terms unacceptable to the FTC.

I appreciate this concern, but I do not believe the Commission should vote for an inadequate settlement because of a fear that our sister agency will take action that we do not believe is in the public interest. We should endeavor to do the right thing even if our preferred course of action may be interrupted by the DOJ's doing the wrong thing.[12] We are accountable for our decisions, as DOJ is for theirs.

### Specific Concerns in Order-Violation Cases

The second nuance we might consider is how to assess the depth and breadth of the relief a court would be likely to award if we are successful in litigation. Indeed, the majority in this case relies extensively on the proposition that the relief negotiated here is greater than we could receive in court. As a general matter, the agency looks to available precedent for guidance on how a court might assess appropriate remedies in a case. When it comes to order violations, however, there are few litigated cases to inform our analysis because the agency has historically settled rather than litigated order-violation cases.[13]

The absence of robust precedent for litigated order-violation remedies creates substantial uncertainty for the Commission in evaluating how the relief in a proposed settlement compares with what might be attainable in litigation. This uncertainty can create an incentive to accept the bird-in-hand of a negotiated settlement, particularly when the negotiated relief represents a substantial increase in both monetary penalty and injunctive relief from previous settlements of order-violation allegations.

I worry, however, that this can lead the agency into a dangerous feedback loop: We cannot confidently predict the relief a court would order, so we do not seek relief from a court. We therefore fail to develop a body of law that would inform predictions about the relief we could

---

[11] See, e.g., Press Release, Fed. Trade Comm'n, FTC and DOJ Case Results in Historic Decision Awarding $280 Million in Civil Penalties against Dish Network and Strong Injunctive Relief for Do Not Call Violations (June 6, 2017), https://www.ftc.gov/news-events/press-releases/2017/06/ftc-doj-case-results-historic-decision-awarding-280-million-civil; Press Release, Fed. Trade Comm'n, Solar Panel Lead Generation Robocallers Who Pitched Energy Savings Settle FTC Charges (Nov. 8, 2017), https://www.ftc.gov/news-events/press-releases/2017/11/solar-panel-lead-generation-robocallers-who-pitched-energy.

[12] Of course, DOJ could opt to reject a settlement in order to push for more relief than had been negotiated by the FTC, and indeed it has done so in the past. That potential does not change the Commission's obligation to take the action we believe best serves the public interest.

[13] Over the past two decades, there have been only a handful of litigated consumer protection order-violation cases discussing scope of relief, with varying outcomes. See, e.g., U.S. Dep't of Justice v. Daniel Chapter One, 89 F. Supp. 3d 132, 148 (D.D.C. 2015), aff'd, 650 F. App'x 20 (D.C. Cir. 2016); United States v. Cornerstone Wealth Corp., 549 F. Supp. 2d 811, 814 (N.D. Tex. 2008); United States v. Prochnow, No. 07-10273, 2007 WL 3082139, at *3–5 (11th Cir. 2007); United States v. Bos. Sci. Corp., 253 F. Supp. 2d 85, 98–102 (D. Mass. 2003); United States v. Alpine Industries, Inc., No. 2:97-cv-509, 2001 WL 587856, at *6 (E.D. Tenn. 2001), aff'd, 352 F.3d 1017 (6th Cir. 2003).

get in court. We can escape this cycle by adhering to the principle that the Commission should not accept a settlement that does not adequately effectuate our goals even where a court might award less.

***Individual Liability***
In considering effective deterrence, the Commission grapples not only with whether to settle or litigate but also with the question of whether any individual executives at a firm should be assigned liability. As Commissioner Chopra and I wrote in a recent case, it is important for Commission investigations to gather evidence that will help us understand whether any individuals should be named in a complaint or settlement.[14]

Whether and when individual executives should be assigned liability in enforcement actions has been a topic of active debate in and around the Commission, including specifically with respect to the Facebook case. The Commission often names individual defendants in cases against small companies, but rarely—if ever—does so in the case of large, publicly traded companies.

When executives at large companies exercise control over decisions, including decisions to break the law, they should be held accountable the same way executives at smaller companies are. I believe the deterrence value of naming an individual defendant where the facts support doing so can be significant; the risk of liability can motivate both a named individual defendant and other executives in the market into ensuring a culture of compliance.

**The Facebook Resolution**
I endeavored to apply these principles to the decision of whether to accept the proposed settlement with Facebook over allegations that it violated its 2012 consent decree. I will not recite the facts before the Commission, other than to note that there was extremely compelling evidence of a series of significant, substantial order violations and law violations. In addition to the evidence the Commission reviewed against Facebook, I believe there was sufficient evidence to name Mr. Zuckerberg in a lawsuit.[15] The question, then, was how to proceed.

---

[14] *Joint Statement of Commissioner Rohit Chopra and Commissioner Rebecca Kelly Slaughter In the Matter of Musical.ly Inc. (now known as TikTok)*, Fed. Trade Comm'n (Feb. 27, 2019), https://www.ftc.gov/system/files/documents/public_statements/1463167/chopra_and_slaughter_musically_tiktok_joint_statement_2-27-19_0.pdf.

[15] Mr. Zuckerberg co-founded Facebook in 2004 and is Facebook's Chairman and Chief Executive Officer. Unlike most publicly traded companies, he also controls a majority of the company's voting shares. In that way, Facebook resembles the closely held corporations against which the Commission frequently pursues individual liability more than it does a typical publicly held firm. As Mr. Zuckerberg has stated on numerous occasions, "I started Facebook, and at the end of the day I'm responsible for what happens on our platform." Mark Zuckerberg, Facebook (March 21, 2018), https://www.facebook.com/zuck/posts/10104712037900071 (updating Facebook users on "the Cambridge Analytica situation").

At the April 30, 2014, F8 Conference, Mr. Zuckerberg publicly announced that Facebook would no longer allow third-party developers to access "friend" data. *See* Facebook Compl. ¶¶ 111–113; *Facebook F8 Developers Conference 2014 - Keynote 1*, YouTube (May 1, 2014), https://www.youtube.com/watch?v=DVu311G5qvI (11:09–12:04). In fact, Facebook continued to allow millions of third-party developers access to "friend" data for at least another year. Facebook Compl. ¶ 116. After a year had passed, Facebook allowed some companies to retain access for months, or even years. *See id.* ¶¶ 126–129. Mr. Zuckerberg has publicly affirmed that Facebook's data privacy failings were his responsibility: "But it's clear now that we didn't do enough to prevent these tools from being used for harm, as well. That goes for . . . developers and data privacy. We didn't take a broad enough view of our

*Merits of Litigation*

I believe the Commission should have voted to refer a complaint against Facebook and Mr. Zuckerberg to the Department of Justice in order to initiate litigation. I understand the risk that the DOJ might have assumed responsibility for the case and possibly settled it on terms—in both scope and magnitude—that were the same or worse than those offered to the Commission. Finally, I understand that there was no guarantee—and indeed little precedent to inform any prediction—about what remedy a court might order at the end of the day were the Commission successful in its suit.

Notwithstanding those concerns, I believe litigation was the best course of action in this matter. Litigation would have provided public transparency and accountability for the company, its leaders, and the Commission. It would send a message to the market and the public that the Commission is willing to go to the mat to ensure compliance with its orders. Under the jurisdiction and mandate of a federal court, the Commission would have been able to seek, and if necessary move to compel, discovery of important documents and testimony to inform a court's assessment of liability. A finding of liability at the end of litigation would deter the company from further violations of the law even without substantial monetary or injunctive relief. If a hard-fought litigation against Facebook produced a result that fell short of public expectations, the public would have every incentive to demand that Congress take steps to address deficiencies in the law.

The vote before us today, however, is not whether to file a complaint and litigate. It is whether to accept a proposed settlement. Despite my preference for litigation in this case, I believe, as a matter of principle, that all settlement proposals should be considered on their merits. If I find a proposal inadequate, I also endeavor to identify specific ways a settlement could be improved to earn my support.

*Merits of the Settlement*

My analysis of this settlement—particularly in comparison to prior data privacy and order-violation settlements—is that it contains terms substantially more detailed and aggressive than the Commission's historical practice, including an unprecedented civil penalty and injunctive terms that impose new data security and privacy provisions. FTC staff fought long and hard for these terms, and they deserve credit for the specific benefits of this settlement.

First, it is unquestionable that the monetary penalty negotiated here is dramatically larger than prior order-violation civil penalties and indeed larger than any other civil penalty the Commission has negotiated or won in court.[16] Second, some terms of the injunctive relief raise

---

responsibility, and that was a big mistake. It was my mistake, and I'm sorry. I started Facebook, I run it, and I'm responsible for what happens here." *Facebook, Social Media Privacy, and the Use and Abuse of Data: Hearing Before the S. Comm. on the Judiciary and the S. Comm. on Commerce, Science & Transportation*, 115th Cong. 1 (2018) (testimony of Mark Zuckerberg, Chairman and Chief Executive Officer, Facebook), https://www.judiciary.senate.gov/imo/media/doc/04-10-18%20Zuckerberg%20Testimony.pdf.

[16] The largest civil penalty the Commission has imposed in an order violation case is $22.5 million. *See* Press Release, Fed. Trade Comm'n, *Google Will Pay $22.5 Million to Settle FTC Charges it Misrepresented Privacy Assurances to Users of Apple's Safari Internet Browser* (Aug. 9, 2012), https://www.ftc.gov/news-events/press-releases/2012/08/google-will-pay-225-million-settle-ftc-charges-it-misrepresented. The largest civil penalty awarded

the bar in important ways for how future orders will be negotiated in data security cases. For example, the order requires Facebook to conduct and document a privacy review of every new or modified product, service, or practice prior to its implementation. This review requires specific assessments of any new privacy risks and how they will be mitigated or communicated to users, and each review must be submitted quarterly to the CEO and the third-party assessor. I also appreciate that the order applies limitations to the use of facial-recognition technology and, in particular, that the order requires the company to be honest about how facial-recognition data will be used. Finally, the executive-certification provisions have the potential to provide incentives for accountability at the highest levels of the company.[17]

***Drawbacks of the Settlement***

Were these remedies proposed for a different company or different fact pattern, I might well be persuaded that they would achieve general and specific deterrence. But we need to consider these terms in the context of the specific facts and firm before us and in light of more problematic portions of the settlement, both what is present and what is absent.

*Civil Penalty Amount*

Five billion dollars represents an astronomical penalty compared to prior Commission settlements or to the financial position of most individuals and firms. In the context of Facebook's financial position and scope of violations, it is a substantially less significant sum. From the time of the original 2012 Facebook order to 2018, Facebook's gross annual revenue increased more than 1000% from $5 billion to over $55 billion.[18] Its 2019 revenues indicate continued growth, posting first-quarter earnings of over $15 billion.[19] Put another way, as of this year, Facebook brings in around $5 billion on a monthly basis.

---

in any FTC matter was $280 million in the *Dish Network* Do-Not-Call litigation. Brought by DOJ on behalf of the FTC, along with a number of the states, the total civil penalty awarded by the judge was $280 million, with $168 million imposed for federal law violations. *See* Press Release, Fed. Trade Comm'n, *FTC and DOJ Case Results in Historic Decision Awarding $280 Million in Civil Penalties against Dish Network and Strong Injunctive Relief for Do Not Call Violations* (June 6, 2017), https://www.ftc.gov/news-events/press-releases/2017/06/ftc-doj-case-results-historic-decision-awarding-280-million-civil.

[17] A good model for the value of executive certification is the certification requirements in Sarbanes-Oxley. *See* 18 U.S.C. § 1350. It is difficult to establish conclusively with empirical data that these legal requirements, instituted after the accounting scandals of the early 2000s, materially changed executive behavior, but there are certainly many indicators to suggest they did. *See, e.g.*, Craig Clay & Daniel Kim, *Sarbanes-Oxley: 15 years of successes and challenges*, Accounting Today (Sept. 15, 2017), https://www.accountingtoday.com/opinion/sarbanes-oxley-marks-15-years-of-successes-and-challenges. Of course, there are some material differences between the provisions in this order and the requirements of Sarbanes-Oxley. Most notably, Sarbanes-Oxley requires executives to certify the accuracy of the financials, whereas the provision in the current order requires only a certification that Facebook has established, implemented, and maintained a mandated Privacy Program and that Facebook is not aware of any material noncompliance with the provisions of the mandated Privacy Program that has not been corrected or disclosed to the Commission. *See* Decision and Order, *In the Matter of Facebook*, No. C-4365 (FTC 2019) § XI ("2019 Order"). It is not clear to me whether that difference will reduce the effectiveness of this provision. Still, this requirement is entirely novel to FTC orders and moves in the right direction of fostering a culture of compliance within the highest levels of a firm.

[18] *See Facebook Revenue 2009-2019 | FB*, Macrotrends, https://www.macrotrends.net/stocks/charts/FB/facebook/revenue (last visited July 19, 2019).

[19] *See Facebook Reports First Quarter 2019 Results*, Facebook (Apr. 24, 2019), https://investor.fb.com/investor-news/press-release-details/2019/Facebook-Reports-First-Quarter-2019-Results/default.aspx.

The law requires us to evaluate civil penalties in terms relative to the particular defendant and case, not relative to prior awards in other cases or on the basis of the absolute dollar value. Specifically, the law requires balancing five factors to determine an appropriate civil penalty amount for an order violation: "(1) the good or bad faith of the defendants; (2) the injury to the public; (3) the defendants' ability to pay; (4) the desire to eliminate the benefits derived by a violation; and (5) the necessity of vindicating the authority of the FTC."[20] None of these factors includes a calibration to prior penalty awards.

I understand the argument that we have no guarantee that a court would award as much, or anywhere close to as much, in civil penalties at the end of litigation. That is partially because we rarely litigate order-violation cases and therefore have a limited basis to assess likelihood of success.[21] In the absence of more detailed precedent about how courts would view an appropriate civil penalty award, we must evaluate the statutory factors ourselves.

In this case, at a minimum, four of the five factors—the injury to the public, the defendant's ability to pay, the desire to eliminate the benefits derived from the violations, and the necessity of vindicating the FTC's authority—all drive the conclusion that $5 billion is an insufficient civil penalty.[22]

Injury to the public can be difficult to quantify in monetary terms in the case of privacy violations. That said, I regard the injury to the public and the institutions of our democracy to be quite substantial. Facebook's conduct that the Commission alleges violated the order also facilitated Cambridge Analytica's expropriation of data and manipulation of voters.

According to the complaint against Cambridge Analytica that the Commission filed today, Cambridge Analytica partnered with a Facebook application, the GSRApp, to access the Facebook platform and collect Facebook users' profile data from approximately 250,000 Facebook users who directly accessed the app, as well as over 50 million of the direct users' Facebook "friends."[23] The FTC alleges that the GSRApp obtained the direct users' consent through false and deceptive means.[24] But the app was able to access the "friend" data only because it was one of the apps that enjoyed continued access to such data well after Mr. Zuckerberg's April 2014 statement that Facebook would finally cut it off.

Although the public narrative around Cambridge Analytica tends to focus on the 2016 election, news outlets have reported on the firm's involvement in the 2014 congressional elections as

---

[20] *United States v. Reader's Digest Ass'n*, 662 F.2d 955, 967 (3d Cir. 1981).

[21] *See* cases cited *supra* note 13.

[22] I refrain from commenting on the first factor because I do not believe there is adequate evidence in the public record to opine on the good or bad faith of the defendant.

[23] *See* Compl. ¶ 1, *In the Matter of Kogan et al.* ("Kogan Compl.").

[24] *See id.* ¶¶ 24–25.

well.[25] According to the Cambridge Analytica complaint, the GSRApp harvested Facebook
profile data from direct users and their friends during the summer of 2014, and the app
developer, Aleksandr Kogan, agreed to match this data with U.S. voter records and provide
personality scores for these users and their friends.[26] This information was used to micro-target
voters in eleven states ahead of the 2014 election.[27] Ten of those states had competitive Senate
elections that year; partisan control of six of them, as well as control of the Senate itself, changed
hands.[28]

I note the outcome of these elections to highlight the impact that sophisticated, manipulative
micro-targeting can potentially have on any election and the ensuing injury to the public. Of
course, we do not know with certainty whether and to what degree the micro-targeting of
political advertisements by Cambridge Analytica changed votes or outcomes. Some of the races
in the targeted states ended up with very narrow margins of victory and some had wide margins.
But because the integrity of our electoral system lies at the very heart of our democracy, I am
deeply concerned about the manipulation of electoral outcomes based on illicitly acquired data,
and the facilitation—even if unintentional—of that manipulation.[29] The public deserves
protection from this profound injury.

My colleagues in the majority note that civil penalties have exceeded $5 billion only in instances
of serious environmental disaster or widespread financial fraud. I believe that the injury to the
public from damaging the integrity of our elections is as serious if not more serious than
environmental and financial harms because it threatens the very systems that stand to protect
Americans from those harms. Concern over this fact pattern should be bipartisan; the
manipulative tactics weaponized in favor of a particular party in one election can just as easily be
turned against it in the next.

---

[25] *See, e.g.*, John Frank, *New details suggest Cambridge Analytica played bigger role in helping Colorado Republicans win in 2014*, Denver Post (Mar. 26, 2018), https://www.denverpost.com/2018/03/26/cambridge-analytica-colorado-2014-election/.

[26] Kogan Compl. ¶ 15.

[27] *See* Carole Cadwalladr & Emma Graham-Harrison, *How Cambridge Analytica turned Facebook 'likes' into a lucrative political tool*, The Guardian (May 17, 2018), https://www.theguardian.com/technology/2018/mar/17/facebook-cambridge-analytica-kogan-data-algorithm.

[28] *See id.*; *Senate Election Results*, N.Y. Times, https://www.nytimes.com/elections/2014/results/senate (last visited July 19, 2019). Cambridge Analytica worked in Arkansas, Colorado, Florida, Iowa, Louisiana, Nevada, New Hampshire, North Carolina, Oregon, South Carolina, and West Virginia. Control of Senate seats changed in Arkansas, Colorado, Iowa, Louisiana, North Carolina, and West Virginia. In one example, the challenger in the North Carolina race and the state party apparatus paid Cambridge Analytica $345,000 for "micro-targeting" from 2014 through 2015. Cambridge Analytica's website touted the success of their efforts in the race, saying they "were able to design and deploy messages tailored to these audiences according to their particular psychographic profiles." *Thom Thillis: Modeled Data & Analysis for North Carolina GOP*, CA Political, https://web.archive.org/web/20180129080254/https://ca-political.com/casestudies/casestudythomtillis2014 (archived Jan. 29, 2018). In that race, the incumbent was defeated by less than two percentage points.

[29] I recognize that Cambridge Analytica's alleged conduct would have violated Facebook's Platform Terms. But, Facebook did not enforce those terms against it. Furthermore, the scope of the potential harm from Cambridge Analytica's alleged violation of Facebook's terms would have been significantly curtailed if Facebook had not allowed grandfathered apps to maintain access to friend data for another year after it publicly stated that access would be cut off—the time period during which Cambridge Analytica collected its data.

Cambridge Analytica does not represent the entirety of the injury to the public that flowed from Facebook's order violations; we do not even know if it represents the majority of it. It is merely one specific and significant beneficiary of Facebook's violations. When we consider how many others might be out there, we should be even more concerned about public injury.

The next factor to consider is ability to pay, a question that comes up frequently with defendants who have limited assets. There is no question that Facebook has the assets to pay $5 billion. The question, then, is how much more it could reasonably be required to pay. Were the Commission to seek in litigation a penalty much closer to the statutory maximum, one could imagine the company arguing to the court that it could not pay such a sum. But we are nowhere close to that number now.

Next, we consider the desire to eliminate the benefits derived from the violations. By assigning a penalty amount that renders the violation economically irrational, the Commission specifically discourages the particular firm from engaging in violations in the future. While it is difficult in this case to quantify the economic value of the violations to the company, there is good reason to believe $5 billion is a substantial undervaluation. The fact that Facebook's stock value increased with the disclosure of a potential $5 billion penalty[30] may suggest that the market believes that a penalty at this level makes a violation profitable.

Finally, we must consider the necessity of vindicating the FTC's authority. In this analysis, I do find past penalty amounts (in both absolute and relative terms) informative to a degree; we need to consider if our standard practice with regard to enforcing orders, including through negotiation of penalties, is effective in ensuring firms take their compliance obligations seriously. The facts in this case raise serious questions about the effectiveness of our prior civil penalty settlements. Facebook's alleged conduct *while under order* strongly suggests that resolutions of prior order-violation cases failed to provide an effective deterrent.

For all of the above reasons, despite the historic nature of the $5 billion penalty, I do not believe that it justifies support for this settlement.

### Injunctive Relief

No civil penalty—and especially a negotiated civil penalty—on its own would effectively achieve the agency's goals of specific and general deterrence. That is true in any matter; the agency never negotiates a civil penalty without an accompanying order prescribing injunctive relief. It is particularly true in this case. Facebook simply has so much money, and its revenue has increased at such a rapid pace, that the company could pay previously inconceivable sums without much impact on its bottom line. The injunctive provisions in the order are therefore

---

[30] When Facebook disclosed the possibility of a $3–5 billion penalty in April 2019, its stock price went up 5%. *See* Nick Stat, *Facebook sets aside $3 billion ahead of record FTC fine over privacy violations*, The Verge (Apr. 24, 2019, 4:24 PM), https://www.theverge.com/2019/4/24/18514805/facebook-q1-2019-earnings-ftc-record-fine-privacy-violations-3-billion. When July 2019 news reports purported to confirm a $5 billion penalty, Facebook's stock rose again. *See* Rob Price, *Why Facebook's stock jumped despite facing a record-breaking $5 billion FTC penalty: 'A slap on the wrist'*, Business Insider (July 12, 2019, 7:51 PM), https://www.businessinsider.com/facebook-stock-rose-news-5-billion-ftc-settlement-why-critics-2019-7.

extremely important for their potential to discipline the firm and curb future violations of the law and the order.

I detailed above the portions of the injunctive relief that I find encouraging; it bears repeating that these terms are substantially stronger than any previous data privacy order and that the staff should be commended for that work. In my assessment, however, two major types of injunctive relief are missing from the settlement. I could have considered supporting the order if it included meaningful limitations on data collection and sharing and substantial *public* transparency about Facebook's data use and order compliance. Without such provisions, the order's ability to achieve specific and general deterrence through its injunctive terms is critically limited.

Data Collection and Sharing
Data collection and sharing limitations would provide the most significant disciplining effect on Facebook's data privacy practices. The order the Commission voted to accept does not impose any limitations on whether Facebook can transfer information to third parties or to other Facebook subsidiaries. Instead, the order requires Facebook to demand certain purpose and use certifications from third parties that request information, giving Facebook free rein to maintain control over what constitutes a permissible purpose and use.[31] In other words, if Facebook wants third parties to have certain data, it can permit that under its Platform Terms; if Facebook wants to withhold access to that data, it can do so. But there may be a gulf between what is good for Facebook and what is good for its users. I believe that the order itself should limit third-party data access to information necessary to provide or operate the product or service for which the third party is requesting the information—it should not just rely on Facebook's malleable developer standards.[32]

Limitations on sharing should apply across Facebook's different properties as well as to third parties. Consumers could intentionally set up wholly different profiles on Facebook, WhatsApp, and Instagram—for example, a professional profile on Facebook and a personal profile with family photos on Instagram—so that their browsing or sharing habits on each platform would not be associated with their profile on the others. But the order's requirements governing disclosure and express affirmative consent for sharing information apply only to Facebook's sharing of

---

[31] Specifically, Part VII of the order requires Covered Third Parties to certify that the purpose or use for each type of Covered Information it requests or has access to "complies with Respondent's Platform Terms." 2019 Order § VII.E.1.a. Facebook's current Platform Terms provide that developers "[r]equest only the data and publishing permissions your app needs to provide a good user experience" and that developers "may not request a user's data—through Platform or through your app—unless you use it meaningfully to improve the quality of a user's experience in your app. It must be clear to the user how their data is used to provide that experience." *Facebook's Platform Policy*, Facebook, https://developers.facebook.com/policy/ (last visited July 19, 2019). There is no provision of the order that prohibits Facebook from changing its Platform Terms in the future. Changes to its Platform Terms would trigger the mandated privacy review outlined in Part VII.E.2 of the order, potentially laying a predicate for an order violation if the changes weakened protections for Covered Information. These are positive provisions, but they fall far short of clear, direct, and immediately enforceable limitations regarding third-party sharing.

[32] *See Online Platforms and Market Power, Part 2: Innovation and Entrepreneurship: Hearing Before the Subcomm. on Antitrust, Commercial & Admin. Law of the H. Comm. on the Judiciary*, 116th Cong. (2019) (response of Matt Perault, Head of Global Policy Development, Facebook, to the question of Rep. Henry C. Johnson, Member, H. Comm. on the Judiciary), https://judiciary.house.gov/legislation/hearings/online-platforms-and-market-power-part-2-innovation-and-entrepreneurship (stating that Facebook is "constantly changing our terms and conditions").

certain data with third parties; I believe that they should also apply to the sharing of all data between Facebook-owned affiliates, including Instagram and WhatsApp.

Finally, the order also fails to impose any substantive restrictions on Facebook's collection and use of data from or about users (and non-users). This failure, in addition to allowing Facebook to aggregate rich data stores across its platform unfettered, may exacerbate competition as well as privacy concerns. We should strive to ensure that all our enforcement efforts are cognizant of, and not inconsistent with, both our consumer protection and competition missions.

In sum, many of the problems identified in our investigation and in the related Cambridge Analytica investigation arose from the use of data beyond consumers' expectations or permissions to enhance Facebook's partnerships and therefore its bottom line. I believe that it is important and appropriate for the order to apply stringent limitations to how Facebook collects, uses, and shares data.

Transparency

Another important element that is missing from the order is public transparency. While the majority highlights the order provisions that provide Facebook management, its third-party assessor, and the Commission with greater insight into Facebook's privacy practices, the public remains entirely in the dark. Facebook should be required to publicly disclose: all categories of information that it collects about consumers and how it collects such information; the purpose and use for each collected category; how long each category is stored; and how consumers can access and delete their information. To help shine a light on how Facebook's data practices affect the market and to empower the millions of consumers who have been subject to those practices, increased transparency over Facebook's collection and use of data is critical.

The order should also require public disclosure of Facebook's biennial privacy assessments as well as information about its data privacy incident reports. The biennial privacy assessments will be provided to the Commission and are subject to release under the Freedom of Information Act. As in the Uber matter the Commission resolved last year, we can reasonably expect that these assessments will indeed be the subject of multiple FOIA requests, so it seems sensible to me that we proactively require their public release.[33] Of course, as I noted with respect to Uber, these assessments will provide only a partial picture of order compliance, but a partial picture is better than total opacity.

In addition to its privacy assessments, Facebook should be required to publicly disclose a summary of its privacy incident reports for each reporting period. There may be good reasons not to disclose each Covered Incident Report mandated under Part IX, but it is important for there to be some transparency around the number and type of Covered Incidents Facebook experiences. This summary should include how many Covered Incidents occurred, how many users were affected, what type of information was accessed, and how the company responded. Transparency serves an invaluable role in keeping companies accountable to their users and the public. There is a profound asymmetry with respect to Facebook's data collection: Facebook

---

[33] *See Statement of Commissioner Rebecca Kelly Slaughter In the Matter of Uber Technologies, Inc.*, Fed. Trade Comm'n (Oct. 26, 2018), https://www.ftc.gov/public-statements/2018/10/statement-commissioner-rebecca-kelly-slaughter-matter-uber-technologies.

knows almost everything about its users and their data, but users know very little about what Facebook does with that data. Users deserve to know more.

*Liability Release*

My discussion thus far has focused on what more could or should be added to the settlement; I turn now to what should be removed.

By far my biggest concern with the terms of the settlement is the release of liability, in particular the commitment that the order resolves "any and all claims that Defendant, its officers, and directors, prior to June 12, 2019, violated the Commission's July 27, 2012 order."[34] I am also uncomfortable with the inclusion of "officers and directors" in the release from "any [Section 5] claim known by the FTC."[35]

I would have preferred to name Mr. Zuckerberg in the complaint and in the order. I disagree with the decision to omit him now, and I strenuously object to the choice to release him and all other executives from any potential liability for their roles to date.

I am concerned that a release of this scope is unjustified by our investigation and unsupported by either precedent or sound public policy. To the contrary, in every recent major federal settlement, if there was a liability release, it was cabined to the offenses described in the complaint.[36]

---

[34] Stipulated Order for Civil Penalty, Monetary Judgment, and Injunctive Relief at 1–2, *United States v. Facebook*.

[35] *Id.*

[36] *See, e.g.*:

1. Deepwater Horizon—The consent decree releases liability only for corporate entities and cabins the release to claims "arising from the Deepwater Horizon Incident," while reserving other claims, including those based on discharge of oil "outside the definition of '*Deepwater Horizon* Incident.'" Consent Decree ¶¶ 61, 64, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La. filed Oct. 5, 2015), https://www.epa.gov/sites/production/files/2016-02/documents/deepwaterhorizon-cd.pdf.

2. Wells Fargo—The settlement limits release of liability only to conduct relating to "single-family residential FHA loans." *See* Stipulation and Order of Settlement and Dismissal with Prejudice at 3, ¶ 7, Attach. A ¶ 2, *United States v. Wells Fargo Bank*, No. 1:12-cv-07527-JMF (S.D.N.Y. filed Apr. 8, 2016), https://www.justice.gov/opa/file/839796/download.

3. CitiMortgage—The release of liability in the settlement is only with respect to "Covered Conduct" specified in the government's complaint, but expressly reserves liability "for conduct other than the Covered Conduct." Stipulation and Order of Settlement and Dismissal at 3, ¶¶ 6, 10, *United States ex rel. Hunt v. Citigroup*, No. 1:11-cv-05473-VM (S.D.N.Y. filed Feb. 15, 2012), https://www.justice.gov/archive/usao/nys/pressreleases/February12/citi/citimortgageincsettlementagreement.pdf.

4. GlaxoSmithKline—The company and individuals were released only with respect to a granularly defined set of "Covered Conduct" relating to marketing certain diabetes drugs, and the government reserved an extensive list of claims including for "any conduct other than the Covered Conduct." Settlement Agreement at 2–5, 8–11, *United States ex rel. Thorpe v. GlaxoSmithKline*, No. 11-10398-RWZ (D. Mass. filed July 2, 2012), https://www.justice.gov/sites/default/files/opa/legacy/2012/07/02/avandia-agreement.pdf.

5. Ocwen—The settlement releases Ocwen only for "all potential liability that has been or might have been asserted by the CFPB *relating to mortgage servicing practices described in the complaint*," and reserving liability for other conduct. Consent Judgment at Ex. E ¶ B, *CFPB v. Ocwen Fin.*, No. 1:13-cv-02025-RMC (D.D.C. filed Feb. 26, 2014), https://files.consumerfinance.gov/f/201403_cfpb_entered-judgment-with-exhibits_ocwen.pdf (emphasis added).

Furthermore, many of those releases were accompanied by admissions of civil or criminal liability, which is entirely different from a settlement that explicitly disclaims liability.[37] Accordingly, in addition to being concerned about the appropriateness of the release in this case, I am very concerned about the precedent it will set for the agency.

Facebook's course of conduct also strongly counsels against this expansive release. Hardly a week passes without a news story revealing some potentially illegal conduct by Facebook. To wait to resolve this case until we were aware of the entire universe of potential violations would be to wait forever. To be sure, not all news stories bear out violations upon further investigation. But I do not believe it is appropriate for the Commission to foreclose the possibility of that investigation.

It would be dramatically better—and better grounded in precedent—to release only the company itself and only with respect to liability under the order and Section 5 for the behavior described in the complaint.

## Conclusion

Having walked through my analysis in detail, I return to where I began: The Commission should not have accepted this settlement and should instead have voted to litigate.

I understand the majority's argument in favor of the terms of the settlement, and I recognize the settlement's historic nature. But I do not share my colleagues' confidence that the order or the monetary penalty will effectively deter Facebook from engaging in future law violations, and thus I fear it leaves the American public vulnerable.

Facebook's privacy and data practices affect all Americans, whether they are users or not. Because of this, public interest in this investigation and its potential outcome has been higher than perhaps any other Commission investigation in recent memory. Much of the public commentary generated by this interest has demanded outcomes that far exceed the FTC's power or legal authority. But the FTC can and should demand settlement terms that will send a clear message to wrongdoers and the public alike that violating a Commission order is to be avoided at all costs. If those terms are rejected, the FTC must litigate.

---

6.   Chevron—The consent decree releases liability only as to certain conduct, such as "violations of the Applicable NSR/PSR Requirements relating to CO emissions at the relevant Refinery resulting from pre-Lodging construction or modification of the FCCU for that Refinery" and conditions the release on the defendant satisfying certain standards, obligations, and carve outs. Consent Decree ¶¶ 203–204, 211, *United States v. Chevron U.S.A.*, No. 3:03-cv-04650-CRB (N.D. Cal. filed June 29, 2005), https://www.epa.gov/sites/production/files/documents/chevron-cd.pdf.

[37] The Deepwater Horizon, Wells Fargo, CitiMortgage, and GlaxoSmithKline settlements all included admissions of civil or criminal liability. *See* Consent Decree ¶¶ H, N, *In re: Oil Spill*, No. 2:10-md-02179-CJB-SS; Stipulation and Order ¶¶ 2–3, *Wells Fargo Bank*, No. 1:12-cv-07527-JMF; Stipulation and Order ¶¶ 2–4, *Hunt*, No. 1:11-cv-05473-VM; Settlement Agreement ¶ G, *Thorpe*, No. 11-10398-RWZ.