UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>          Plaintiff,<br>   v.<br>TWITTER, INC.,<br>          Defendant. | Case No. 22-cv-03070-TSH<br><br>**ORDER RE MOTION FOR PROTECTIVE ORDER AND RELIEF FROM CONSENT ORDER**<br><br>Re: Dkt. No. 17 |

X Corp., successor in interest to Defendant Twitter, Inc., moves the Court for an order terminating or modifying the May 26, 2022 Stipulated Order for Civil Penalty, Monetary Judgment, and Injunctive Relief (ECF No. 11) (the "Stipulated Order") pursuant to Federal Rule of Civil Procedure 60(b)(5)-(6) and staying the Federal Trade Commission's ("FTC's") Notice of Deposition of Elon Musk pursuant to Federal Rule of Civil Procedure 26.  In the alternative, X Corp. requests that the Court enter an order directing the FTC to provide discovery to X Corp. and staying enforcement of the Stipulated Order until that discovery is produced.  The Court held a hearing on November 16, 2023 and now issues this order.[1]

**I.     BACKGROUND**

**A.     The Stipulated Order**

The United States filed a complaint in this case on May 25, 2022 against Twitter.  ECF No. 1.  The government alleged that from at least May 2013 until at least September 2019, Twitter misrepresented to users of its online communication service the extent to which it maintained and protected the security and privacy of their nonpublic contact information.  Specifically, while

---

[1] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  ECF Nos. 9, 10, 32.

Twitter represented to users that it collected their telephone numbers and email addresses to secure their accounts, the government alleged that Twitter failed to disclose that it also used user contact information to aid advertisers in reaching their preferred audiences. The government claimed that Twitter's misrepresentations violated the Federal Trade Commission Act and a 2011 FTC Order (ECF No. 1, Ex. A). ECF No. 1 ¶ 2. The same day the parties filed a joint motion asking the Court to enter the Stipulated Order, saying that "[t]he parties have resolved all issues in this matter," ECF No. 5 at 2. The following day the Court entered the Stipulated Order. ECF No. 11.

Let's read it carefully. First, the Court made seven findings:

> 1. This Court has jurisdiction over the subject matter and all of the parties.
>
> 2. Venue is proper as to all parties in this District.
>
> 3. The Complaint states a claim upon which relief may be granted against Defendant under Sections 5(a) and (*l*), 13(b), and 16(a)(1) of the FTC Act, 15 U.S.C. §§ 45(a), 45(*l*), 53(b), and 56(a)(1), including for violations of Part I of the Commission's Decision and Order in *In re Twitter, Inc.*, C-4316, 151 FTC LEXIS 162 (F.T.C. Mar. 2, 2011).
>
> 4. Defendant's activities are "in or affecting commerce," as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.
>
> 5. Defendant waives any claim that it may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Stipulated Order, and agrees to bear its own costs and attorney's fees.
>
> 6. Defendant neither admits nor denies any of the allegations in the Complaint, except as specifically stated in the Decision and Order set forth in Attachment A. Only for purposes of this action, Defendant admits the facts necessary to establish jurisdiction.
>
> 7. Defendant and Plaintiff waive all rights to appeal or otherwise challenge or contest the validity of this Stipulated Order.

Second, the Court issued a monetary judgment:

> A. Judgment in the amount of ONE HUNDRED FIFTY MILLION dollars ($150,000,000.00) is entered in favor of Plaintiff against Defendant as a civil penalty pursuant to Section 5(*l*) of the FTC Act, 15 U.S.C. § 45(*l*).
>
> B. Defendant is ordered to pay to Plaintiff, by making payment to the Treasurer of the United States, ONE HUNDRED FIFTY MILLION dollars ($150,000,000.00), which, as Defendant stipulates, its undersigned counsel holds in escrow for no purpose other than payment to Plaintiff. Such payment must be made within seven (7)

2

days of entry of this Stipulated Order by electronic fund transfer in accordance with instructions specified by a representative of Plaintiff.

C. In the event of any default in payment, the entire unpaid amount, together with interest, as computed pursuant to 28 U.S.C. § 1961 from the date of default to the date of payment, shall immediately become due and payable.

D. Defendant relinquishes dominion and all legal and equitable right, title, and interest to all funds paid pursuant to this Stipulated Order. Defendant shall make no claim to or demand for return of the funds, directly or indirectly, through counsel or otherwise.

E. Defendant agrees that the facts alleged in the Complaint will be taken as true, without further proof, only in any subsequent civil litigation by Plaintiff to enforce its rights to any payment or monetary judgment pursuant to this Stipulated Order.

F. Defendant acknowledges that its Taxpayer Identification Numbers (Social Security Numbers or Employer Identification Numbers), which Defendant has previously submitted to Plaintiff, may be used for collecting and reporting on any delinquent amount arising out of this Stipulated Order, in accordance with 31 U.S.C. § 7701.

Then the Court did the following, which X Corp. and the government seem to have very different understandings of:

> IT IS FURTHER ORDERED that Defendant, and its successors and assigns, shall consent to: (i) reopening of the proceeding in FTC Docket No. C-4316; (ii) waiver of its rights under the show cause procedures set forth in Section 3.72(b) of the Commission's Rules of Practice, 16 C.F.R. § 3.72(b); and (iii) modifying the Decision and Order in *In re Twitter, Inc.*, C-4316, 151 FTC LEXIS 162 (F.T.C. Mar. 2, 2011), with the Decision and Order set forth in Attachment A.

Next, the Court gave the Department of Justice ("DOJ") the same rights that the FTC has to request certain documents under the new Decision and Order (which the Court will refer to as the "Administrative Order" so the reader will understand that it is reference to an FTC order, not a court order):

> IT IS FURTHER ORDERED that Defendant shall provide to the Department of Justice copies of all of the reports, assessments, notifications, certifications, and other documents required or requested under the Decision and Order set forth in Attachment A as follows: Parts VI.A, VI.E, VIII.A, IX, X.A, XI.A, and XI.B. Such documents shall be furnished via email to Consumer.Compliance@usdoj.gov, with the subject line "United States v. Twitter, Inc., DJ 102-4022." In the event that electronic mail is unavailable, the documents may be sent to the Director of the Department of Justice's Consumer Protection Branch, and whomever he or she designates, via overnight courier (not the U.S. Postal

3

        Service) to: Director, Consumer Protection Branch, Department of Justice, 450 Fifth St. NW Ste. 6400-South, Washington, DC 20001, with the subject line "United States v. Twitter, Inc., DJ 102-4022." Defendant agrees that the Department of Justice shall have the same rights as the Commission (as given in the Decision and Order set forth in Attachment A) to request such documents under the specified parts, subject to any applicable law or regulation. Within fourteen (14) days of receipt of a written request from a representative of the Department of Justice's Consumer Protection Branch related to the reports, assessments, notifications, certifications, and other documents produced pursuant to the parts of the Decision and Order identified in this paragraph, Defendant agrees to submit additional compliance reports or other requested information, which must be sworn under penalty of perjury. For purposes of this paragraph, "Defendant" shall have the same definition and scope as the definition of "Respondent" in Paragraph E on page 3 of the Decision and Order set forth in Attachment A.

Finally, the Court ordered that "this Court shall retain jurisdiction in this matter for purposes of construction, modification, and enforcement of this Stipulated Order."

**B.  The Administrative Order**

The Administrative Order (ECF No. 42-2) created a compliance structure for Twitter. Part V mandates that Twitter establish and maintain a "comprehensive privacy and information security program" (the "Program") in order to "protect[] the privacy, security, confidentiality, and integrity" of certain user information. The Administrative Order details the required content of the Program, including, for example, the development and evaluation of risk-appropriate safeguards, employee training, and monitoring and reporting of certain security incidents to the FTC. Part V.E–I. The Administrative Order required Twitter to implement the Program by November 22, 2022. ECF No. 18 (Koffmann Decl.) ¶ 6.

Assessment of Twitter's Program by "qualified, objective, independent third-party professionals" is required by Part VI of the Administrative Order. Part VI sets forth detailed requirements for those assessments, which must cover five specific elements: (1) whether Twitter "has implemented and maintained the Program," (2) "the effectiveness of [Twitter's] implementation and maintenance" of the Program, (3) identification of "any gaps or weaknesses in, or instances of material noncompliance with, the Program[,]" (4) the status of any previously identified gaps or weaknesses, and (5) identification of the evidence the assessor relied upon and an explanation of why that evidence was appropriate and sufficient for its analysis. Part VI.D.

4

1   The assessor must sign its work and certify that it "conducted an independent review of the
2   Program and did not rely primarily on assertions or attestations by [Twitter's] management." *Id.*
3   In July 2022, Twitter executed a Statement of Work with Ernst & Young ("EY") to perform this
4   assessment. ECF No. 19-2.

5       X Corp. states that in the five months between the issuance of the Administrative Order on
6   May 26, 2022 and Elon Musk's acquisition of Twitter on October 27, 2022, the FTC sent Twitter
7   a total of three demand letters (one of which was sent on October 27, 2022). ECF No. 18
8   (Koffmann Decl.) ¶¶ 4-6.

### C. Elon Musk Acquires Twitter

X Corp.[2] reports that following Musk's acquisition of Twitter, the FTC has sent X Corp. 17 demand letters that incorporate more than 200 individual demands. ECF No. 18 (Koffmann Decl.) ¶ 7. In addition, the FTC has deposed five former Twitter employees, as well as David Roque, a partner at EY. *Id.* ¶ 8. The FTC has also sought to depose Musk. ECF Nos. 18-11 & 18-12. X Corp. characterizes this as a sharp increase in investigative activity, likely aimed at Musk personally, rather than legitimate investigative efforts.

The government says this increase in investigative activity should not be surprising because Musk directed at least five rounds of terminations, layoffs or other reductions in X Corp.'s workforce, which affected the security, governance, risk and compliance team. ECF No. 41 at 5-6. The government argues that the FTC was concerned about X Corp.'s ability to comply with the Administrative Order given these significant changes to the company. As for deposing Musk, the government argues that the major changes to the company appear to have been initiated by Musk himself. *Id.* at 7-8

The parties focus on Roque's deposition, highlighting different portions of his testimony. X Corp. generally argues that Roque's testimony shows that the FTC improperly bullied and badgered EY, in a way that is inconsistent with EY's role as an independent assessor. X Corp. quotes Roque testifying that the FTC's conduct made him "fe[el] as if the FTC was trying to

---

[2] Twitter merged with and into X Corp. ECF No. 18-6 (Delaware Secretary of State filing).

influence the outcome of the engagement before it had started . . ." ECF No. 18-14 at 120:20–22. He testified:

> [EY's] obligation under our contract is to go in and do the independent assessor report and then report the facts based on the results. In some of the discussions that we were having with the FTC, expectations were being conveyed about what those results should be before we had even begun any procedures, and I was concerned that there was this adversarial situation occurring where you had two competing parties that, stepping back, both had a desire for a certain outcome to occur that may not have always been aligned.

*Id.* at 122:4-14. "[T]he way the conversations with the FTC were transpiring" concerned Roque that the FTC could pose "an adverse threat [to EY]," meaning that the FTC could be "somebody outside of the arrangement [EY] had with Twitter trying to influence the outcome of [EY's] results." *Id.* at 120:23–121:2.

When the FTC attorney deposing Roque asked him to confirm that "no one from the FTC directed you to reach a particular conclusion about Twitter's program," he explained that "[t]here w[ere] suggestions of what they would expect the outcome to be." *Id.* at 122:20–24. Roque testified that the "outcome" he perceived the FTC expected was that EY "would conclude that there were deficiencies in Twitter's privacy and information security program." *Id.* at 120:20–22, 200:19–201:3.

Roque also testified that at a meeting in January 2023, the FTC gave EY "a list of specific[] . . . types of procedures they were expecting us to execute" and "provid[ed] areas that they were expecting us to look at" in connection with its "independent" assessment under the Administrative Order. *Id.* at 201:11–15. "It was almost as if [they] were giving us components of our audit program to execute." *Id.* at 203:17–21. Roque explained that this level of "third party" involvement in an independent testing engagement was "unusual," especially since EY conceived of its auditing role as limited to "look[ing] at the processes and controls" that make up the required elements of the Program and how they operate, "[n]ot going into some of the one-offs, very specific details [FTC staff] were asking us about." *Id.* at 203:13–204:25.

The government quotes different portions of Roque's deposition, focusing on why EY chose to resign as the independent assessor and emphasizing the government's theme that Twitter

6

was undergoing significant turmoil. Roque testified that EY chose to resign because of concerns "with the timing of the engagement . . .[,] the resource availability of the client to support and execute the engagement, [and] the ongoing changes amid the executive management team to be able to represent compliance with the order." *Id.* at 24:21-25:11. Because the "order has a very specific timeline for the end of the assessment period," EY and X Corp. had agreed that EY would "be onsite starting in January of 2023." *Id.* at 25:15-25, 26:8-13. However, when EY reached out in December 2022, they were informed that X Corp. "did not have the resources to facilitate [EY] beginning [its] procedures." *Id.* at 26:17-27:6. At least weekly thereafter, EY followed up on its request, but X Corp. continued pleading insufficient resources. *Id.* at 27:18-25. Finally, in February 2023, X Corp. proposed that EY begin field work procedures on March 15, 2023. *Id.* at 27:7-11. EY was concerned, however, that this truncated period was insufficient to "actually . . . complete or assess all of the controls that [it was] going to be required to look at" under the Administrative Order. *Id.* at 25:15-25.

Moreover, Roque explained that the "significant amount of turnover and departure of employees from the company" meant that there was "a very limited set of individuals that had been identified to facilitate [EY's] audit." *Id.* at 28:3-15. Further, "[t]he large number of departures that occurred at [X Corp.] in November and through early December just left holes operationally," including in terms of who could serve as the designated "owners" responsible for the various controls that made up the company's privacy and information security program. *Id.* at 33:9-34:24. These holes remained apparent to EY from information that X Corp. provided in December 2022 and January 2023. *Id.* at 34:25-35:9.

Finally, Roque testified there was "constant turnover" in "the executives that were . . . familiar with the [privacy and information security] programs that had been implemented." *Id.* at 38:15-23. As part of its assessment, EY "need[ed] to obtain a representation letter" from an X Corp. manager or executive who could "convey they have accurately represented and truthfully shared the operation of the program." *Id.* at 38:24-39:12. But by February 2023, EY was "wondering if [X Corp.] would be able to have somebody in a role that could make those types of attestations or representations to us." *Id.*

7

## II. ANALYSIS

**A. Rule 60(b) Motion**

### 1. Legal Standard

Rule 60(b)(5)-(6) states that "the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons . . . the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or any other reason that justifies relief."

"'[T]he power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible.'" *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 381 n.6 (1992) (quoting *New York State Ass'n for Retarded Children, Inc. v. Carey*, 706 F.2d 956, 967 (2d Cir. 1983)). "A district court may modify or terminate a consent decree, subject to abuse-of-discretion review, if changed circumstances have caused compliance with the decree to become substantially more onerous, have rendered the decree impracticable, or have caused its continued enforcement to be inimical to the public interest." *Coffey v. Braddy*, 834 F.3d 1184, 1193 (11th Cir. 2016) (cleaned up). "[A]ny showing of a significant change in factual conditions or law would justify a modification of a decree," *Patterson v. Newspaper & Mail Deliverers' Union of New York & Vicinity*, 13 F.3d 33, 37 (2d Cir. 1993) (applying a "flexible standard").

"In *Rufo v. Inmates of Suffolk County Jail,* the Supreme Court articulated the applicable two-prong standard for modifying a consent decree under Rule 60(b)(5)." *United States v. Asarco*, 430 F.3d 972, 979 (9th Cir. 2005). "The moving party must satisfy the initial burden of showing a significant change either in factual conditions or in the law warranting modification of the decree. The district court must then determine whether the proposed modification is suitably tailored to resolve the problems created by the changed factual or legal conditions." *Id*. (cleaned up). "In particular, [i]f the movant cites significantly changed factual conditions . . . it must additionally show that the changed conditions make compliance with the consent decree more onerous, unworkable, or detrimental to the public interest." *Id*. (cleaned up).

### 2. Analysis

X Corp. argues that the Court should terminate or modify the Stipulated Order in light of

8

the FTC's abusive investigation conduct.  X Corp. argues that the FTC radically shifted its investigative strategy after Musk acquired Twitter, imposing new and burdensome demands and treating the Stipulated Order as license for invasive scrutiny of any move X Corp. makes, no matter how remote from data privacy and security concerns.  X Corp. argues that the agency's ongoing overreach raises serious concerns about due process and prosecutorial misconduct, as well as the fairness of, and public confidence in, agency investigations and proceedings.  X Corp. in particular points to the FTC's alleged interference with EY's ability to be an independent assessor as striking at the heart of the compliance mechanism that was put in place.  X Corp. says that the FTC's newly adopted enforcement regime constitutes a "changed circumstance" rendering continued enforcement of the Stipulated Order "no longer equitable."

But there is a problem with this motion.  The obligations that X Corp. seeks to be relieved of come from the FTC's Administrative Order, *not* this Court's Stipulated Order.  Remember what the Stipulated Order did:  It made some findings; it imposed a monetary judgment; it ordered Twitter to consent to the reopening of the FTC proceeding and to the modification of the prior FTC order with the new one attached as Attachment A to the Stipulated Order; it gave DOJ the same rights the FTC has to obtain certain documents under the Administrative Order; and it retained jurisdiction "for purposes of construction, modification, and enforcement of this Stipulated Order."  ECF No. 11, Ex. A.

For the most part, the Stipulated Order does not require X Corp. to comply with the Administrative Order.[3]  The Administrative Order stands on its own as an FTC order.  The Court says "for the most part" because section III of the Stipulated Order obligates X Corp. to provide certain documents to DOJ that are contemplated by the Administrative Order, and DOJ would not otherwise have that right.  But even if the Court were to wipe away section III, such that literally nothing in the Stipulated Order required X Corp. to comply with the Administrative Order, X

---

[3] At the hearing, X Corp. shifted focus and argued that what it really wants is to be relieved of the Court's ability to enforce the Administrative Order via contempt sanctions.  This was a significant shift from the focus of the written briefing.  In any event, the Court is of the view that it has the power to enforce only the literal terms of the Stipulated Order.  Aside from the obligation to provide DOJ certain documents, the Stipulated Order does not require X Corp. to comply with the Administrative Order, which is therefore not enforceable by this Court via contempt sanctions.

Corp. would still be bound by the Administrative Order and subject to the FTC's enforcement of it. Indeed, even if the Court completely vaporized the entirety of the Stipulated Order, X Corp. would still be bound by the Administrative Order.

As noted previously, section II of the Stipulated Order provides that:

> IT IS FURTHER ORDERED that Defendant, and its successors and assigns, shall consent to: (i) reopening of the proceeding in FTC Docket No. C-4316; (ii) waiver of its rights under the show cause procedures set forth in Section 3.72(b) of the Commission's Rules of Practice, 16 C.F.R. § 3.72(b); and (iii) modifying the Decision and Order in *In re Twitter, Inc.*, C-4316, 151 FTC LEXIS 162 (F.T.C. Mar. 2, 2011), with the Decision and Order set forth in Attachment A.

The Court reads this provision literally to mean that it ordered Twitter to consent to the reopening of the FTC proceeding, to waive its rights under the FTC's show cause procedures, and to consent to the modification of the previous FTC order with the new Administrative Order. This sped up the issuance of the Administrative Order, but it does not mean that the Administrative Order *became* a Court order. And though this Court's Stipulated Order sped up the issuance of the Administrative Order, it did not breathe life into it. The Administrative Order has life and legal force because it is an FTC order.

Rule 60(b) allows the Court to modify its *own* orders, not another tribunal's orders. There is no modification the Court can make to the Stipulated Order that will relieve X Corp. of the obligation to comply with the Administrative Order. (And please remember that this case is not a petition to review an FTC order, which cannot be filed in a district court anyway. 15 U.S.C. § 45(c).) The Court lacks the power to grant X Corp. the requested relief, i.e., relief from its prospective obligations under the Administrative Order. Accordingly, X Corp.'s motion to terminate or modify the Stipulated Order is **DENIED**.

### B. Alternative Request for Discovery or to Stay Musk's Deposition

There is authority for the proposition that the Court may order discovery in aid of a Rule 60(b) motion. *See, e.g., Midwest Franchise Corp. v. Metromedia Restaurant Group, Inc.*, 177 F.R.D. 438, 442 (ND. Iowa 1997); *Sathianathan v. Smith Barney, Inc.*, 2007 WL 2417370, *3 (N.D. Cal. Aug. 24, 2007) ("some preliminary discovery before a ruling on a Rule 60 Motion is

10

appropriate so long as a party acts in good faith and makes out a reasonable case that discovery might lead to relevant information") (cleaned up).

Here, however, no discovery is necessary or appropriate. The flaw in X Corp.'s motion is purely legal: X Corp. is seeking to be relieved from its prospective obligations under the Administrative Order, and there is no order the Court can issue under Rule 60(b), or under any other Rule, that would accomplish that. Accordingly, discovery would not serve any purpose for this judicial proceeding.

The Court also does not understand how it could order the FTC not to depose Musk. The Stipulated Order does not mean that the Court is supervising the FTC's enforcement of the Administrative Order.

X Corp.'s alternative request for discovery or to stay Musk's deposition is therefore **DENIED**.

### III. CONCLUSION

X Corp.'s motion is **DENIED** in its entirety.

**IT IS SO ORDERED.**

Dated: November 16, 2023

THOMAS S. HIXSON
United States Magistrate Judge

11